**GARDY & NOTIS, LLP**
Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7337
Fax: 201-567-7377

Counsel for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES E. HUMPHREY, JR.,<br><br>                    Plaintiff,<br><br>          v.<br><br>VIACOM INC.,<br>CBS CORPORATION,<br>CBS TELEVISION NETWORK,<br>SPORTSLINE.COM, INC.,<br>THE WALT DISNEY COMPANY,<br>ESPN, INC.,<br>THE HEARST CORPORATION,<br>VULCAN, INC.,<br>VULCAN SPORTS MEDIA and<br>THE SPORTING NEWS,<br><br>                    Defendants. | No.<br><br>__COMPLAINT__<br><br>__JURY TRIAL DEMANDED__ |

Plaintiff, by his undersigned counsel, alleges the following upon personal knowledge as to himself and upon information and belief as to all other matters. The allegations based upon information and belief were formed after an inquiry reasonable under the circumstances.

## ALLEGATIONS PURSUANT TO LOCAL CIVIL RULE 10.1

1.      The names and addresses of the parties are as follows:

**Plaintiff**

Charles E. Humphrey, Jr.
c/o Gardy & Notis, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632

**Defendants**

Viacom, Inc.
1515 Broadway
New York, New York 10036

CBS Corporation
51 West 52nd Street
New York, New York 10019

CBS Television Network
1515 Broadway
New York, New York 10036

Sportsline.Com, Inc.
2200 West Cypress Creek Road
Fort Lauderdale, Florida 33309

The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

ESPN, Inc.
935 Middle Street
Bristol, Connecticut 06010

The Hearst Corporation
959 Eighth Avenue
New York, New York 10019

Vulcan, Inc.
505 5th Avenue South
Seattle, Washington 98104

Vulcan Sports Media
10176 Corporate Square Drive
St. Louis, Missouri 63132

The Sporting News
475 Park Avenue South
New York, New York 10016

## NATURE OF THE ACTION

2.      Plaintiff brings this action against the major operators of Internet fantasy sports leagues for violations of the anti-gambling and gambling loss recovery laws of New Jersey and other states with similar prohibitions.

3.      Each of the defendants operated and promoted Internet fantasy sports leagues in which the participants agree to pay a specified amount of money to participate; the determination of winners is based predominantly on chance rather than skill; and the winners receive a monetary or other valuable prize.  Defendants receive the wagers made by participants to play in the fantasy sports leagues.  These wagers represent gambling losses.  The wagers are the source of revenues and profits to defendants from operating these Internet fantasy sports leagues.

4.      Despite the illegal nature of such gambling in New Jersey and the United States in general, defendants actively and knowingly facilitate illegal Internet gambling by operating fantasy sports leagues through their Internet websites throughout the United States.  The revenues that defendants earn from the operation of these Internet fantasy sports leagues are derived directly from the wagers made by players, denominated by defendants as membership or participation fees charged to the participants in the league.  Such wagers range from $9.95 to $499.95 per team.

5.      During the past year, revenues from the operation of fantasy sports leagues are estimated to have been over $1.5 billion, resulting in defendants having received and retained substantial gambling losses incurred by players who are members of the general public throughout the United States.

3

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 and no plaintiff is resident of the same state as any defendant.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.

7.     This Court has personal jurisdiction over defendants because each defendant conducts substantial business in New Jersey.  Each of the defendants has sufficient minimum contacts with New Jersey or otherwise intentionally avails itself of the consumer markets within New Jersey through its targeting of persons in New Jersey to participate in their Internet fantasy sports leagues and through its advertising and marketing activities in New Jersey.

8.     Venue is proper as the acts upon which this action is based occurred in part in this District.  Further, defendants received and retained substantial wagers made by members of the public in this District and defendants' liability arises, in part, through their promotion of the illegal gambling and related activities that occurred in this District.

## THE PARTIES

9.     Plaintiff Charles E. Humphrey, Jr. ("Humphrey") has not engaged in any of the gambling activities described herein.  Humphrey is a resident of Jefferson County, Colorado.

10.     Defendant Viacom Inc. ("Viacom") is a worldwide entertainment and publishing company.  At all relevant times, Viacom has exercised dominion and control over its subsidiaries and divisions, and Viacom is liable for the acts of such subsidiaries and divisions as set forth herein.  On January 1, 2006, Viacom completed various corporate transactions to separate itself into two publicly traded entities: CBS Corporation and "new" Viacom, Inc.  Viacom's principal place of business is located at 1515 Broadway, New York, New York 10036.

4

11.     Defendant CBS Corporation ("CBS Corp.") is comprised of CBS Television Network, UPN, CBS Radio, Viacom Outdoor, Viacom Television Stations Group, Paramount Television, King World, Simon & Schuster, Showtime and Paramount Parks, and is liable for the acts of such subsidiaries and divisions as set forth herein.  CBS Corp.'s principal place of business is located at 51 West 52nd Street, New York, New York 10019.

12.     Defendant CBS Television Network ("CBS") is included in the Television segment of defendant Viacom.  CBS distributes a comprehensive schedule of news and public affairs broadcasts, sports and entertainment programming to more than 200 domestic affiliates throughout the United States.  CBS is a subsidiary of Viacom and CBS Corp.  CBS's principal place of business is located at 1515 Broadway, New York, New York 10036.

13.     Through CBS.com and CBSNews.com, defendants Viacom, CBS Corp.  and CBS operate Web sites that collectively received more than 1.5 billion page views in 2004 and, according to Nielsen/NetRatings, attracted an average audience of 7.7 million U.S.  monthly unique visitors.  These Internet sites derive revenue from a combination of advertising and sponsorships, subscription services and e-commerce.  CBS.com is responsible for the CBS's promotional Web sites, online subscription services, fantasy leagues and interactive voting technology.  Both sites provide links to defendant CBS.SportsLine.com

14.     Defendant SportsLine.com, Inc. ("SportsLine") is a provider of online sports content, services and merchandise on a domestic and international basis, though its Internet site CBS SportsLine.com.   In December 2004, Viacom took SportsLine private through an acquisition of all of the publicly held shares in SportsLine.  SportsLine's principal place of business is located at 2200 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

15.     Through the website CBSSportsLine.com, defendants Viacom, CBS Corp., CBS and SportsLine (collectively, the "CBS defendants") operate fourteen pay-to-play fantasy sports leagues (the "SportsLine Leagues") involving professional football, basketball, baseball and hockey.  The entry fee for each of the SportsLine Leagues ranges from $29.95 to $499.95.  The potential prize amounts for the winner of each twelve-team league range from $150 to $3,600.  This results in a gross profit to the CBS defendants of approximately as little as $200 to as much as $2,400 per twelve-team group, or from 40-60% of the total amounts wagered by participants in the SportsLine Leagues.  Such profit constitutes a winner's share of the bets made by the players in these fantasy sports leagues.

16.     Defendant The Walt Disney Company ("Disney"), together with its subsidiaries, is a diversified worldwide entertainment company.  ABC, Inc., an indirect subsidiary of Disney, owns 80% of defendant ESPN, Inc.  At all relevant times, defendant Disney has exercised dominion and control over its subsidiaries and divisions and is liable for the acts of such subsidiaries and divisions as set forth herein.  Disney's principal place of business is located at 500 South Buena Vista Street, Burbank, California 91521.

17.     Defendant ESPN, Inc. ("ESPN") is a multinational, multimedia sports entertainment company.  Through its website, ESPN.com, ESPN delivers comprehensive sports news, information and video to millions of fans each month.  ESPN.com averages sixteen million users per month.  ESPN is 80 percent owned by ABC, Inc., an indirect subsidiary of Disney, and 20% by The Hearst Corporation.  ESPN's principal place of business is located at 935 Middle Street, Bristol, Connecticut 06010.

18.     Defendant The Hearst Corporation ("Hearst") is a diversified communications company.  Hearst owns 20% of defendant ESPN.  At all relevant times, defendant Hearst has

exercised dominion and control over its subsidiaries and divisions and is liable for the acts of such subsidiaries and divisions as set forth herein.  Hearst's principal place of business is located at 959 Eighth Avenue, New York, New York 10019.

19.     Disney, ESPN and Hearst (collectively, the "ESPN defendants"), through the ESPN.com website, operate paid fantasy leagues in professional baseball, basketball, and hockey (the "ESPN Leagues").  The entry fee for one team in each of the ESPN Leagues ranges from $19.95 to $29.25.  The potential prizes, dependant upon the number of entrants, range from $15 to $5,000.  The profits received by the ESPN defendants constitute a winner's share of the bets made by the players in these fantasy sports leagues.

20.     Defendant Vulcan, Inc. ("Vulcan") is a private company founded in 1986 by Paul G.  Allen to manage his personal and charitable endeavors.  Vulcan includes Allen's stake in Microsoft, as well as holdings in dozens of companies providing computer, technology, multimedia, and communications products and services; some recent portfolio additions include biotechnology ventures, energy, and real estate assets.  Allen also owns professional sports teams like the NBA's Portland Trail Blazers and the NFL's Seattle Seahawks, as well as stakes in six charitable organizations.  At all relevant times, Vulcan has exercised dominion and control over its subsidiaries and divisions and Vulcan is liable for the acts of such subsidiaries and divisions as set forth herein.  Vulcan's principal place of business is located at 505 5th Avenue South, Seattle, Washington 98104.

21.     Defendant Vulcan Sports Media ("Sports Media") is owned by Vulcan.  Sports Media operates defendant The Sporting News.  At all relevant times, Sports Media has exercised dominion and control over its subsidiaries and divisions and is liable for the acts of such

subsidiaries and divisions as set forth herein. Sports Media's principal place of business is located at 10176 Corporate Square Drive, St. Louis, Missouri 63132.

22.     Defendant The Sporting News ("TSN") is the country's oldest and one of its largest sports magazines. TSN is owned by defendant Sports Media. Through its website Sportingsnews.com, Vulcan, Sports Media and TSN (collectively, the "TSN defendants") operate several paid fantasy sports league in professional hockey, basketball, stock car racing, football and baseball (collectively, the TSN Leagues"). The entry fee for one team in each of the TSN Leagues ranges from $9.99 to $199.95. The total prize value, dependant upon the number of entrants, in each league ranges from more than $10,000 to $124,000, with the individual prizes ranging from $25 to 10,000. The profits received by the TSN defendants constitute a winner's share of the unlawful bets made by the players in these fantasy sports leagues. TSN's principal place of business is located at 475 Park Avenue South, New York, New York 10016.

## THE HISTORY OF FANTASY SPORTS

23.     Today's fantasy sports phenomenon is an outgrowth of Rotisserie Baseball created by journalist, Daniel Okrent. While commuting between Hartford, Connecticut and Austin, Texas in the fall of 1979, Okrent devised the rules for what later became known as Rotisserie Baseball.

24.     Under Okrent's rules, each team received a budget of $260 to draft twenty-three players from the American or National Baseball League, filling slots by position: nine pitchers, five outfielders, one shortstop, etc. Players were auctioned off to the highest bidder, and each team's performance was based on the cumulative statistics of its players in eight categories.

25.     Okrent, eager to test his invention, introduced the games to his friends and colleagues and in 1980 the first fantasy baseball league was created consisting of ten teams. At

the end of the season, the winner received a ceremonial Yoo-Hoo shower.  Due to the journalistic connections of the members of the Okrent league, rotisserie baseball spread quite rapidly.  By the late 1980s, the game had surpassed its cult status.  In 1989, The Sporting News estimated that nearly 500,000 people played.

26.     By the early 1990s, rotisserie baseball led to rotisserie football and basketball, which spawned a multitude of other fantasy sports.  However, the Internet boom of the late 1990s changed the theretofore predominantly social and entertainment nature of the game.  The Internet transformed a small game among friends into a multi-billion dollar industry dominated by some of the country's largest corporations.  The president of the Fantasy Sports Trade Association, Greg Ambrosius, summed it all up, as reported in a June 21, 2004 article in *Sports Illustrated*:  "But this isn't a small closet hobby anymore.  This sumbitch is a big, big industry, and it's all due to the Internet."

27.     The impact of the Internet on the fantasy sports industry is demonstrated by the amount of money and resources companies have invested in their fantasy sports leagues in the past ten years.  In 1996, SportsLine employed three people to run its fantasy operation; in 2004, fifty people contributed to the site's fantasy operations, including an editorial staff of six (who offer advice to fantasy team owners).  Of the company's $57.6 million in revenue in 2003, $15.9 million, or 28%, came from fantasy sports, a 34% increase over 2002.  SportsLine's fantasy football leagues alone attracted 1.3 million paid users in the fall of 2003, according to a study done by Nielsen/NetRatings.  Of the two million people who visited the site during the month of October 2003, 1.32 million were fantasy players.  "I've seen our game go from having a minor cult following to being a major part of our success," said Scott Engel, SportsLine senior producer of fantasy sports, in a June 21, 2004 article in *Sports Illustrated*.

9

28.     The Internet sports sites, such as CBS SportsLine.com, began their involvement in fantasy sports by providing statistics, player evaluations and injury reports via their websites. Defendants and other operators of fantasy sports leagues quickly recognized the profit available to them from the wagers placed by the players in these fantasy sports leagues and began to operate their own leagues, requiring bets to be made by players, which were denominated as "entry fees," for the chance to win a prize. Defendants' fantasy sports leagues are generally open to anyone over the age of thirteen.

29.     In addition, each of the television networks, including CBS, ABC and ESPN (owned and operated by defendants), now include "Fantasy Updates," which include commentary on professional players from the perspective of fantasy team owners. These networks also provide statistics from all games along the bottom of the screen during broadcasts of sporting events so that fantasy team owners are kept up-to-date on the performance of their players.

30.     A recent Harris poll estimated that nearly thirty million Americans play fantasy sports, averaging $110 a year per sport in wagers. An industry trade group estimates that more than a million leagues exist for baseball and football alone.

31.     A 2005 survey estimates that the number of Americans playing fantasy football now tops twelve million. This same survey estimates that the average fantasy players compete in two and a half leagues per sport at a cost of $150 per team, or $375 per year.

## THE SPORTSLINE LEAGUES

32.     The CBS defendants offer thirteen online fantasy sports leagues in which participants pay for the chance to win a prize. If a participant is not already a CBS SportsLine

member, he or she is prompted to register online with CBS SportsLine prior to signing up for any

of the fantasy sports leagues.

33.     The following table illustrates the wagers placed and the available potential

prizes:

| **Sport** | **League** | **Cost** | **Prize** |
|---|---|---|---|
| Football | Gold | $39.95 for first team<br>$29.95 for each add'l team | $200 |
| | Platinum | $99.95 for first team<br>$79.95 for each add'l team | $600 |
| | Diamond | $249.95 for first team<br>$229.95 for each add'l team | $1,600 |
| | Double Diamond | $499.95 per team | $3,500 |
| Baseball | Gold | $29.95 for the first team<br>$24.95 for each add'l team | $150 |
| | Platinum | $99.95 for first team<br>$79.95 for each add'l team | $600 |
| | Diamond | $249.95 for first team<br>$229.95 for each add'l team | $1,600 |
| | Double Diamond | $499.95 for first team<br>$449.95 for each add'l team | $3,500 |
| Basketball | Gold | $29.95 for the first team<br>$24.95 for each add'l team | $150 |
| | Platinum | $99.95 for first team<br>$79.95 for each add'l team | $600 |
| | Diamond | $249.95 for first team<br>$229.95 for each add'l team | $1,600 |
| Hockey | Gold | $29.95 for the first team<br>$24.95 for each add'l team | |

| Sport | League | Cost | Prize |
|---|---|---|---|
| | Platinum | $99.95 for first team<br>$79.95 for each add'l team | $600 |
| | Diamond | $249.95 for first team<br>$229.95 for each add'l team | $1,600 |

34.  Payouts are awarded only to the first place winner of each twelve-team league.

35.  The CBS SportsLine Leagues are open to legal residents of the fifty United States (excluding Puerto Rico and residents of Arizona, Iowa, Louisiana, Maryland, Montana and Vermont), Washington D.C., and Canada (excluding Quebec) eighteen years of age or older. Legal residents of Arizona, Iowa, Louisiana, Maryland, Montana and Vermont and contestants under the age of eighteen, may pay to play but are not eligible to win any prizes.

## THE ESPN LEAGUES

36.  The ESPN defendants offer fantasy football, baseball, basketball and hockey leagues in which participants pay for the chance to win a prize.  If a participant is not already a registered member of ESPN.com (or of an affiliated website, e.g., ABC.com, ABCNews.com, DisneyOnline.com, EXPN.com, Family.com and Movies.com), he is prompted to register online with ESPN.com prior to signing up for any of the fantasy sports leagues.

37.  The following table illustrates the wagers placed and the available potential payouts:

12

| Sport | Cost | Prize |
|---|---|---|
| Football | $29.95 per team<br>3 team package = $49.95<br>5 team package = 69.95 | 1st place overall = One Plasma Widescreen High Definition TV (approximate retail value of $5,000), plus hotel and airfare for trip to Detroit and participation in ESPN events and publications |
| Baseball | $29.95 for first time owners<br>$24.95 for owners of teams in any of the other fantasy sports<br>$19.95 for ESPN Insiders Subscribers<br>$17.95 for each add'l team<br>3 team package = $49.95<br>5 team package = $69.95 | 1st place overall = $3,000 Best Buy Gift Card<br>2d place overall = $1,100 Best Buy Gift Card<br>3d place overall = $499 |
| Basketball | $29.95 for first time owners<br>$24.95 for owners of teams in any of the other fantasy sports<br>$19.95 for ESPN Insiders Subscribers<br>$17.95 for each add'l team<br>3 team package = $49.95<br>5 team package = $69.95 | 1st place overall = $3,000 Best Buy Gift Card<br>2d place overall = $1,100 Best Buy Gift Card<br>3d place overall = $499 |
| Hockey | $29.95 for first time owners<br>$24.95 for owners of teams in any of the other fantasy sports<br>$19.95 for ESPN Insiders Subscribers<br>$17.95 for each add'l team<br>3 team package = $49.95<br>5 team package = $69.95 | 1st place overall = $3,000 Best Buy Gift Card<br>2d place overall = $1,100 Best Buy Gift Card |

38.     Each of the ESPN Leagues offer both Rotisserie and Head-to-Head scoring options.  Payouts are indicated to the top three scoring teams in the entire league in each scoring option.  In addition, the winner of each twelve-team league receives the choice of a Champion T-shirt or a mini-banner valued at $15 each.

39. The ESPN Leagues are open to registered users of ESPN.com who are legal residents of the fifty United States including Washington D.C., and Canada (excluding Quebec) thirteen years of age or older. Residents of Arizona, Florida, Louisiana, Montana and Vermont may pay to play but are not eligible to win any prizes.

## THE TSN LEAGUES

40. The TSN defendants offer paid fantasy baseball, basketball, football, hockey and stock car racing leagues in which participants pay for the chance to win a prize. If a participant is not already a registered member of Sportingnews.com, he is prompted to register online with Sportingnews.com prior to signing up for any of the fantasy sports leagues. Payment of an entry fee is required to participate in each of the TSN Leagues.

41. The following table illustrates the wagers placed and the available potential prizes:

| Sport | League | Cost | Prize |
|---|---|---|---|
| Baseball | Fantasy Baseball Commissioner | 1 team =  $24.99<br>3 teams = $49.99<br>5 teams = $99.99 | 1st place= $100<br>2d place = $25 |
| Basketball | Fantasy Hoops | 1 team =  $17.99<br>3 teams = $34.99<br>5 teams = $39.99 | 1st place= $75<br>2d place = $25 |
| | Ultimate Salary Cap Fantasy Hoops | 1 team =  $24.99<br>3 teams = $69.99<br>5 teams = $99.99 | $1,500 to $25 |

14

| Sport | League | Cost | Prize |
|---|---|---|---|
| Football | Fantasy Football:<br>Competitor's Edition | 1 team =  $9.99<br>3 teams = $19.99<br>5 teams = $29.99 | $5,000 to $25 |
| | Fantasy Football:<br>Expert's Edition | 1 team =  $24.99<br>3 teams = $64.99<br>5 teams = $99.99 | 1st place = $100<br>2d place = $25 |
| | Ultimate Salary Cap Football | 1 team =  $24.99<br>3 teams = $69.99<br>5 teams = $99.99 | $10,000 to $25 |
| | Masters Salary Cap Football<br>(participants eligible to receive the overall and roster value prizes available in the Ultimate Salary Cap Football competition) | $199.95 | 1st place = $1,200<br>2d place = $400<br>3d place = $200 |
| Hockey | Ultimate Salary Cap Hockey | 1 team =  $17.99<br>3 teams = $34.99<br>5 teams = $52.99 | $1,500 to $25 |
| Stock Car Racing | Ultimate Fantasy Stock Car | 1 team =  $17.99<br>3 teams = $34.99<br>5 teams = $52.99 | $2,000 to 25 |

42.    In the Ultimate Salary Cap Fantasy Hoops, Ultimate Salary Cap Football, Ultimate Salary Cap Hockey and Fantasy Stock Car leagues, prizes are also available for the first five finishers with top roster value ranging from $250 to $25.  In addition, the first place team in each league in Ultimate Salary Cap Football, Ultimate Salary Cap Hockey (of at least ten teams) and Fantasy Stock Car (of at least twelve teams) receives $50.

43.    In Fantasy Football: Competitor's Edition, payouts are made to each manager in the top twenty-five leagues, ranging from $100 per manager in the 1st place league to $25 to

each manager in the 11th to 25th leagues.  In Fantasy Stock Car leagues, the first place team each week is awarded $100.

44.     The TSN leagues are open to legal residents eighteen years of age or older of the continental United States, Washington D.C., and Canada.  Residents of Arizona, Colorado, Florida, Louisiana, Maryland, Minnesota, Montana, North Dakota, Vermont and Quebec may pay to play but are not eligible to win or receive any prizes.

## HOW FANTASY SPORTS ARE PLAYED

45.     The first order of business in creating any fantasy league is collecting members. Operating as virtual team owners, individuals draft real-life players to be members of their respective fantasy teams.  The statistics these players generate in real games are collected, and fantasy points are awarded based on these statistics -- the better a fantasy owner's real-life players perform, the more fantasy points he accrues for his fantasy team.  These points ultimately determine a winner in either rotisserie or head-to-head scoring options, the latter featuring weekly match-ups between the league's teams.  The the team that accumulates the most points or victories over the course of the season -- and in the case of head-to-head prevails in the postseason -- is declared the league winner.  A key aspect of success in fantasy sports leagues, over which the fantasy team owners have no control, is that the players drafted remain healthy and available to play.

46.     Each competition is comprised of leagues that include eight, ten or twelve teams. Each team consists of a specified number of real-life players in that sport.  From those players, team owners select a starting/active roster of a smaller number of players that includes a number of players at each position.

16

47.     Fantasy competitions involve a choice of two different types of scoring: Rotisserie (each team is ranked in a number of statistical categories and points are awarded based on a fantasy team's ranking in each category) and Head-to-Head (two teams are matched up against each other each week and the team earning the most points wins the weeks' match up). Fantasy football leagues frequently involve only Head-to-Head scoring while the other sports leagues usually involve a choice of the two.

48.     In all leagues, owners may, throughout the season, attempt to improve their team rosters by adding available free agents, dropping players who aren't performing to their expectations or trading players with owners of other teams in the league pursuant to the rules of the league.

## FANTASY SPORTS ARE GAMES OF CHANCE

49.     Because the winners of fantasy sports leagues are determined by the statistics of actual players in the National Football League ("NFL"), National Hockey League ("NHL"), National Basketball Association ("NBA"), Major League Baseball ("MLB") and NASCAR, fantasy sports are games of chance.  Attempts by third parties to predict the future performances of athletes involve chance guesses.  In the same way that bettors on the outcomes of horse races and sporting events cannot control the performance of the horses or teams on which they bet, fantasy sports contestants lack the ability to accurately predict and control the performance of their respectively drafted athletes.  Thus, the elements of chance predominate over the elements of skill in determining the distribution of prizes.

50.     Even more so than in the case of real-world team owners, factors beyond the fantasy team owner's control can and frequently do affect whether the team wins or loses, such as injuries, weather, and personal tragedies in players' lives.  Even the most unforeseeable events

can affect a team's chances.  For example, when an NFL team has a commanding lead and does not wish to "run up the score," the real life coach will remove star players from the remainder (sometimes a substantial portion) of the game.  This is clearly contrary to the interest of fantasy team owners who have those star players on their teams, whose interests are best served when their best players play an entire game and accumulate as many favorable statistics as possible.

51.    Further, often teams will withhold announcing that a player will not be playing until game day.  If that announcement occurs after a fantasy team owner has set his or her starting lineup, that team will include a player that cannot earn any points, ultimately decreasing the fantasy team's chance for a good performance.

52.    Professional athletes are at constant risk for injury on the field.  The chance that a fantasy sports team owner's star player gets injured and is out for the part or all of a season can easily destroy the entire fantasy season.  That owner is then left to scramble to replace that player with a player who most likely will not have the same high statistics that caused the owner to choose the "star" in the first place.

53.    For example, in the 2000 through 2003 seasons, NFL players racked up 6,558 injuries.  More than half of the athletes were injured annually, with the number spiking at 68% in 2003-2004, according to the NFL's weekly injury reports.  Real-life teams are comprised of starters and bench players who stand ready to take the place of the injured player.  In a fantasy league, when an active player is injured on the first play of a game or week, the fantasy owner plays the remainder of that game or week short-handed.

54.    Similarly, during the 1999 MLB season, eighty-three players appeared on the Disabled List for a total of 6,022 days solely with injuries to the shoulder described as "inflammation," tendonitis," or "strain."

55.    A study of NBA players from the 1988-1989 through the 1997-1998 seasons showed that 75.2% of all illnesses and injuries suffered during that period were athletic related and that those athletic-related injuries resulted in 93.3% of all days missed.  The study's results also showed that game related injuries increased 12.4% during the ten-year period.

56.    In addition to injuries that are sustained during play, over the years there have been numerous unusual injuries that occurred off the field, which managers, coaches, team physicians and fantasy sports team owners could not foresee.  For example, NFL star quarterback Ben Roethlisberger was injured in an off the field motorcycle crash, MLB player John Smoltz burned his chest while ironing a shirt that he was wearing and Wade Boggs hurt his back when he lost his balance while trying to put on cowboy boots.

57.    The death of a family member may also cause professional athletes to miss one or more games.  Just as in real life, professional athletes handle personal tragedy in different ways. In October 2005, two NFL players both suffered the tragedy of the unexpected deaths of their brothers.  Paul Spicer, starting defensive end for the Jacksonville Jaguars, learned his brother had been murdered in their hometown of Indianapolis.  Spicer flew to Indianapolis that day, publicly offered a $20,000 reward for information on his brother's killer and then returned in time to play in the Jaguars' victory over the Pittsburgh Steelers three days later.  Meanwhile, Leonard Little, the St. Louis Rams' standout end, missed at least two games while he grieved the death of his brother, who was shot in Knoxville, Tenn.  Just as there is no way to predict the death of a family member, fantasy sports team owners cannot predict how any of their players will react to such a tragedy.  However, it is certain that the effect of such players missing a game will have detrimental effects on their fantasy teams.

19

58.     NBA star of the Detroit Pistons, Ben Wallace missed at least two games in 2004 due to the death of his brother.  Wallace, a Center is a member of the upper echelon of NBA players, whose absence for several games undoubtedly had serious consequences for the owners of fantasy teams of which he was a member.

59.     Often, a professional athlete engages in conduct that is contrary to the rules of the league or his team and as a result he is suspended for an entire season.  In 2003, NHL Vancouver Canucks forward Todd Bertuzzi was suspended indefinitely for punching Colorado's Steve Moore from behind, then driving him headfirst into the ice, causing him to suffer three fractured vertebrae and post-concussion symptoms.  Bertuzzi missed the rest of the regular season and the playoff season but his suspension was lifted in August 2005, prior to the start of the 2005-2006 season.

60.     Similarly, a November 2004 brawl between players on the NBA Indiana Pacers and the Detroit Pistons that spilled into the stands led to three Indiana players being suspended for twenty-five or more games.  Jermaine O'Neal was suspended for twenty-five games (later reduced to fifteen games) and Stephen Jackson was suspended for thirty games for their roles in the brawl.  The severest penalty was issued to Ron Artest who was suspended for the entire season.  No matter how skillfully the fantasy team owner drafted the players on his or her team, the unforeseen loss of players such as O'Neal, Jackson and Artest probably destroyed several fantasy basketball teams that season.

61.     There are numerous other factors that contribute to the success or failures of professional sports teams and fantasy sports teams as well, such as pure luck.  Brian Campbell of the NHL Buffalo Sabres explained: "We've just been fighting and working hard, but there's been a lot of luck too, and you need that to win games."

62. NFL Seattle Seahawk's coach, Mike Holmgren, acknowledged that the same is true in the NFL: "To say that luck doesn't play a little or the ball bounces your way doesn't play a part in this business, you're nuts. It happens. We've had a couple in the last couple years that were horrible losses that bounced the other way, so it's nice to go through a season where every once in a while, it kind of goes your way. (November 30, 2005 press conference.)

63. The number one priority of real life sports teams is to win the game, with everything else being a distant second. There are numerous obvious examples of inconsistencies between the goals of real life and fantasy team owners. For example, when their teams are comfortably ahead, real life coaches take their stars -- whose statistics that day are the only relevant factor to the fantasy owner -- out of the game and give a chance to young or bench players. In real life baseball, poor fielders are sometimes removed in late innings of close games, depriving a fantasy owner the possibility of more at-bats which can result in better statistics. In football, hockey, and basketball, clock management in the late stages of games is of paramount concern, much to the chagrin of the fantasy owner looking to compile statistics for his players. In baseball, with first base open, the real life manager often elects to walk the star batter – a disappointing event to both the fantasy owner of the pitcher who suffers a negative statistics and the fantasy owner of the batter, who misses the opportunity to collect a hit or a run-batted-in ("RBI"). Errors by fielders are bad for the real life team trying to win, but not for the fantasy owner of the pitcher who is indifferent to unearned runs or batters who reach base on errors.

## COUNT I

### Recovery under State Gambling-Loss Recovery Laws

64.     Plaintiff Humphrey repeats and realleges as if fully set forth herein, each and every allegation contained above and further alleges the following:

65.     The following table sets forth certain information about state laws that authorize a qui tam, or private attorney general, plaintiff to recover the individual gambling losses of others (the "State Qui Tam Gambling-Loss Recovery Laws").  The columns show:

a.      **State** shows the name of the particular state.

b.      **Statute** gives the applicable section of that state's statutes.

c.      **Treble** indicates whether the statute allows for treble and/or quadruple) recovery.

d.      **Recover After** sets forth the time frame in which the actual loser has the exclusive right to recover gambling losses; and

e.      **Recovery Sharing** indicates if the losses recovered are shared with a state or local agency.  Where sharing is required, the amount shared is one-half to the qui tam plaintiff and one-half to the state or local agency indicated.

| State | Statute | Treble | Recover After | Recovery Sharing |
|---|---|---|---|---|
| District of Columbia | D.C. Code §16-1702 | Yes | 3 months | Dist. of Columbia |
| Georgia | O.C.G.A §13-8-3(b) | No | 6 months | County educational fund |
| Illinois | 720 ILS 5/28.8 | Yes | 6 months | No sharing |

22

| State | Statute | Treble | Recover After | Recovery Sharing |
|---|---|---|---|---|
| Kentucky | KSR §§372.020 & 372.040 | Yes | 6 months | No sharing |
| Massachusetts | ALM GL Ch. 137, §1 | Yes | 3 months | No sharing |
| New Jersey | N.J.S.A. §2A:40-6 | No | 6 months | State of N.J. |
| Ohio | ORC §3763.02 | No | 6 months | No sharing |
| South Carolina | S.C. Code Ann. §32-1-20 | Quadruple | 3 months | County where offense committed |

(The full text of each of the indicated state statutes is set forth in Annex A hereto.)

66.     N.J.S.A. §2A:40-6 is fairly typical of the State Qui Tam Gambling-Loss Recovery Laws.  It provides "If the person who shall lose and pay such money, shall not, within [six months], without collusion, sue for the money or other thing or things so lost and paid, or delivered, any other person may sue for and recover the same, with costs of suit, from such winner, depositary or stakeholder as aforesaid; the one moiety [one-half] thereof to the use of the person suing for the same, and the other moiety to the use of the state; provided the action is instituted within six calendar months from and after the expiration of the [six months allotted as the time] for the loser to sue for the same."

67.     As of the date of filing of this action, no civil action invoking any of the State Qui Tam Gambling-Loss Recovery Laws was pending in any court.

68.     During the relevant periods for a loser to sue under the State Qui Tam Gambling-Loss Recovery Laws each of the defendants acted in operating and promoting and/or aiding and abetting the operation and promotion of unlawful gambling schemes in which (i) the players agree to pay a specified amount of money to participate; (ii) the winning wager, bet or stake is

23

achieved based predominantly on the lot, chance, casualty or unknown or contingent event; and
(iii) the winners receive a monetary prize.

69.     Pursuant to defendants' gambling schemes, and during that time, defendants acted
as the depository or stakeholder for bets placed by members of the general public and were the
winners of those bets to the extent not paid out to winners in the fantasy leagues operated by
defendants.

70.     The fantasy sports leagues operated by defendants were continuously promoted
during all relevant periods by defendants.

71.     Players participated in defendants' Internet fantasy sports leagues at a cost
ranging from $9.95 to $499.95.

72.     Winning players in defendants' Internet fantasy sports leagues receive monetary
prizes ranging from $25 to $10,000.

73.     All wagers, bets or stakes placed or made pursuant to the foregoing scheme were
unlawful gambling transactions in violation of the relevant State Qui Tam Gambling-Loss
Recovery Laws.

WHEREFORE, plaintiff respectfully request the following relief:

A.      Pursuant to the State Qui Tam Gambling-Loss Recovery Laws, recovering all
money lost by players participating in defendants' unlawful gambling schemes, increased by the
applicable multiple thereof, if any, under those laws during the relevant periods applicable under
those laws and awarding all, or one-half thereof to plaintiff Humphrey and the other half, if
applicable, to the appropriate state or local agency as provided under those laws; and

B.      Declaratory, equitable and injunctive relief; attorneys' fees and costs of suit incurred herein; and such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

Dated: June 20, 2006

**GARDY & NOTIS, LLP**

By:    /s/ James S. Notis

Mark C. Gardy (MG-0338)
James S. Notis (JN 4189)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

Attorneys for Plaintiff

# ANNEX A

## State Qui Tam Gambling-Loss Recovery Laws

### District of Columbia: D.C. Code §16-1702

§16-1702.  Recovery of losses at gaming.

A person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or betting, a sum of money, or other valuable thing, amounting to $25 or more, and pays or delivers the money or thing, or any part thereof, may, within three months after the payment or delivery, sue for and recover the money, goods or other valuable thing, so lost and paid or delivered, or any part thereof, or the full value thereof, by a civil action, from the winner thereof, with costs.  If the person who loses the money or other thing, does not, within three months actually and bona fide, and without collusion, sue, and with effect prosecute, therefor, any person may sue for, and recover treble the value of the money, goods, chattels, and other things, with costs of suit, by a civil action against the winner, one-half to the use of the plaintiff, the remainder to the use of the District of Columbia.

### Georgia: O.C.G.A §13-8-3

(a) Gambling contracts are void; and all evidences of debt, except negotiable instruments in the hands of holders in due course or encumbrances or liens on property, executed upon a gambling consideration, are void in the hands of any person.

(b) Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county.

### Illinois: 720 ILS 5/28.8

Sec. 28-8.  Gambling losses recoverable.

(a) Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court.  No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a "winner" of any moneys lost by such other person in or through any such transactions.

(b) If within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy, any person may initiate a civil action against the winner.  The court or the jury, as the case may be, shall determine the amount of the loss.  After such determination, the court shall enter a judgment of triple the amount so determined.

## Kentucky: KSR §§372.020 and 372.040

372.020 Recovery of gambling losses from winner or his transferee.

If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery.  Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or transferee of the winner.  If the conveyance or transfer was of real estate, or the right thereto, in violation of KRS 372.010, the heirs of the loser may recover it back by action brought within two (2) years after his death, unless it has passed to a purchaser in good faith for valuable consideration without notice.

372.040 Suit by third person where loser or creditor does not sue.

If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

## Massachusetts: ALM GL Ch. 137, §1

Chapter 137: Section 1 Recovery of money or goods lost at gaming; limitation period

Section 1.  Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

## New Jersey: N.J.S.A. §2A:40-6

2A:40-2.  Liability of stakeholder or person receiving wager

Whoever pays, delivers or deposits any money, property or thing in action upon the event of any wager or bet prohibited by this chapter or by any law of this state, may sue for and recover the

A-2

same of the winner, or person to whom the same shall be paid or delivered, or of the stakeholder or other person in whose hands the same shall be deposited, or any part thereof, whether or not the same shall have been delivered or paid over by such depositary or stakeholder and whether or not any such wager or bet be lost.

[New Jersey, however, has an exception to this rule in the Casino Control Act, N.J. Stat. Ann. §5:12-101. That statute, essentially, provides that a loan made for casino gambling in Atlantic City is legal and enforceable. *See Gottlob v. Lopez*, 205 N.J.Super. 417, 501 A.2d 176 (1985).]

2A:40-5. Action by loser to recover money or property lost at gaming, with costs; limitation

If any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery.

2A:40-6. Informer action to recover money or property lost at gaming; limitation; costs

If the person who shall lose and pay such money, or lose and deliver such thing or things as aforesaid, shall not, within the time aforesaid, without collusion, sue for the money or other thing or things so lost and paid, or delivered, any other person may sue for and recover the same, with costs of suit, from such winner, depositary or stakeholder as aforesaid; the one moiety thereof to the use of the person suing for the same, and the other moiety to the use of the state; provided the action is instituted within 6 calendar months from and after the expiration of the time limited in section 2A:40-5 of this title for the loser to sue for the same.

## Ohio: ORC §3763.02

§3763.02. Money lost at games may be recovered; exceptions.

If a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit.

§3763.04. Suit by third party.

f a person losing money or thing of value, as provided in section 3763.02 of the Revised Code, within the time therein specified, and without collusion or deceit, does not sue, and effectively prosecute, for such money or thing of value, any person may sue for and recover it, with costs of suit, against such winner, for the use of such person prosecuting such suit.

A-3

**South Carolina: S.C. Code Ann. §§32-1-10 and 32-1-20**

SECTION 32-1-10.  Loser of money at cards or other game may sue for recovery of losses.

Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction.

SECTION 32-1-20.  If loser fails to sue for recovery, any other person may.

In case any person who shall lose such money or other thing as aforesaid shall not, within the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for any other person, by any such action or suit as aforesaid, to sue for and recover the same and treble the value thereof, with costs of suit, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed.