Andrew C. DeVore (NY Bar No. AD3511)
 (*pro hac vice* application forthcoming)
Kenneth D. Friedman (Dist. Ct. Bar No. KF6186)
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York  10036
Tel:  (212) 790-4500
Fax:  (212) 790-4545

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES E. HUMPHREY, JR.,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>VIACOM INC., CBS CORPORATION, CBS TELEVISION NETWORK, SPORTSLINE.COM, INC., THE WALT DISNEY COMPANY, ESPN, INC., VULCAN, INC., VULCAN SPORTS MEDIA, AND THE SPORTING NEWS,<br><br>                              Defendants. | No. 2:06 Civ. 2768 (DMC) (MF)<br><br><br><br>Return Date:  October 23, 2006<br><br>**Oral Argument Requested** |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SPORTSLINE.COM, INC. AND VULCAN SPORTS MEDIA, INC.'S MOTION TO DISMISS THE COMPLAINT <u>FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 4

ARGUMENT .............................................................................................................. 7

I.     THE COURT SHOULD DISMISS THIS CASE BECAUSE HUMPHREY CANNOT STATE A CLAIM UNDER ANY ONE OF THESE *QUI TAM* STATUTES ................................................................................................. 7

     A.    Fantasy Sports Are Not "Gambling" Covered By These Statutes ......................... 8

     B.    Defendants Do Not Constitute "Winners" As A Matter Of Law ......................... 11

     C.    No Participant Sustained The Necessary "Loss" As A Matter Of Law .............. 14

     D.    A Majority of Fantasy League Participants Could Not Have Paid An Entrance Fee Over The Statutory Minimum In Certain States ........................... 16

     E.    The Complaint's Generalized Allegations Cannot State a Claim As A Matter Of Law ..................................................................................................... 17

II.    THE COURT SHOULD DISMISS THIS CASE BECAUSE IT LACKS JURISDICTION TO ENFORCE THESE STATE PENAL STATUTES ...................... 19

     A.    These Gambling *Qui Tam* Provisions Are Penal Statutes ................................... 19

     B.    This Court Lacks Jurisdiction To Enforce These State Penal Statutes ............... 24

III.   THE COURT SHOULD ABSTAIN FROM CONSIDERING THIS CASE AS IT IS NOT CLEAR THAT ANY OF THE SUBJECT STATES WOULD ENFORCE THESE ARCANE LAWS EVEN AS TO TRUE GAMBLING ACTIVITY ................. 25

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alvord v. Smith,*
 1878 WL 6352 (Ind. 1878) ..................................................................... 10

*Angstadt v. Midd-West Sch. Dist.,*
 377 F.3d 338 (3d Cir. 2004)...................................................................... 4

*Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt, Inc.,*
 No. 20050698, 2006 WL 2382725 (Utah Aug. 18, 2006) ..................................... 23

*Barret v. Hampton,*
 4 S.C.L. 226, 1809 WL 252 (S.C. 1807) ...................................................... 16

*Berkebile v. Outen,*
 426 S.E.2d 760 (S.C. 1993) ..................................................................... 16

*Bodine v. Limberopoulos,*
 4 Ohio Supp. 252, 1939 WL 352 (Comm. Pl. Mahoning Cty. 1939)..................... 7, 22

*Boswell v. Robinson,*
 33 N.J.L. 273, 1869 WL 4245 (N.J. 1869) .................................................... 20

*Bressler v. Averbuck,*
 76 N.E.2d 146 (Mass. 1947) ............................................................... 18, 22

*Brophy v. City of Perth Amboy,*
 44 N.J.L. 217, 1882 WL 218 (N.J. 1882) ..................................................... 21

*Burford v. Sun Oil Co.,*
 310 U.S. 315 (1943)............................................................................. 29

*Caldwell v. Chambers,*
 6 S.E.2d 120 (Ga. Ct. App. 1939) ............................................................... 7

*Caribe Hilton Hotel v. Toland,*
 307 A.2d 85 (N.J. 1973)......................................................................... 26

*Castellon v. Hudson County Treasurer,*
 366 A.2d 13589 (N.J. Super. Ct. App. Div. 1976)............................................... 7

*Chiropractic Am. v. LaVecchia,*
 180 F.3d 99 (3d Cir. 1999)...................................................................... 25

*Chun v. State of New York,*
 807 F. Supp. 288 (S.D.N.Y. 1992) ............................................................. 29

*Cie v. Comdata Network, Inc.,*
 656 N.E.2d 123 (Ill. App. Ct. 1995) ........................................................... 26

*City of Philadelphia v. Austin,*
 407 A.2d 1294 (N.J. Burlington Co. Ct. 1979)............................................. 19, 23

*Claridge at Park Place, Inc. v. Matellian,*
 No. 951748, 1996 WL 1186889 (Mass. Super. Ct. April 22, 1996)...................... 27

## TABLE OF AUTHORITIES
### (continued)

Page

*Cole v. Groves*,
  134 Mass. 471, 1883 WL 10885 (Mass. 1883) ................................................... 23

*Colorado River Water Conserv. Dist. v. United States*,
  424 U.S. 800 (1976) ........................................................................................ 25

*Colorado River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976) ........................................................................................ 29

*Commonwealth v. Sousa*,
  600 N.E.2d 1012 (Mass. App. Ct. 1992) ..................................................... 8, 12

*Commonwealth v. Wotan*,
  665 N.E.2d 976 (Mass. 1996) ........................................................................... 7

*District of Columbia v. Real Property Known as 313 M St.*,
  633 A.2d 820 (D.C. 1993) ................................................................................ 7

*Donovan v. E. Racing Assoc.*,
  86 N.E.2d 903 (Mass. 1949) ..................................................................... 18, 20

*Doug Grant, Inc. v. Great Bay Casino Corp.*,
  232 F.3d 173 (3d Cir. 2000) ........................................................................... 11

*Evancho v. Fisher*,
  423 F.3d 347 (3d Cir. 2005) ........................................................................... 17

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ........................................................................... 23

*Genty v. Resolution Trust Corp.*,
  936 F.2d 899 (3d Cir. 1991) ........................................................................... 23

*Glen 6 Assocs., Inc. v. Dedaj*,
  770 F. Supp. 225 (S.D.N.Y. 1991) ................................................................. 26

*Grode v. Mutual Fire, Marine and Inland Ins. Co.*,
  8 F.3d 953 (3rd Cir. 1993) ............................................................................. 29

*Gwin v. Breedlove*,
  43 U.S. 29 (1844) ........................................................................................... 24

*Hargreaves v. Greate Bay Hotel & Casino*,
  357 S.E.2d 305 (1987) .................................................................................... 27

*Hartlieb v. Carr*,
  94 F. Supp. 279 (E.D. Ky. 1950) .................................................................... 20

*Himmelman v. Pecaut*,
  110 N.W. 919 (Iowa 1907) ............................................................................. 11

*Holmes v. Brickey*,
  82 N.E.2d 200 (Ill. App. Ct. 1948) ................................................................ 18

*Huntington v. Atrill*,
  146 U.S. 657 (1892) ................................................................... 19, 20, 21, 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Int'l Game Tech., Inc. v. Second Judicial Dist. Ct. of the State of Nevada*,
128 P.3d 1088 (Nev. 2006) ............................................................................ 28

*Jacob v. Clark*,
72 S.W. 1095 (Ky. Ct. App. 1903) .......................................................... 20, 21

*Johns v. Smith*,
81 So. 514 (Fla. 1919) ..................................................................................... 9

*Johnson v. Beatty*,
126 N.E.2d 816 (Ohio Ct. App. 1954) ......................................................... 20

*Johnson v. Collins Entertainment Co.*,
199 F.3d 710 (4th Cir. 1999) .............................................................. 26, 28, 29

*Jones v. Cavanaugh*,
21 N.E. 306 (Mass. 1889) ............................................................................. 11

*Kentucky Off-Track Betting, Inc. v. McBurney*,
993 S.W.2d 946 (Ky. 1999) .......................................................................... 26

*Kleimeyer v. Payne*,
15 Ohio Dec. 671, 1905 WL 812 (Super. Ct. 1905) ............................... 24, 25

Ky. Rev. Stat. Ann. § 372.040 ........................................................................ 22

*Las Vegas Hacienda, Inc. v. Gibson*,
359 P.2d 85 (Nev. 1961) ...................................................................... 8, 9, 12

*Louisiana Power & Light Co. v. City of Thibodaux*,
360 U.S. 25 (1959) ................................................................................. passim

*Martin v. Citizens' Bank of Marshallville*,
171 S.E. 711 (Ga. 1933) ............................................................................... 15

*Martin v. Francis*,
191 S.W. 259 (Ky. Ct. App. 1917) .............................................................. 11

*Martin v. Stewart*,
438 F. Supp. 2d 603 (D.S.C. 2006) ......................................................... 28, 29

*Marx v. Scott*,
10 N.E.2d 1003 (Ohio Ct. App. 1937) ......................................................... 18

*Mashanutcket Pequot Gaming Ent. v. Malhorta*,
740 A.2d 703 (N.J. Super. Ct. Law Div. 1999) ........................................... 26

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*,
435 N.E.2d 407 (Ohio 1982) ........................................................................ 26

*Morse v. Lower Marion Sch. Dist.*,
132 F.3d 902 (3d Cir. 1997) ..................................................................... 7, 11

*Mulligan v. W. Union Tel. Co.*,
20 F. Supp. 953 (D.N.J. 1937) ............................................... 20, 21, 22, 25

## TABLE OF AUTHORITIES
### (continued)

Page

*Paul v. United Parcel Serv.*,
   No. 05-CV-1918, 2005 WL 3307268 (D.N.J. Dec. 6, 2005) ................................. 4

*Pearsall v. Alexander*,
   572 A.2d 113 (D.C. 1990) ............................................................... 15

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*,
   836 F.2d 173 (3d Cir. 1988) ............................................................. 11

*People ex rel. Fahner v. Climatemp, Inc.*,
   428 N.E.2d 1096 (Ill. App. Ct. 1981) ................................................... 23

*People v. Whitney*,
   720 N.E.2d 225 (Ill. 1999) .............................................................. 7

*Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*,
   490 F.2d 509 (2d Cir. 1973) ............................................................ 27

*Rahmani v. Resorts Int'l Hotel, Inc.*,
   20 F. Supp. 2d 932 (E.D. Va. 1998) .................................................... 27

*Republic of Philippines v. Westinghouse Elec. Corp.*,
   821 F. Supp. 292 (D.N.J. 1993) ............................................. 19, 21, 22, 24

*Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*,
   953 F.2d 1431 (3d Cir. 1991) ........................................................... 25

*Ridenour v. Kaiser-Hill Co.*,
   397 F.3d 925 (10th Cir. 2005) .......................................................... 28

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) ........................................................... 28

*Rogers v. Edmund*,
   12 Ohio C.D., 1901 WL 1121 (Cir. Ct. 1901) ............................................ 13

*Rorrer v. P.J. Club, Inc.*,
   556 S.E.2d 726 (S.C. Ct. App. 2001) ................................................. 7, 20

*Rosenthal v. Al Packer Ford, Inc.*,
   36 Md. App. 349, 374 A.2d 377 (1977) ................................................... 9

*Salamon v. Taft Broad. Co.*,
   475 N.E.2d 1292 (Ohio Ct. App. 1984) ......................................... 18, 22, 26

*Salonen v. Farley*,
   82 F. Supp. 25 (E.D. Ky. 1949) ...................................................... 20, 21

*Salzman v. Boeing*,
   26 N.E.2d 696 (Ill. App. Ct. 1940) .................................................... 20

*Scachitti v. UBS Fin. Servs.*,
   831 N.E.2d 544 (Ill. 2005) ............................................................ 28

*Seinfeld v. Becherer*,
   No. 05-1321, 2006 WL 2441732 (3d Cir. Aug. 24, 2006) ................................... 4

## TABLE OF AUTHORITIES
### (continued)

Page

*Staninger v. Tabor*,
   103 Ill. App. 330, 1902 WL 4002 (App. Ct. 1901)......................................... 18, 25

*State v. American Holiday Assoc., Inc.*,
   151 Ariz. 312, 727 P.2d 807 (Ariz. 1986) ........................................................ 9

*State v. Dudley*,
   21 A.2d 209 (N.J. 1941)................................................................................. 11

*State v. Larchmont Farms, Inc.*,
   628 A.2d 761 (N.J. Super. Ct. App. Div. 1993)................................................ 19

*State v. Moriarity*,
   268 F. Supp. 546 ........................................................................................... 24

*Stone v. Clay*,
   61 F. 889 (7th Cir. 1894) .............................................................................. 10

*Sunrise Dairies v. Pierre's Steak House & Rest., Inc.*,
   193 A.2d 171 (N.J. Super. Ct. Law Div. 1963) ............................................... 7

*Tasner v. U.S. Indus., Inc.*,
   379 F. Supp. 803 (N.D. Ill. 1974) ................................................................. 24

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
   451 U.S. 630 (1981) ...................................................................................... 23

*Todd v. Societe Bic, S.A.*,
   21 F.3d 1402 (7th Cir. 1994) ........................................................................ 27

*Toomey v. Penwell*,
   245 P. 943 (Mont. 1926)................................................................................. 9

*Town Ctrs. Ltd. P'ship v. Montgomery*,
   No. 99AP-689, 2000 WL 342768 (Ohio Ct. App. April 4, 2000) ....................... 26

*Tucker v. Cutler*,
   185 F.2d 853 (6th Cir. 1950) ........................................................................ 21

*Turner v. Turner*,
   908 S.W.2d 124 (Ky. Ct. App. 1995) ............................................................ 7

*Tyler v. Goodman*,
   240 S.W.2d 582 (Ky. Ct. App. 1951) ............................................................ 12

*United States ex rel. Estate of Botnick v. Cathedral Healthcare Sys., Inc.*,
   352 F. Supp. 2d 530 (D.N.J. 2005) ............................................................... 21

*United States ex rel. Kelly v. Boeing Co.*,
   9 F.3d 743 (9th Cir. 1993) ............................................................................ 28

*United States ex rel. Springfield Terminal Railway Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ........................................................................ 23

*United States v. Washington*,
   879 F.2d 1400 (6th Cir. 1989) ...................................................................... 28

**TABLE OF AUTHORITIES**
(continued)

Page

*Ward v. District of Columbia*,
   494 A.2d 666 (D.C. 1985) .................................................................. 18

*Wilkinson v. Stitt*,
   56 N.E. 830 (Mass. 1900) .................................................................. 10

*Wilson v. Conlin*,
   3 Ill. App. Ct. 517, 1878 WL 10565 (1878) .................................. 9, 10

*Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) ........................................................... 19

*Zellers v. White*,
   70 N.E. 669 (Ill. 1904) ................................................................ 16, 22

**STATUTES**

720 Ill. Comp. Stat. 5/28-8 ....................................................... 11, 14, 22

720 Ill. Comp. Stat. 5/28-8(a) ........................................................ 16, 25

D.C. Code § 16-1702 ........................................................... 11, 12, 14, 16

Ga. Code Ann. § 13-8-3 ................................................................. 14, 24

Ga. Code Ann. § 13-8-3(b) .................................................................. 11

Ky. Rev. Stat. Ann. § 372.020 ...................................................... 14, 16

Ky. Rev. Stat. Ann. § 372.040 .............................................................. 11

Ky. Rev. Stat. Ann. § 446.080 ............................................................... 7

Mass. Gen. Laws ch. 137 § 1 ...................................................... 11, 12, 14, 22

N.J. Rev. Stat. § 2A:40-1 .................................................................. 8, 13

N.J. Rev. Stat. § 2A:40-5 ...................................................................... 14

N.J. Rev. Stat. § 2A:40-6 ......................................................... 13, 18, 24

Ohio Rev. Code § 3763.04; .................................................................. 11

Ohio Rev. Code Ann. § 3763.02 .......................................................... 14

S.C. Code § 32-1-10 ................................................................. 12, 14, 16

S.C. Code § 32-1-20 ................................................................... passim

**CONSTITUTIONAL PROVISIONS**

D.C. Const. § 401(a) ........................................................................... 28

Ga. Const. sec. I, II ............................................................................ 28

Ill. Const. art. V, § 8 .......................................................................... 28

Ky. Const. § 81 .................................................................................. 28

Mass. Const. 1st Pt., art. XXX ............................................................ 28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

N.J. Const. art. V, § 11 ............................................................................ 28

Ohio Const. art. III, § 6 ........................................................................... 28

S.C. Const. art. IV, § 15 .......................................................................... 28

U.S. Const. art. II, § 3 ............................................................................. 28

**RULES**

FED. R. CIV. P. 12(b)(6) ............................................................................. 1

**OTHER AUTHORITIES**

7 Williston on Contracts § 17.6 at 595 (1997 ed.) ................................... 12

Randy Best, *The False Claims Act and the English Eradication of Qui Tam
Legislation*, 78 N.C.L. Rev. 539 (2000) ................................................. 26

Recent Case, 63 Harv. L. Rev. 888 (1950) ............................................. 21

Restatement of Contracts § 521, cmt. a ................................................... 12

Defendants SportsLine.com, Inc., ("SportsLine") and Vulcan Sports Media, Inc. d/b/a

The Sporting News ("Sporting News"), by their undersigned attorneys, respectfully submit this

Memorandum of Law, along with the Declaration of Kenneth D. Friedman and the exhibits

annexed thereto, in support of their Motion to Dismiss the Complaint Pursuant to FED. R. CIV. P.

12(b)(6).

## PRELIMINARY STATEMENT

Charles Humphrey, a professional poker player and self-styled authority on U.S.

gambling law,[1] seeks to stop millions of players from participating in fantasy sports leagues and

recover billions of dollars by attempting to paint those leagues as "gambling" subject to the

gambling *qui tam* statutes of eight different states. Those antiquated statutes, patterned on

England's Statute of Anne from 1710, just do not apply to these complex games, and Humphrey

cannot state a claim under the statutes as a matter of common sense and controlling law.

Humphrey asks this Court to conclude that tens of millions of Americans who "buy"

fantasy sports teams and compete to see who can best "manage" those teams over the course of a

season are engaged in illegal gambling. Worse, he would have the Court rule that the fees all

those people pay in order to buy teams and receive Defendants' extensive services constitute

"gambling losses" that he has a right to recover *three or four times over*. No court has ever held

that fantasy sports leagues constitute gambling.[2] Controlling law, and Humphrey's incurable

---

[1]    *See* Humphrey's web site at www.gambling-law-us.com (noting that Humphrey is "one of
the founders of the *Tournament of Champions of Poker* and of *Team Pegasus*, an association of
professional tournament poker players"); http://www.pokerpages.com/players/profiles/5122/
chuck-humphrey.htm (noting Humphrey's win of $44,661 in a poker game and his "Ambition"
to "reshape the world of tournament poker"); http://pokerati.com/2006/08/22/draft-barry-bonds-
dont-drop-the-soap/ (suggesting that Humphrey filed this case to further a legislative campaign
to legalize on-line poker) (*See* Friedman Decl. Exs. A-C.)
[2]    Indeed, legislation prohibiting on-line gambling passed by the House of Representatives and
pending in the Senate expressly excludes fantasy sports games such as those at issue here from
its definition of "gambling."   *See* H.R. 4411 (the "Internet Gambling Prohibition and

failure to plead any essential element of his purported claim, foreclose each of these illogical conclusions here.

At its most basic, gambling requires that two or more parties risk losing a "bet" or "wager" on the outcome of some uncertain event.  Neither participants nor Defendants risk losing anything based on the outcome of the fantasy leagues.  Participants *necessarily and certainly* pay their entry fee when they enter a league at the beginning of the season, and Defendants *necessarily and certainly* pay out pre-determined prizes at the end of the season. There is no "risk" and no "uncertainty" associated with either payment, and the obligation of each party to make those payments is not dependent on the outcome of the league.  Moreover, participants receive extensive consideration in return for their fees, including Defendants' administration of the leagues and a wealth of statistical information and related analysis throughout the relevant sports season.  Humphrey's baseless claim of "gambling" cannot overcome the basic fact that fees paid to participate in a fantasy league do not constitute a "bet" or "wager" in any sense, but rather a fee for services pursuant to lawful contract.

Humphrey cannot satisfy any one of the elements necessary to state a claim under the gambling *qui tam* statutes.  The statutes permit recovery only from a "winner" who either participates in gambling activity or bets on others who do.  Defendants do neither.  To the contrary, Defendants receive entry fees, provide extensive services under their contracts, and guarantee modest prizes fixed in advance by those same contracts.  They neither "participate in" nor "bet on" gambling activity as a matter of law and incontrovertible fact.

Humphrey also cannot allege, as he must, that any participant in the fantasy leagues suffered a "loss" at gambling.  Participants pay a one-time entry fee, which is not risked in any

---

Enforcement Act") (Friedman Decl. Ex. DD.)

way on league outcome, and receive extensive services in exchange.  That payment is nothing more than part of a mutual exchange of consideration in support of a lawful contract, and cannot possibly support the "loss" element essential to Humphrey's claim.

Moreover, Humphrey's claims are so bereft of facts that they cannot state a claim as a matter of law.  Humphrey fails to identify *even one* individual who participated in *even one* of the subject leagues, or to allege that any individual suffered any loss in connection with such participation.  Thus, compounding Humphrey's inability to allege that Defendants are "winners" or that participants suffer any "loss" as a matter of law, his complaint should be dismissed because he has utterly failed to allege either element as a matter of fact.

Even were the Court to conclude that there is some basis to apply these statutes, it should dismiss because it is axiomatic that federal courts have no original jurisdiction to execute penal laws of the individual states.  Because these gambling *qui tam* statues are clearly penal statutes designed to address public harms, enforcing the eight different statutes at issue here would violate that axiom eight times over.

Finally, even if the Court had the power to enforce these statutes, it should abstain from doing so.  Under the *Thibodaux* abstention doctrine, the Court should abstain from considering a diversity action like this one where the state law is unclear and an important state interest is at stake.  Statutory requirements and controlling precedent make perfectly clear that this case should be dismissed for failure to state a claim.  But it is not at all clear whether or how any one of the subject states would actually *enforce* these arcane laws, even as to true gambling activity.  Under *Thibodaux*, this Court should abstain from attempting to resolve that uncertainty under the distinct laws and policies of eight different states.

In short, Humphrey's meritless claims should be dismissed, and he has picked the wrong forum in which to pursue his legislative agenda.

## STATEMENT OF FACTS

Sporting News and SportsLine are two of the leading providers of fantasy sports leagues and the array of services essential to their operation.  They administer such leagues and provide these extensive services through their websites www.sportingnews.com (the "Sporting News Site") and www.cbssportsline.com (the "SportsLine Site").  (Compl. ¶¶ 15, 22; Friedman Decl. Exs. F-U (league rules and conditions).[3]

Fantasy leagues that pit team owners against each other in a test of team management skills based on detailed statistical information and real-world events have their genesis in a "rotisserie" baseball game created by Daniel Okrent in 1980.  (Compl. ¶ 23.)  In Okrent's league, players each paid an entry fee of $260 to "purchase" twenty-three Major League Baseball ("MLB") players.  (Compl. ¶ 24.)  The resulting fantasy "teams" then competed against each other over the course of the full MLB season based on the performance of those players in eight statistical categories – batting average, home runs, runs batted in, stolen bases, wins, earned run average, saves and "WHIP" (the ratio of walks and hits compared to innings pitched).  (Compl. ¶ 25.)  As in the modern Internet leagues now at issue, access to voluminous statistical

---

[3]   It is well-established that this Court may consider the rules of Defendants' fantasy sports league services, which are relied upon in the complaint and integral to Humphrey's claims, for the purpose of ruling on Defendants' motions to dismiss.  *See Seinfeld v. Becherer*, No. 05-1321, 2006 WL 2441732, at *8 n.1 (3d Cir. Aug. 24, 2006) (proper to consider text of proxy statement "invoked" in complaint and attached to motion to dismiss); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342-43 (3d Cir. 2004) (motion to dismiss was not converted to one for summary judgment where complaint referred to, but failed to enumerate, certain requirements; "Having put the relevant requirements at issue, [plaintiffs] cannot now claim that their own failure to enumerate these requirements creates an issue of fact precluding dismissal."); *Paul v. United Parcel Serv.*, No. 05-CV-1918, 2005 WL 3307268, at *1 (D.N.J. Dec. 6, 2005) (court may dismiss pursuant to Rule 12(b)(6) in reliance on "undisputedly authentic documents if the plaintiff's claims are based upon those documents").

information was essential to the operation of these leagues.  (*See* Friedman Decl. Ex. D at p. 85 (noting that by the early 1980s, "so many rot[isserie] freaks were calling [MLB] teams to get injury reports that they were overwhelming p.r. staffs").)

The growth of the Internet, and the provision of comprehensive statistical information and "real-time" interactive services by providers such as Sporting News and SportsLine, have fueled an explosion in the popularity of fantasy sports.  (Friedman Decl. Ex. D at p. 85)  *Fifteen to eighteen million fans* are now estimated to participate in fantasy leagues, (*see* Friedman Decl. Ex. E.), and an entire industry has developed around the offering of goods and services to aid participants in the operation of their leagues and the management of their teams.  (Compl. ¶¶ 26, 27, 28; Friedman Decl. Ex. D at pp. 85-86.)  Those goods and services include the online hosting and administration of fantasy leagues and games, (Compl. ¶¶ 28, 32, 40; Friedman Decl. Ex. D at pp. 83, 86), and the provision of up-to-the-minute performance statistics, player evaluations, injury reports, and extensive league and player-related content provided by substantial editorial staffs.  (Compl. ¶¶ 27, 28; Friedman Decl. Ex. D at p. 86; Friedman Decl. Exs. F-I, N-Q.)  And fantasy league players devote an extraordinary amount of time to monitoring player performance and revising team rosters via trades, the addition of free agents, cutting players, and the activation and "benching" of various players in accordance with league rules.  (Compl. ¶¶ 46, 48.)  A survey conducted for the Fantasy Sports Trade Association found that owners of fantasy baseball and football teams spend approximately three hours per week managing their teams. (Friedman Decl. Ex. D at pp. 82, 83.)

SportsLine and Sporting News offer fans the opportunity to participate in a number of fantasy sports leagues,[4] and provide a myriad of administrative and support services in

---

[4]    (*See* Compl. ¶ 4 (identifying leagues); Friedman Decl. Exs. F-U (providing league rules).)

consideration for the entry fees paid by league participants.  (Compl. ¶¶ 33, 41, 71; Friedman

Decl. Ex. G at 3-8, Ex. R at ¶ 2 (noting that SportsLine "provides users with access to a rich

collection of online resources, including, various communications tools, online forums, shopping

services, personalized content and branded programming").)  Upon signing up for a league,

participants agree to official rules that set forth, among other things, pre-determined prize

amounts unrelated to the number of participants in each league that are fixed in advance by the

rules.  (Compl. ¶¶ 34, 42-44; Friedman Decl. Exs. L at ¶ 12, R at ¶¶ 14, 16.)  The rules also

provide that entry fees are not refundable, after the date of the draft as to SportsLine and either

within seven days from the start of the season or twenty-four hours from purchase as to Sporting

News.  (*See* Friedman Decl. Ex. O at 3; http://www.sportingnews.com/contract/cancellation.html

(Sept. 28, 2006).)

　　　　Once participants pay their fee and join a league, they utilize Defendants' myriad services

to buy their teams and manage those teams throughout the relevant sports season.  SportsLine

allows participants to conduct player drafts directly on its website, either live with other league

members or through an automated process conducted by SportsLine.  (*See* Friedman Decl. Ex. N

at 3-5.)  SportsLine oversees the draft and facilitates player transactions throughout the season,

including lineup changes, trades, and the addition of free agents and the waiver of players, and

maintains overall team statistics and league standings.  In addition, SportsLine has a dedicated

editorial staff that provides information and advice to fantasy team owners, including

performance statistics, weather conditions, injury reports and player evaluations, that owners use

in deciding whether to engage in the transactions described above.  (Compl. ¶¶ 27, 28; Friedman

Decl. Ex. R at ¶ 2 ("Service Description").)

Sporting News similarly offers participants the opportunity either to join a league formed by Sporting News or a league created by other participants and administered by Sporting News, or to create their own leagues within the Sporting News Site.  (*See* Friedman Decl. Ex. I at 3.) Sporting News also provides a host of statistical information to allow participants to research particular players and to draft teams through the "buy and sell players" feature of the site.  (*See* Friedman Decl. Ex. G at 4-5.)  Sporting News thereafter allows participants to engage in a defined number of roster transactions each week, administers and tracks all such transactions, and maintains league standings and relevant team statistics.  Sporting News updates player statistics, fantasy team points, and league standings at the end of each game day throughout each season, and updates player pricing on a weekly basis.  (Friedman Decl. Ex. G at 3-8.)

## ARGUMENT

### I.   THE COURT SHOULD DISMISS THIS CASE BECAUSE HUMPHREY CANNOT STATE A CLAIM UNDER ANY ONE OF THESE *QUI TAM* STATUTES

Dismissal is proper when a plaintiff fails to allege an essential element of his claim. *Morse v. Lower Marion Sch. Dist.*, 132 F.3d 902, 916 (3d Cir. 1997).  Under the strict judicial scrutiny that must be applied to such penal statutes,[5] Humphrey cannot satisfy any one of the

---

[5]   *See Castellon v. Hudson County Treasurer*, 366 A.2d 1358, 1359 (N.J. Super. Ct. App. Div. 1976) (ruling that civil penalty provision in connection with unlawful lotteries is penal and must be "strictly construed lest it be applied to persons or conduct beyond the Legislature's contemplation"); *Sunrise Dairies v. Pierre's Steak House & Rest., Inc.*, 193 A.2d 171, 173 (N.J. Super. Ct. Law Div. 1963) (same regarding civil penalty on corporate officers); *Rorrer v. P.J. Club, Inc.*, 556 S.E.2d 726, 729 (S.C. Ct. App. 2001) (gambling *qui tam*  provision is penal and must be strictly construed); *Bodine v. Limberopoulos*, 4 Ohio Supp. 252, 1939 WL 352, at *2 (Comm. Pl. Mahoning Cty. 1939) (same); *see generally District of Columbia v. Real Property Known as 313 M St.*, 633 A.2d 820, 822 (D.C. 1993); *Caldwell v. Chambers*, 6 S.E.2d 120 (Ga. Ct. App. 1939); *People v. Whitney*, 720 N.E.2d 225, 228 (Ill. 1999); *Commonwealth v. Wotan*, 665 N.E.2d 976, 977-78 (Mass. 1996).  While Kentucky provides generally for liberal statutory construction, *see* Ky. Rev. Stat. Ann. § 446.080, Kentucky courts have made clear that "where the words in a statute are clear and unambiguous . . . there is no room for construction and the statute must be accepted as written."  *Turner v. Turner*, 908 S.W.2d 124, 124 (Ky. Ct. App. 1995).

essential elements necessary to state a claim under any one of these gambling *qui tam* laws.[6]

Most fundamentally, he cannot possibly establish that the entry fees participants pay in exchange

for the right to participate in Defendants' leagues and receive their extensive services constitutes

a "bet" or "wager" on the outcome of an uncertain or contingent event.  He also cannot establish

that Defendants constitute "winners" under these statutes in connection with any one of the

fantasy leagues.  Nor can he establish that any participant suffered any gambling "loss" in

participating in those leagues.  Moreover, Humphrey's allegations are so generalized and lacking

in any material facts that they cannot support his claim as a matter of law.  Because Humphrey

has not – and cannot – state a claim under these statutes, his claims should be dismissed.

**A.      <u>Fantasy Sports Are Not "Gambling" Covered By These Statutes.</u>**

The essence of gambling activity is that two or more parties "bet" or "wager" on the

outcome of an uncertain, chance, or contingent event.  *See* N.J. Rev. Stat. § 2A:40-1;

*Commonwealth v. Sousa*, 600 N.E.2d 1012, 1015 (Mass. App. Ct. 1992) (noting that placing and

accepting a bet are opposite sides of the same coin; both parties to the wager must take a risk on

an uncertain outcome and, depending upon the outcome, obligate themselves to pay money to the

other); *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 86 (Nev. 1961) (in unlawful gambling

"each party interested therein has a chance of gain and takes a risk of loss. . . . it is not known

who is to give until after the event").  In contrast, a game is not gambling when – as with the

fantasy games at issue here – the offeror of a prize commits in advance of the competition to

award that prize to the successful participant "in the event of compliance with the terms and

---

[6]    Humphrey has asserted claims under the gambling *qui tam* statutes of the District of
Columbia, Georgia, Illinois, Kentucky, Massachusetts, New Jersey, Ohio and South Carolina.
For the Court's convenience, copies of each of the subject gambling loss recovery statutes are
attached as Friedman Decl. Exs. V-CC.  Their terms differ, but in essence these statutes provide
that, some prescribed time after an individual suffers a gambling loss, a third-party may seek to
recover three or four times the loss amount from the winner.

conditions of his offer." *Las Vegas Hacienda*, 359 F.2d at 87; *Toomey v. Penwell*, 245 P. 943, 944 (Mont. 1926) ("[A] race run for a purse or premium is not transformed into a gambling transaction merely because every contestant is required to pay an entrance fee."); *State v. American Holiday Assoc., Inc.*, 151 Ariz. 312, 315, 727 P.2d 807, 810 (Ariz. 1986) (*en banc*) (gambling statute not violated by corporation that charged entrance fee to participate in word puzzle contest; ruling that "the payment of an entrance fee is not an illegal bet or wager in an otherwise legal competition for prizes to be awarded by a non-participant, at least where the entrance fees do not specifically make up the prize purse" and finding "no distinction in principle to be drawn on the basis of whether the sponsor of the contest hopes to make or actually does make a profit on its operation"); *Rosenthal v. Al Packer Ford, Inc.*, 36 Md. App. 349, 349-50, 374 A.2d 377, 379 (1977) ("A lawful and enforceable contract may come into being when one announces or circulates to all who may see or hear, an offer or promise that he will give or pay a reward or prize to a person who performs a specified act, and the offer is accepted by performance of the act."); *Wilson v. Conlin*, 3 Ill. App. Ct. 517, 1878 WL 10565, at *2 (1878) ("[T]o require a fee in advance for the privilege of being admitted to contest the prize, is no more a gambling process than the offer of a prize to the successful party."). A prize in this context simply is not the same thing as a bet or wager. *See Johns v. Smith*, 81 So. 514 (Fla. 1919) (prize paid in a horse race did not violate statute forbidding stakes, bets, or wagers).

There can be no bet or wager here because the prizes are fixed by contract in advance of the competition and Defendants are certain to pay out those fixed prizes to the best-performing team manager at the conclusion of the season. (Friedman Decl. Exs. H at 2, N at 11-12.) In a bet or wager, the person providing the money has a chance to win it; when a person offers a *prize*, he or she is certain to lose it. *See Toomey*, 245 P. at 945; *Las Vegas Hacienda*, 359 P.2d at 86 (a

"prize or premium differs from a wager in that in the former, the person offering the same has no chance of gaining back the thing offered, but, if he abides by his offer, he must lose"). Defendants here are contractually bound to pay out the prizes they offer at the end of the season, and have no ability to win those prizes.

The prizes offered here are even further distinguished from a bet or wager because those prizes are established by contract at the outset of the season regardless of the number of players in each league or the cumulative amount of their entry fees.[7] *See Stone v. Clay*, 61 F. 889, 892 (7th Cir. 1894) (horse race was not gambling because the prize was not "the sum of the stakes which the subscribers agreed to pay for each horse nominated"); *Wilkinson v. Stitt*, 56 N.E. 830, 831 (Mass. 1900) (ruling that "contention that [bicycle] racing for this cup, which was offered as a prize for a series of bicycle races . . . and was purchased by . . . [non-participants] is betting, gambling, or wagering, or is against public policy, is too plainly untenable to require discussion"). Additionally, in the case of a bet or wager it is not known until after the event who will provide the money. *Alvord v. Smith*, 1878 WL 6352, at *3 (Ind. 1878); *Wilson*, 1878 WL 10565, at *2 ("There is nothing staked upon the result of a future contingency. The amount to be paid is fixed, and not in any event to be returned, increased or diminished; thus, entity that offered prize on outcome of horse race but ran no horse being entirely indifferent as to the result . . . occupied the position of a third party to those engaged in running their horses."). There is no question here that Defendants pay the prizes.

Accordingly, because there is simply no "bet" or "wager" at issue here, Humphrey cannot state a claim under these gambling *qui tam* statutes and his claim should be dismissed.

---

[7]    Moreover, Humphrey makes no claim relative to the prizes Defendants provide, (*see* Compl. ¶ 3 (seeking recovery only of "wagers . . . made by participants to play in the fantasy sports leagues," which he characterizes as "gambling losses.")), which in any event cannot possibly transform an entry fee into a "bet."

**B.**   **Defendants Do Not Constitute "Winners" As A Matter Of Law.**

Humphrey assumes – with no factual support whatsoever – that there is some basis to recover from Defendants as "winners" under the gambling *qui tam* statutes.  (Compl. ¶¶ 5, 15, 22.)  There is no basis in fact or law for that assumption, without which his claim must fail.

*First*, the court need not – and, as demonstrated below, should not – accept as true Humphrey's unsupportable assertion that Defendants are "winners" under these statutes.  *See Doug Greate, Inc. v. Great Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) ("[W]e need not accept as true 'unsupported conclusions and unwarranted inferences.'"); *Morse*, 132 F.3d at 906 (the "court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988) ("[T]he court does not consider conclusory recitations of law.")[8]

---

[8]   This Court should also disregard Humphrey's similarly unsupported assumption that Defendants are liable as "stakeholders."  (Compl. ¶ 69).  This argument is flawed for several reasons.  By definition, a stakeholder in one who receives the sums wagered, "hold[s] them against the determining event . . . and then pay[s] them over to the winner."  *State v. Dudley*, 21 A.2d 209, 210 (N.J. 1941); *Jones v. Cavanaugh*, 21 N.E. 306, 307 (Mass. 1889) (same); *see also Martin v. Francis*, 191 S.W. 259, 262 (Ky. Ct. App. 1917) (noting that a stakeholder is "one in whose hands money or property is deposited to abide the event of a gambling contract"); *Himmelman v. Pecaut*, 110 N.W. 919, 920 (Iowa 1907) (noting that the money paid to a stakeholder is "but a naked deposit to be paid over to one [of the wagerers] on the happening of a contingency").  This is simply not the case here.  Participants pay entry fees to Defendants in consideration for their administration of the leagues and extensive related services.  Defendants pay prizes at the end of the season that are *fixed by contract* before any entry fee is received and are *unrelated to the number of entrants or cumulative value of those fees*.  (*See* Friedman Decl. Exs. G at 2, N at 11-12).  In the face of that clear contractual obligation, the entry fees plainly are not "held against" anything or "paid over" to anyone.  Humphrey's claim is logically as well as legally unsupportable.  In order for Defendants to be "stakeholders," Defendants *cannot* be the "winners" who receive the pot from the stakeholder.  But Defendants are the only purported "winners" alleged in the Complaint.  (Compl. ¶¶ 15, 22.)  Moreover, the plain language of the vast majority of the *qui tam* statutes at issue expressly limits the informer's right of recovery to actions against the "winner."  *See* D.C. Code § 16-1702; Ga. Code Ann. § 13-8-3(b); 720 Ill. Comp. Stat. 5/28-8; Ky. Rev. Stat. Ann. § 372.040; Mass. Gen. Laws ch. 137 § 1; Ohio Rev. Code § 3763.04; S.C. Code § 32-1-20.

*Second*, Defendants plainly are not "winners" as a matter of law, but merely parties to an enforceable contract. Defendants provide substantial consideration, in the form of administration of the leagues and the provision of extensive statistical and analytical services, in exchange for the entry fees paid for participation in the fantasy leagues. At no time do Defendants participate in any bet. Absent such participation, Defendants cannot be "winners" as a matter of law. *Las Vegas Hacienda,* 359 P.2d at 86 (offering prize to winner of athletic or similar competition does not give rise to a wagering contract if the offeror does not participate in the competition and has no chance of gaining back the prize offered); *see generally* 7 Williston on Contracts § 17.6 at 595 (1997 ed.) (explaining difference between offering a prize and gambling); *Sousa*, 600 N.E.2d at 1015 ("A bet is a hazard of money or property upon an incident by which one or both parties stand to lose or win by chance."). The entry fees participants pay to Defendants give rise to a lawful contract between them. *See* Restatement of Contracts § 521, cmt. a ("The competition itself is the agreed exchange for the promises prize."). That lawful contract cannot transform Defendants into "winners" subject to liability under the *qui tam* statutes.

*Third*, the Sporting News and SportsLine Defendants are not "winners" under the plain terms of these *qui tam* statutes. The statutes make clear that the "winner" must be a *participant* in the card, dice, or other game at issue. For example, the D.C., Massachusetts, and South Carolina statutes define a "winner" as one who wins by "playing at cards, dice or any other game, or by betting on the sides or hands of person[s] who play." D.C. Code § 16-1702; Mass. Gen. Laws ch. 137, § 1; S.C. Code § 32-1-10. In Kentucky, only the "winner" of money from a gambling loser is liable under the statute. *Tyler v. Goodman*, 240 S.W.2d 582, 584 (Ky. Ct. App. 1951). The New Jersey statute likewise makes clear that a "winner" is one who actually "wagers, bets or stakes" upon a race, game, or other unknown or contingent event. N.J. Rev.

Stat. §§ 2A:40-1, 2A:40-6.  Statutes in other jurisdictions contain the same basic requirement. *See*, *e.g.*, *Rogers v. Edmund*, 12 Ohio C.D., 1901 WL 1121 *5 (Cir. Ct. 1901) (noting that "operation of [gambling *qui tam* statute] is confined to instances where *by playing at some game, or by some bet or wager*, one person has won of another, money or other thing of value, and the action it authorizes is to be directed against the winner") (emphasis supplied).  Humphrey has not alleged, and cannot possibly allege, this essential statutory element.

*Finally*, Humphrey's allegations and documents incorporated by reference in the complaint confirm that Defendants do not compete against fantasy sports participants in any way, and do not "win" anything from them.  (Compl. ¶¶ 45-48; Friedman Decl. Exs. F-U.) Defendants provide extensive services to the participants throughout the course of the relevant sports season.  (Compl. ¶¶ 45-48, Friedman Decl. Ex. R at ¶ 2.)  At the end of the season, Defendants award prizes, in pre-determined amounts fixed by contract, to the team managers who have accrued the most "fantasy points."  (Compl. ¶ 45; Friedman Decl. Exs. M at ¶ 4, P at 8).  At no point do the participant-owners of any team pay anything to Defendants that is in any way dependent on the outcome of any league.  (Compl. ¶¶ 45-48; Friedman Decl. Exs. M at ¶ 3, O at 2.)  Nor do participants ever "risk" losing their entry fee – they irrevocably part with that fee shortly after they enter a league, and receive in exchange substantial services from Defendants over the course of an extended sports season.

Accordingly, because Defendants do not "play" in the fantasy leagues, "bet on the side of" anyone who does play, or have any financial interest whatsoever in the outcome of any league, Defendants cannot be "winners" subject to liability under the gambling *qui tam* statutes as a matter of law.

C.   **No Participant Sustained The Necessary "Loss" As A Matter Of Law**.

A *qui tam* plaintiff like Humphrey has no right to recover anything unless a participant in gambling activity wins money from one who loses money in that activity.  In addition to the fact that fantasy leagues *are not gambling*, and that defendants *do not win anything,* participants suffer no "loss" in participating.  Furthermore, three states – D.C., Kentucky, and South Carolina – limit recovery only if that loss occurs at one "time" or "sitting."  *See* D.C. Code § 16-1702; Ky. Rev. Stat. Ann. § 372.020; S.C. Code Ann. § 32-1-10.  Humphrey does not, and cannot, allege either of these essential elements.

Humphrey cannot recover under any one of the *qui tam* statutes unless a participant in gambling activity suffered a "loss" at gambling.[9]  No fantasy league participant suffered any such "loss."  To the contrary, participants pay Defendants a one-time, *non-refundable* entry fee to participate in the leagues, and receive in consideration for that fee the benefit of Defendants' extensive administrative, statistical, and analytical services throughout the relevant sports season. (Compl. ¶¶ 45-48; Friedman Decl. Exs. F-U.)  In the ensuing months, participants spend an estimated average of *three hours every week* utilizing those services to manage their teams and review their standings.  (Friedman Decl. Ex. D at pp. 82, 83.)  Only at the end of the sports season are prizes awarded, in amounts fixed by the contracts that govern participation in the leagues.  (Compl. ¶¶ 34, 42-43; Friedman Decl. Exs. M at ¶ 4, P at 8.)  Accordingly, in paying for the right to participate in the leagues and receive Defendants' services, participants simply do not "lose" anything, and certainly suffer no cognizable "gambling" loss.   Whether or not a

---

[9]   *See* D.C. Code § 16-1702 ("loses to a person . . ."); Ga. Code Ann. § 13-8-3 (recovery "by the loser . . ."); 720 Ill. Comp. Stat. 5/28-8 (recovery by "any person who by gambling shall lose . . ."); Ky. Rev. Stat. Ann. § 372.020 (recovery by "any person [who] loses to another . . ."); Mass. Gen. Laws ch. 137, § 1 ("whoever loses to a person"); N.J. Rev. Stat. § 2A:40-5 ("any person shall lose . . ."); Ohio Rev. Code Ann. § 3763.02 ("such person losing . . ."); S.C. Code Ann. § 32-1-20 ("any person who shall lose . . .").

participant is a successful league manager, their entry fee is never "in the balance" in any way in connection with their participation in the league.  Indeed, once participants have selected their team and begun to enjoy Defendants' services, their fee cannot be recovered.  (Compl. ¶¶ 15, 22; Friedman Decl. Ex. O at 3; http//:sportingnews.com/contract/cancellation.html (Sept. 28, 2006).) Humphrey concedes that is precisely the benefit of participants' bargain.  (Compl. ¶ 28 ("Internet sport sites . . . began their involvement in fantasy sports by providing statistics, player evaluations and injury reports.")  There is no "loss" on these facts, and this exchange of consideration is nothing more than an "ordinary contract," in which "both parties may ultimately gain by entering into the agreement." *Martin v. Citizens' Bank of Marshallville*, 171 S.E. 711, 713 (Ga. 1933).

The facts alone mandate this conclusion.  The law confirms it.  The contract that participants enter into to participate in the fantasy leagues cannot possibly be twisted into a gambling contract.  The essential element of such a contract that one of the parties "is *certain* to lose," *id.* (emphasis supplied), is totally absent.  There is simply no "loss" in the payment of a fixed fee in exchange for substantial consideration received over a period of several months and a chance to win a prize.  The contract also totally lacks the other essential element of a gambling contract – that Defendants and participants *competed against each other*.  *See Pearsall v. Alexander*, 572 A.2d 113, 115 (D.C. 1990) (ruling that an agreement to share proceeds of jointly-purchased lottery ticket was not a gambling contract because the parties did not "wager against one another on the outcome of . . . [an] event, [or] play against one another at cards, dice, or any other game").

Moreover, Humphrey cannot allege the essential element that any participant in a fantasy league must have "lost" money at one "time" or "sitting," as required under the D.C., Kentucky,

and South Carolina statutes.  D.C. Code § 16-1702; Ky. Rev. Stat. Ann. § 372.020; S.C. Code § 32-1-10; *see also*, *e.g*., *Zellers v. White*, 70 N.E. 669, 672 (Ill. 1904) (defining "sitting" as "time that transpires . . . from the time certain players begin playing [draw poker] together on any one occasion until they cease playing together on that occasion").  Kentucky goes even further, mandating that the loss occur at one "time" or "within twenty-four [] hours[.]"  Ky. Rev. Stat. Ann. § 372.020.  Because the outcome of the fantasy leagues is based on the performance of individual players on each participant's team in multiple games over the course of the relevant sports season, Humphrey cannot possibly allege this essential fact and his claims under the D.C., Kentucky, and South Carolina statutes should be dismissed.

> **D.   A Majority of Fantasy League Participants Could Not Have Paid An Entrance Fee Over The Statutory Minimum In Certain States.**

Even if Humphrey could possibly allege the necessary "loss" – he cannot – his claims under the statutes of Illinois, South Carolina, and Washington D.C. must be dismissed because he cannot allege any "loss" over the minimum statutory threshold.  In both Illinois and South Carolina, that threshold is $50.  720 Ill. Comp. Stat. 5/28-8(a); S.C. Code Ann. § 32-1-10.  In D.C., it is $25.  D.C. Code § 16-1702.  Any "loss" below these thresholds cannot be the basis of any cause of action under those statutes.  *See Barret v. Hampton*, 4 S.C.L. 226, 1809 WL 252, at *1 (S.C. 1807) (no claim lies to recover gambling "losses" falling below statutory minimum because such gambling is "innocent and lawful"); *see also Berkebile v. Outen*, 426 S.E.2d 760, 762 (S.C. 1993) (same).  Because the entrance fees to buy teams in virtually all of the leagues at issue fall well below these minimums, (*see* Compl. ¶¶ 33, 41),[10] every claim relating to such leagues should be dismissed with prejudice as to these states.

---

[10]   According to Humphrey's own allegations, (Compl. ¶ 41), the entry fees to purchase teams for the following Sporting News leagues cannot satisfy the statutory minimums:  Fantasy Baseball Commissioner ($24.99 for one team, $49.99 for three teams); Fantasy Hoops ($17.99

E.    **The Complaint's Generalized Allegations
Cannot State a Claim As A Matter Of Law.**

Even with the benefit of "notice" pleading, Humphrey's allegations are so generalized

and lacking in material allegations that they cannot state a claim as a matter of law. *See Evancho*

*v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (affirming dismissal because "even under the most

favorable view, [plaintiff's] amended complaint utterly fails to meet the liberal notice pleading

standard of Rule 8(a)"). Upon close scrutiny, Humphrey alleges only the following:

- That many people participate in fantasy sports leagues over the Internet, (Compl. ¶¶ 26-31);
- That participants pay entrance fees in varying amounts for the privilege of using Defendants' fantasy sports league services, (*id.* ¶¶ 33, 41);
- That in exchange for these one-time entrance fees participants receive the right to participate in the relevant league, the benefit of Defendants' substantial services over the course of a full sports season, and the chance to win a fixed prize, (*id.* ¶¶ 34, 42-43; *see also*, *e.g.*, Friedman Decl. Ex. N at 11-12); and
- That participants devote substantial time and energy to researching, strategizing, drafting and trading players, and otherwise managing their teams over the course of the season based on a wealth of statistical and other information and "fantasy points" compiled and provided by Defendants. (Compl. ¶¶ 45-48.)

Humphrey does not identify *even one* individual who participated in *even one* of the

subject leagues, much less one who allegedly lost money to Defendants in those leagues, and

concedes that he has done neither himself. (Compl. ¶¶ 9, 71.) Instead, Humphrey appears to

hope that this Court will take on faith that at some point, some individual, in one of the subject

---

for one team, $34.99 for three teams, $39.99 for five teams); Fantasy Football:  Expert's Edition
($24.99 for one team); Ultimate Salary Cap Football ($24.99 for one team); and Ultimate
Fantasy Stock Car ($17.99 for one team, $34.99 for three teams).  The following Sporting News
leagues – the entry fees for which Humphrey alleged incorrectly in the complaint – also cannot
satisfy the statutory minimums:  Ultimate Salary Cap Hoops ($19.99 for one team, $39.99 for
three teams) (Friedman Decl. Ex. ___)); Fantasy Football:  Competitor's Edition ($9.99 for one
team, $14.99 for two teams, $19.99 for three teams) (Friedman Decl. Ex. K.).)  Similarly,
according to Humphrey's own allegations, (Compl. ¶ 33), the entry fees to purchase teams for
the following SportsLine leagues also cannot satisfy the statutory minimums:  Football Gold
League ($39.95 for first team, $29.95 for optional team); Baseball Gold League ($29.95 for first
team, $24.95 for optional team); Basketball Gold League ($29.95 for first team, $24.95 for
optional team); and Hockey Gold League ($29.95 for first team, $24.95 for optional additional
team).

states, paid some entrance fee to some Defendant to participate in one of the subject leagues, participated in that league, and suffered some compensable gambling loss in connection with that participation. That hope is not enough. Humphrey must plead each and every essential element of each alleged statutory violation.[11]

The complaint fails abjectly and incurably to do so. As demonstrated above, Humphrey fails to offer any support for his bald assertion that Defendants are "winners" under the statutes, *see Holmes v. Brickey*, 82 N.E.2d 200, 202 (Ill. App. Ct. 1948) (plaintiff has "burden to allege and prove who did win his money"), and fails altogether to allege any cognizable "loss." He also fails to allege the purported amount of such nonexistent "losses," *see Marx v. Scott*, 10 N.E.2d 1003, 1004 (Ohio Ct. App. 1937) (dismissal proper under gambling *qui tam* statute because plaintiff did not allege amount of losses or that defendants were winners), or when those nonexistent losses were purportedly sustained. *See Bressler v. Averbuck*, 76 N.E.2d 146, 148 (Mass. 1947) (affirming dismissal of equitable action based on gambling loss recovery provision and ruling that pleading a loss over a six month period did not inform the defendant of the claim).

In short, Humphrey impermissibly asks this Court to indulge a gambling *qui tam* suit seeking a "recover[y] for his own use, unknown (but presumably substantial) amount of money lost by unnamed and unknowable persons in unspecified games of chance." *Salamon v. Taft Broad. Co*., 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) (affirming summary judgment in *qui*

---

[11]   Because Humphrey does not allege when anyone participated in any league, (Compl. ¶¶ 68, 70), it is also impossible to tell which of Humphrey's claims are precluded by the six-month statute of limitations under the New Jersey statute, N.J. Stat. Ann. § 2A:40-6, by the one-year statute of limitations under the D.C., Massachusetts, New Jersey, Ohio, and South Carolina statutes, *Ward v. District of Columbia*, 494 A.2d 666, 667 (D.C. 1985), *Donovan v. E. Racing Assoc*., 86 N.E.2d 903, 905 (Mass. 1949); S.C. Code Ann. § 32-1-20, or the two-year statute of limitations under the Illinois statute, *Staninger v. Tabor*, 103 Ill. App. 330, 1902 WL 4002, at *2 (App. Ct. 1901).

*tam* action where plaintiff could not allege who had lost a particular sum to another person). The Court should reject that request and dismiss this case for failure to allege any one of the elements necessary to state such a claim.

## II.  THE COURT SHOULD DISMISS THIS CASE BECAUSE IT LACKS JURISDICTION TO ENFORCE THESE STATE PENAL STATUTES

Even were the Court to conclude that Humphrey could state a claim notwithstanding his demonstrated failure to do so, it is axiomatic that United States District Courts have no subject matter jurisdiction to enforce state penal laws such as these gambling *qui tam* statutes. Accordingly, should the Court resolve to enforce these statutes here, it should dismiss this case with prejudice.

### A.  These Gambling *Qui Tam* Provisions Are Penal Statutes.

A statute providing for a civil penalty is penal if "'its purpose is to punish an offense against the public justice of the State' rather than 'to afford a private remedy to a person injured by the wrongful act.'"  *Huntington v. Atrill*, 146 U.S.657, 673-74 (1892); *see also Republic of Philippines v. Westinghouse Elec. Corp.*, 821 F. Supp. 292, 296 (D.N.J. 1993) (same, quoting *Huntington*); *Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1219 (9th Cir. 2006) (the "label 'civil' does not strip a remedy of its penal nature").  The dispositive feature of a penal law is that the alleged wrongdoing is deemed a "'wrong to the public.'"  *Philippines*, 821 F. Supp. at 297 (quoting *Huntington*); *see also State v. Larchmont Farms, Inc.*, 628 A.2d 761, 770 (N.J. Super. Ct. App. Div. 1993) (holding civil environmental protection statute to be penal because "sanctions for essentially public wrongs are penal in nature"); *City of Philadelphia v. Austin*, 407 A.2d 1294, 1296 (N.J. Burlington Co. Ct. 1979) (ruling civil penalty for failure to file tax returns to be penal because goal of statute was to "vindicat[e] . . . public justice").

The Supreme Court has made quite clear that gambling *qui tam* statutes are penal in

nature. *Huntington*, 146 U.S. at 667 ("a statute giving the right to recover back money lost at

gaming and, if the loser does not sue within a certain time, authorizing a *qui tam* action to be

brought by any other person for threefold the amount, has been held to be remedial as to the

loser, though penal as regards the suit by a common informer"). And the states have long

recognized that such provisions are penal statutes enacted to deter the "wrong to the public" of

gambling. *See*, *e.g.*, *Rorrer*, 556 S.E.2d at 729 ("object of [*qui tam* gambling] statute was

manifestly to punish excessive gaming"); *Mulligan v. W. Union Tel. Co.*, 20 F. Supp. 953, 959

(D.N.J. 1937) (lottery *qui tam* action was a "form of punishment for public, not private, wrongs"

created by the State of New Jersey for violation of her statutes); *Boswell v. Robinson*, 33 N.J.L.

273, 1869 WL 4245, at *3 (N.J. 1869) (citing Statute of Anne as the "basis of our act to prevent

gambling").

Driven by the Supreme Court's definition of "penal" and corresponding analysis, the

supreme or appellate courts of five of the eight subject states – Illinois, Kentucky,

Massachusetts, Ohio, and South Carolina – have *already ruled definitively* that these gambling

*qui tam* provisions are penal. *Johnson v. Beatty*, 126 N.E.2d 816, 817 (Ohio Ct. App. 1954)

(gambling *qui tam* provision penal, not remedial); *Donovan*, 86 N.E.2d at 905 ("[a gambling loss

recovery] action given to a third person . . . is penal"); *Salzman v. Boeing*, 26 N.E.2d 696, 699

(Ill. App. Ct. 1940) (gambling loss recovery provisions remedial as to loser, but penal as to *qui*

*tam* plaintiff); *Jacob v. Clark*, 72 S.W. 1095, 1096 (Ky. Ct. App. 1903) (gambling *qui tam*

provision is "in the nature of a penalty," which must be "strictly construed");[12] *Rorrer*, 556

---

[12]   A pair of old decisions by the same district judge in Kentucky wrongly concluded that the
third-party recovery provisions are remedial. *Hartlieb v. Carr*, 94 F. Supp. 279, 280 (E.D. Ky.
1950); *Salonen v. Farley*, 82 F. Supp. 25, 29-30 (E.D. Ky. 1949). Those decisions are flatly

S.E.2d 729 (gambling *qui tam* provision is "penal in nature" and must be strictly construed).  The

Supreme Court of New Jersey has also ruled definitively that such *qui tam* provisions are penal,

*Brophy v. City of Perth Amboy*, 44 N.J.L. 217, 1882 WL 218, at *1 (N.J. 1882), and courts in this

district have resolved that district courts lack jurisdiction over *qui tam* actions brought under an

analogous provision prohibiting lotteries.[13]  *See Mulligan,* 20 F. Supp. at 959.

Close analysis of these provisions under the law of this District confirms that these

gambling *qui tam* provisions are penal statutes.  The Court should look to the substance of the

*qui tam* statutes to determine whether they are, in their "essential character and effect," a

"punishment of an offense against the public or a grant of a civil right to a private person."

*Philippines*, 821 F. Supp. at 296 (quoting *Huntington*).  Each of these *qui tam* provisions is

decidedly penal under the factors articulated by the *Philippines* court:

> whether the purpose of the law is to punish an infringement of individual rights or
> a breach of public duties; whether the fines imposed would accrue to a public

---

contrary to the controlling precedent on this point from the Kentucky Court of Appeals, *see Jacob*, 72 S.W. at 1096 (ruling that the very same provision is penal), and were roundly criticized even at the time they were issued.  *See* Recent Case, 63 Harv. L. Rev. 888, 889-90 (1950).  Compounding that error, the judge concluded that his court's jurisdiction was coterminous with the state's.  *Farley*, 82 F. Supp. at 30.  The Supreme Court dictates otherwise. *Huntington*, 146 U.S. at 671 (no jurisdiction may "execute the penal laws of another"); *see also, e.g.*, *Mulligan*, *supra.*  These decisions have never been cited except in a cryptic *per curiam* decision of virtually no precedential value.  *Tucker v. Cutler*, 185 F.2d 853 (6th Cir. 1950).
[13]   The Court may recall its decision in *United States ex rel. Estate of Botnick v. Cathedral Healthcare Sys., Inc.*, 352 F. Supp. 2d 530 (D.N.J. 2005), considering whether a *qui tam* claim under the federal False Claims Act ("FCA") should be deemed penal (in which case the claim would not survive death) or remedial.  *Id.* at 531-32.  That case addressed a distinct, and clearly distinguishable, issue.  Critically, in the FCA context, the state is the party that suffers the direct injury, and that injury is the basis for the *qui tam* recovery.  It was specifically for that reason that the Court concluded that damages under the FCA were trebled, *i.e.*, in order to make the state whole for that direct injury by returning the great majority of the *qui tam* recovery to the state.  *Id.* at 532.  Here, in stark contrast, the *gambling loser* is the real injured party, and that harm is the basis for the *qui tam* recovery.  The state suffers no direct injury, and no part of the recovery goes to compensate the gambling loser.  Thus, the gambling *qui tam* statutes present the exact opposite of the structure that drove the Court's analysis in *Botnick*, and serve no remedial purpose whatsoever as to the party injured by the prohibited activity.

> authority or to an individual; whether the fines are calculated to compensate the plaintiff for harm suffered or to punish the defendant for past acts, deter future acts, and provide retribution . . .

*Philippines*, 821 F. Supp. at 297.

*First*, the "essential character and effect" of each statute plainly is to punish those who breach their "public duty" not to engage in unlawful gambling. *See Bodine v. Limberopoulos*, 4 Ohio Supp. 252, No. 105072, 1939 WL 352, at *2 (Comm. Pl. Mahoning Cty. July 28, 1939) (gambling *qui tam* provisions are "imposed as a punishment for the winner's disregard and violation of the positive inhibitions of the gambling statutes"); *Mulligan*, 20 F. Supp. at 959 (*qui tam* action punishes the public wrong of violating New Jersey's lottery statute). The very premise of passage of these statutes was to expand the states' police powers. *See, e.g., Salamon*, 475 N.E.2d at 1298 (noting that such statutes were "born in a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers"); *Bodine*, 1939 WL 352, at *2 (ruling that gambling *qui tam* provisions were designed to penalize gambling winner for breach of public duty). Even the direct loss recovery provisions of these statutes have been ruled to be for the public purpose of "discourag[ing] gambling by giving the loser the right to recover back his losses despite his violation of the law." *Bressler*, 76 N.E.2d at 148.

*Second*, the trebled and even *quadrupled* fines under the *qui tam* statutes are quite clearly not "calculated to compensate the plaintiff," but rather to "punish the defendant for past acts, deter future acts, and provide retribution" by extracting amounts far greater than any actual amounts lost. *Philippines*, 821 F. Supp. at 297; *see* D.C. Code § 16-1702 (*qui tam* recovery is treble gambling loss amount); 720 Ill. Comp. Stat. 5/28-8 (same); Ky. Rev. Stat. Ann. § 372.040 (same); Mass. Gen. Laws ch. 137, § 1 (same); S.C. Code § 32-1-20 (recovery *quadruple* loss amount); *see Zellers,* 70 N.E. at 672 (gambling loss recovery statue "is calculated to make

[unlawful gambling] gains unavailing to the winner, and to remove, to some extent, at least, the incentive to play").[14]  That unambiguous public purpose is further reinforced by the fact that the *qui tam* actions do not typically ripen until *after* the statute of limitations has run on the gambling loser's claim for direct recovery, and no part of the punitive *qui tam* recovery goes to compensate the loser.  *See Cole v. Groves*, 134 Mass. 471, 1883 WL 10885, at *2 (Mass. 1883) (noting that after three month statue runs on gambling loser's claim "all right of action in the loser is gone, and a right of action accrues to any person who may choose to sue for that *penalty*") (emphasis supplied).  Instead, the portion of the punitive *qui tam* recovery that does not go to the state goes exclusively to the *unrelated and unharmed qui tam plaintiff* in order to induce *public* enforcement of the laws and further their public ends.  *Cf. United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 646 n.1 (D.C. Cir. 1994) ("*Qui Tam* provisions first gained popularity in thirteenth-century England as a supplement to ineffective public law enforcement.").  By definition, the "statutory goal" of these third party recovery provisions "is clearly not compensatory or restitution, but rather 'vindication of the public justice.'  As such it is a penal law . . . meant to inflict a pecuniary punishment for ignoring a public responsibility."  *City of Philadelphia*, 407 A.2d at 1296 (citations omitted).

---

[14]   Moreover, the Third Circuit has repeatedly emphasized that "the strong weight of authority . . . supports the characterization of treble damages as punitive."  *Genty v. Resolution Trust Corp.*, 936 F.2d 899, 913 (3d Cir. 1991) (following Fifth and Seventh Circuits in holding that trebled portion of RICO damages is penal because it is part of an "overall attack on the public wrongs of organized crime"); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 219 (3d Cir. 1992) (antitrust treble damages "serve a penal and deterrent function in addition to a remedial one"); *see also Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (noting that Supreme Court has "frequently observed" that treble damages "play an important role in penalizing wrongdoers, and deterring wrongdoing"); *Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt., Inc.*, No. 20050698, 2006 WL 2382725, at *2 (Utah Aug. 18, 2006)  ("because of the highly penal nature of the trebling of damages [in the forcible detainer statute], this provision is subject to strict construction"); *People ex rel. Fahner v. Climatemp, Inc.*, 428 N.E.2d 1096, 1098 (Ill. App. Ct. 1981) (ruling "that any multiplication of the amount of actual damages serves to increase the award beyond the merely compensatory.").

*Third*, the fact that a portion of the fines under four of the statutes "accrue[s] to the public authority" further underscores the plainly "public purpose" of these statutes. *Philippines*, 821 F. Supp. at 297; *see* D.C. Code § 16-1702 (one-half of gambling *qui tam* recovery goes to the use of the District of Columbia); Ga. Code Ann. § 13-8-3 (gambling *qui tam* recovery split jointly between informer and education fund of the county where gambling occurred); N.J. Stat. § 2A:40-6 (one-half of gambling *qui tam* recovery goes to the state); S.C. Code § 32-1-20 (one-half of gambling *qui tam* recovery goes to the use of the county in which the gambling offense was committed).

In short, as in the *Philippines* case, these *qui tam* provisions "impose punitive sanctions not to compensate plaintiffs," but to deter unlawful conduct "by way of example or correction for the public good." 821 F. Supp. at 298. They are penal statutes that address purely "public duties." *Id*. By their history and construction under binding Supreme Court and state precedent, these *qui tam* provisions are penal statues. Accordingly, as demonstrated below, this Court lacks jurisdiction to enforce these statutes.

**B.      This Court Lacks Jurisdiction To Enforce These State Penal Statutes.**

United States District Courts have no original jurisdiction to execute penal laws of the individual states. *Huntington*, 146 U.S. at 673; *State v. Moriarity*, 268 F. Supp. 546, 556 n.12 (D.N.J. 1967) (same); *Tasner v. U.S. Indus., Inc.*, 379 F. Supp. 803, 807 (N.D. Ill. 1974) ("It is generally recognized that penalties fixed by state law are not enforceable in federal courts."); *Kleimeyer v. Payne*, 15 Ohio Dec. 671, 1905 WL 812, at *1 (Super. Ct. 1905) (noting that Ohio court could not enforce a *qui tam* gambling action arising under Kentucky statute). This axiom bars foreign jurisdictions from adjudicating "all suits in favor of the state for the recovery of pecuniary penalties." *Huntington*, 146 U.S. at 671; *Gwin v. Breedlove*, 43 U.S. 29, 37 (1844) ("the courts of the United States hav[e] no power to execute the penal laws of the individual

states"); s*ee also Mulligan,* 20 F. Supp. at 959 (remanding case because court lacked power to

consider alleged violation of New Jersey statute penalizing setting up lotteries).

In seeking to impose massive penalties on Defendants pursuant to eight states' penal

laws, Humphrey asks this Court to violate this axiom *eight times over.*  Because this Court

*cannot* consider those claims as a matter of law, the Court should dismiss this action in its

entirety with prejudice.[15]

## III.    THE COURT SHOULD ABSTAIN FROM CONSIDERING THIS CASE AS IT IS NOT CLEAR THAT ANY OF THE SUBJECT STATES WOULD ENFORCE THESE ARCANE LAWS EVEN AS TO TRUE GAMBLING ACTIVITY

Defendants have demonstrated that by their terms and consistent with controlling law,

these statutes *do not cover Defendants' fantasy leagues.*  Were the Court to conclude nonetheless

that it should enforce these antiquated laws, and that it has the power to do so, it should dismiss

or stay this case under the *Thibodaux* abstention doctrine because it is not clear whether or how

any one of the subject states would *enforce* these arcane laws even as to true gambling activity.

*See Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959).  Because resolution

of this issue plainly presents "difficult questions of state law bearing on policy problems of

substantial public import whose importance transcends the result in the case then at bar,"

*Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 814 (1976); *Chiropractic*

*Am. v. LaVecchia*, 180 F.3d 99, 103 (3d Cir. 1999) (*Thibodaux* abstention is designed to "leave

to the states the resolution of unsettled questions of state law"); *Richman Bros. Records, Inc. v.*

*U.S. Sprint Communications Co*., 953 F.2d 1431, 1443 (3d Cir. 1991) (*Thibodaux* abstention

---

[15]    Indeed, the plain language of the Illinois *qui tam* statute *mandates* that such claims be brought in that state's courts.  720 Ill. Comp. Stat. 5/28-8(a); *Staninger v. Tabor*, 103 Ill. App. 330, 1902 WL 4002, at *3 (Ill. App. Ct. 1901).  Courts in other jurisdictions have reached similar conclusions.  *Kleimeyer*, 1905 WL 812, at *1 (noting that Kentucky gambling *qui tam* statute has "no extra territorial operation or effect").

proper where "unclear state law in federal diversity case and important state interest at stake"),

the Court should abstain under *Thibodaux*.

Thibodaux abstention is proper where the area of law is "continually evolving and to a

certain extent unsettled." *Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225, 228 (S.D.N.Y. 1991).

Here, the very premise of these *qui tam* statutes is obsolete, *Salamon*, 475 N.E.2d at 1298 (noting

that such statutes were "born in a vanished era where the absence of an organized police

authority to enforce criminal statutes made necessary the use of such rewards for informers");

s*ee generally* Randy Best, *The False Claims Act and the English Eradication of Qui Tam

Legislation*, 78 N.C.L. Rev. 539, 531, 601 (2000), and each of the subject states has retreated

from the absolute prohibition on gambling that animated their enactment.  *See, e.g., Caribe

Hilton Hotel v. Toland*, 307 A.2d 85, 86, 88 (N.J. 1973) (noting that New Jersey's "public policy

no longer can be said to condemn gambling *Per se*"); *Mashanutcket Pequot Gaming Ent. v.

Malhorta*, 740 A.2d 703, 706 (N.J. Super. Ct. Law Div. 1999) ("Since the 1976 amendment [to

the New Jersey Constitution], it is even clearer that the enforcement of legally incurred gambling

debts does not offend New Jersey public policy"); *Mills-Jennings of Ohio, Inc. v. Dep't of Liquor

Control*, 435 N.E.2d 407, 409 (Ohio 1982) (noting marked "weakening of [Ohio's] clear and

long-standing antigambling public policy"); *Town Ctrs. Ltd. P'ship v. Montgomery*, No. 99AP-

689, 2000 WL 342768, at *7 (Ohio Ct. App. April 4, 2000) (noting that "the public policy of

Ohio is not as anti-gambling as it once was").  South Carolina, Kentucky, and Illinois have all

explicitly retreated from a total gambling ban to permit increased legalized gambling, *see*,

*Johnson v. Collins Entertainment Co*., 199 F.3d 710, 720 (4th Cir. 1999); *Kentucky Off-Track

Betting, Inc. v. McBurney*, 993 S.W.2d 946, 948 (Ky. 1999); *Cie v. Comdata Network, Inc.*, 656

N.E.2d 123, 125-29 (Ill. App. Ct. 1995), and courts in Georgia and Massachusetts have enforced

judgments arising from gambling debts.  *Hargreaves v. Great Bay Hotel & Casino*, 357 S.E.2d

305 (1987) ; *Claridge at Park Place, Inc. v. Matellian*, No. 951748, 1996 WL 1186889, at *2

(Mass. Super. Ct. April 22, 1996).

In light of this continuing evolution, it is not clear whether or how any one of these *eight*

*different states* would enforce these 18th Century gambling *qui tam* laws in the 21st Century.

Accordingly, failing to dismiss or abstain in this case would cause this Court to engage in the

perilous task of making an "*Erie* guess" as to the present-day and likely distinct meaning of eight

arcane statutes.  *See Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509, 516 &

n.8 (2d Cir. 1973) (citing *Thibodaux* for the proposition that "the Supreme Court today would

[not] demand that federal judges waste their time exploring a thicket of state decisional law" in

cases where they could not "predict [state] law with authority," and noting that doing so only

"prevents a clarification by the state courts"); *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1416-17

(7th Cir. 1994) (*en banc*) (noting impossibility of making such "*Erie* Guesses" in "any principled

fashion" and that doing so intrudes "on the prerogative of the state courts to control that

development") (Ripple, J., dissenting).  This Court should refrain from making that necessarily

unprincipled guess in this case.[16]

The fact that these state *qui tam* statutes may well be unconstitutional reinforces this

conclusion.  Federal courts have confronted the tension between the FCA's empowerment of

private citizens to sue on behalf of the United States and the Article II imperative that the

---

[16]   At least one court has also concluded that gambling loss recovery laws *incentivize* gambling
by permitting the recovery of lawfully-incurred gambling debts across state lines.  *See Rahmani
v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 936-37 (E.D. Va. 1998) ("Indeed, if the [statute
were] to permit this, it would have the perverse effect of encouraging Virginians to gamble,
albeit out-of-state.").  This additional consideration plainly was not present when the *qui tam*
statutes were first enacted in any state, adding yet another level of deep uncertainty as to the
continued viability of these laws.

executive branch alone may enforce the nation's laws.  *See*, *e.g.*, *Ridenour v. Kaiser-Hill Co*., 397 F.3d 925, 934 (10th Cir. 2005) (citing *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (*en banc*)); *United States ex rel. Kelly v. Boeing Co*., 9 F.3d 743, 754 (9th Cir. 1993).  State courts have confronted the same issue under analogous state statutory and constitutional provisions.  *See*, *e.g.*, *Int'l Game Tech., Inc. v. Second Judicial Dist. Ct. of the State of Nevada*, 127 P.3d 1088, 1098 (Nev. 2006); *Scachitti v. UBS Fin. Servs*., 831 N.E.2d 544, 559-62 (Ill. 2005).[17]  Though courts at both levels have resolved that those statutes are constitutional because they provide for *the executive* to exercise ultimate control over the *qui tam* action, *see, e.g.*, *Int'l Game Tech*, 127 P.3d at 1098 (*qui tam* provisions constitutional so long as plaintiff's authority "does not overly interfere with the executive branch's authority"); *Scachitti*, 831 N.E.2d at 559-62 (same); *Riley*, 252 F.3d at 757 (same), these gambling *qui tam* provisions are bereft of any analogous provision.  (*See* Friedman Decl. Exs. V-CC.)  Absent such mandatory executive oversight, these statutes should not pass constitutional muster in any state.

Moreover, abstention is plainly appropriate here because to enforce these gambling laws as to Defendant's fantasy leagues would intrude impermissibly into the very heart of the state's policy power.  *Johnson*, 199 F.3d at 720 (noting that the power to regulate gambling is at the core of "the state's paramount interest in the health, welfare, safety, and morals of its citizens"); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare"); *Martin v. Stewart*, 438 F. Supp. 2d 603, 607 (D.S.C. 2006) ("gambling laws are at the core of the state's police power"); *Chun v. State of New York*, 807 F. Supp. 288, 292 (S.D.N.Y.

---

[17]   Each of the subject states has a constitutional provision analogous to the "Take Care" clause in Article II that embodies the separation of powers doctrine.  *See* U.S. Const. art. II, § 3; D.C. Const. § 401(a); Ga. Const. sec. I, II; Ill. Const. art. V, § 8; Ky. Const. § 81; Mass. Const. 1st Pt., art. XXX; N.J. Const. art. V, § 11; Ohio Const. art. III, § 6; S.C. Const. art. IV, § 15.

1992) ("scope of laws regulating gambling and lotteries is clearly a matter of predominantly state concern").

Because this Court should not wade into the thicket of eight states' uncertain and likely unenforceable laws and rule on a "social welfare" issue at the core of the states' police power, it should abstain under *Thibodaux*. *See Johnson*, 199 F.3d at 719 (abstaining in case brought by habitual gamblers against video poker operators who had purportedly violated state gaming statute by offering "cash payouts in excess of the maximum amount allowed" and "special inducement[s]"); *Martin*, 438 F. Supp. 2d at 607-08 (abstaining from deciding what constitutes "gambling" under South Carolina law); *Chun*, 807 F. Supp. at 292 (abstaining from deciding the scope of regulations of gambling and lotteries).[18]

---

[18]   The *Johnson*, *Martin* and *Chun* courts abstained under the *Burford* doctrine rather than under the *Thibodaux* doctrine. *See Burford v. Sun Oil Co.*, 310 U.S. 315 (1943). As the Supreme Court has explained, *Burford* differs from *Thibodaux* in that the "former . . . unlike the latter . . . raised colorable constitutional claims and [was] therefore brought under federal-question, as well as diversity jurisdiction." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 815, n.21 (1976). Like *Thibodaux*, this action was brought solely on the basis of diversity jurisdiction, (Compl. ¶ 6), whereas the *Johnson*, *Martin*, and *Chun* actions were brought both on both federal questions and diversity jurisdiction grounds. *See Johnson*, 199 F.3d at 717; *Martin*, 438 F. Supp. 2d at 605; *Chun*, 807 F. Supp. at 290. Accordingly, although "*Thibodaux* is really a variant of the *Burford* abstention doctrine," *Grode v. Mutual Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 957 (3rd Cir. 1993), *Thibodaux* is the applicable abstention doctrine in this case.

## <u>CONCLUSION</u>

For all of the foregoing reasons, SportsLine and Sporting News respectfully request that the Court grant their motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Dated:  September 28, 2006

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By:    s/ Kenneth D. Friedman
      Kenneth D. Friedman (Dist. Ct. Bar No. KF6186)

Andrew C. DeVore (NY Bar No. AD3511)
 (*pro hac vice* application forthcoming)
7 Times Square
New York, New York 10036
Tel:  (212) 790-4500
Fax:  (212) 790-4545

*Attorneys for Defendants SportsLine.com, Inc.* and *Vulcan Sports Media, Inc.* d/b/a The Sporting News

41037778.10