**GARDY & NOTIS, LLP**
Mark C. Gardy (MG-0338)
James S. Notis (JN-4189)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7337
Fax: 201-567-7377

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHARLES E. HUMPHREY, JR.,

          Plaintiff,

v.

VIACOM INC.,
CBS CORPORATION,
CBS TELEVISION NETWORK,
SPORTSLINE.COM, INC.,
THE WALT DISNEY COMPANY,
ESPN, INC.,
THE HEARST CORPORATION,
VULCAN, INC.,
VULCAN SPORTS MEDIA and
THE SPORTING NEWS,

          Defendants.

No. 2:06 Civ. 2768 (DMC)(MF)

**ORAL ARGUMENT
REQUESTED**

Return Date: November 27, 2006

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................iii

PRELIMINARY STATEMENT.........................................................1

STATEMENT OF FACTS................................................................3

ARGUMENT...................................................................................5

I.     THE STANDARDS APPLICABLE TO DEFENDANTS
      MOTIONS...............................................................................5

II.    ALL OF THE ELEMENTS OF GAMBLING ARE
      PRESENT IN THE PARTICULAR PAY-TO-PLAY
      FANTASY SPORTS LEAGUES RUN BY
      DEFENDANTS........................................................................7

          A.    Prize............................................................................7

          B.    Chance.........................................................................7

          C.    Consideration...............................................................8

III.   DEFENDANTS' EFFORTS TO DISTINGUISH THEIR
      BUSINESS FROM GAMBLNG ARE UNAVAILING......................9

          A.    Chance v. Skill............................................................10

          B.    The Bet vs. Entry Fee Distinction Without a
              Difference...................................................................12

          C.    Prizes Are, in Fact, Based on the Number of Players
              in a Fantasy League.....................................................15

          D.    Defendants Are "Winners"............................................16

# TABLE OF CONTENTS
## (continued)

**Page**

E.    Defendants' Services Are Just a Cost of Doing Business and Are Irrelevant to a Determination Of Whether the Fantasy Sports Leagues Constitute Gambling.................................................................17

IV.  PLAINTIFF'S COMPLAINT MEETS THE REQUIREMENTS FOR ALLEGING THE *QUI TAM* CLAIMS.............................................................18

V.   *THIBODAUX* ABSTENTION DOES NOT APPLY.........................19

VI.  OTHER FEDERAL COURTS HAVE EXERCISED JURISDICTION OVER THE SAME *QUI TAM* STATUTES.......................................................25

CONCLUSION..............................................................28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Boardwalk Regency Corp. v. Attorney General of State of N.J.*,
457 A.2d 847 (N.J. Super. Ct. Law Div. 1982)............................. 7, 11

*Boosalis v. Crawford,*
99 F.2d 374 (D.C. Cir. 1938) ........................................................... 11

*Bressler v. Averbuck*,
76 N.E.2d 146 (Mass. 1947)............................................................. 18

*Colorado River Water Conservation District v. Akin*,
424 U.S. 800 (1976) ..................................................... 19, 20, 21, 22, 24

*Buford* and *Railroad Comm'n of Texas v. Pullman Co.*,
312 U.S. 496 (1941) ........................................................................... 23

*Buford v. Sun Oil Co.*,
319 U.S. 315  (1943) ......................................................................... 23

*Chiropractic America v. Lavecchia*,
180 F.3d 99 (3d Cir. 1999) .............................................................. 23

*Chun v. State of New York*,
807 F. Supp. 288 (S.D.N.Y. 1992)................................................... 23

*Club Association of West Virginia, Inc. v. Wise*,
156 F. Supp.2d 599 (S.D. W.Va. 2001) ........................................... 22

*Cobaugh v. Klick-Lewis, Inc.*,
561 A.2d 1248 (Pa. Super. Ct. 1989) ............................................... 11

*Commonwealth v. Allen*,
404 S.W.2d 464 (Ky. 1966) ............................................................. 11

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Commonwealth v. Lake*,
    57 N.E.2d 923 (Mass. 1944)................................................................ 11

*Conley v. Gibson*,
    355 U.S. 41 (1957) ............................................................................... 6

*Federal Communications Commission v. American Broadcasting Co.*,
    347 U.S. 284 (1954) ............................................................................. 6

*Foman v. Davis*,
    371 U.S. 178 (1962) ........................................................................... 28

*Glen 6 Associates, Inc. v. Dedaj*,
    770 F. Supp. 225 (S.D.N.Y. 1991).................................................... 22

*Glick v. MTV Networks*,
    796 F. Supp. 743 (S.D.N.Y. 1992)......................................... 3, 24, 25

*Gomez v. Toledo*,
    446 U.S. 635 (1980) ............................................................................. 5

*Grant v. State*,
    44 S.E.2d 513 (Ga. App. 1947) ......................................................... 11

*Grayson v. Mayview State Hosp.*,
    293 F.3d 103 (3d Cir. 2002) .............................................................. 28

*Hayes v. Gross*,
    982 F.2d 104 (3d Cir. 1992) ................................................................ 5

*Hedges v. United States*,
    404 F.3d 744 (3d Cir. 2005) ................................................................ 6

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ............................................................................... 6

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Allen,*
    377 P.2d 280 (Cal. 1962) ............................................................. 8, 10

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997) ...................................................... 5, 28

*Jacob v. Clark,*
    72 S.W. 1095 (Ky. Ct. App. 1903) ................................................... 26

*Johnson v. Collins Entertainment Co., Inc.,*
    199 F.3d 710 (4th Cir. 1999) ........................................................... 22

*Kleimeyer v. Payne,*
    15 Ohio Dec. 671, 1905 WL 812 (Ohio Super. May 1905) .............. 27

*Lac D'Amiante Du Quebec v. American Home Assurance Co.,*
    864 F.2d 1033 (3d Cir. 1988) ..................................................... 21, 23

*Las Vegas Hacienda v. Gibson,*
    359 P.2d 85 (Nev. 1961) ............................................................ 11, 13

*Louisiana Power & Light Co. v. City of Thibodaux,*
    360 U.S. 25 (1959) ..................................................................... 19, 20

*Luce v. Edelstein,*
    802 F.2d 49 (2d Cir. 1986) ............................................................... 28

*Lucky Calendar Co. v. Cohen,*
    117 A.2d 487 (N.J. 1955) ................................................................... 7

*Martin v. Stewart,*
    438 F. Supp. 2d 603 (D.S.C. 2006) .................................................. 23

*Mulligan v. Western Union Tel. Co.,*
    20 F. Supp. 953 (D.N.J. 1937) .......................................................... 27

v

## TABLE OF AUTHORITIES
### (continued)

Page

*Nami v. Fauver*,
　82 F.3d 63 (3d Cir. 1996) ..................................................... 5

*Phillips, Nizer, Benjamin, Krin & Ballon v. Rosentstiel*,
　490 F.2d 509 (2d Cir. 1973) ............................................... 22

*Progress Vending, Inc. v. Department of Liquor Control*,
　394 N.E.2d 324 (Ohio Ct. App. 1978) .............................. 11

*Richmand Bros. Records, Inc. v. U.S. Sprint Communications Co.*,
　953 F.2d 1431 (3d Cir. 1991) ............................................. 23

*Salamon v. Taft Broadcasting Co.*,
　475 N.E.2d 1292 (Ohio Ct. App. 1984) ........................... 18

*Scott v. Curd*,
　101 F. Supp. 396 (E.D. Ky. 1951)..................................... 26

*Shaev v. Saper*,
　320 F.3d 373 (3d Cir. 2003) ............................................... 5

*State v. American Holiday Assoc.*,
　727 P.2d 807 (Ariz. 1986) ................................................. 14

*State v. Moriarity*,
　268 F. Supp. 546 (D.N.J. 1967).......................................... 27

*U.S. v. Korpan*,
　354 U.S. 271 (1957) ..................................................... 9, 10

*Tasner v. U.S. Industries, Inc.*,
　379 F. Supp. 803 (N.D. Ill. 1974)...................................... 27

*Vinson v. Casino Queen, Inc.*,
　123 F.3d 655 (7th Cir. 1997)............................ 3, 24, 25, 27

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997) ................................................................. 5

*Wilkinson v. Stitt*,
175 Mass. 581, 56 N.E. 830 (Mass. 1900) ........................................ 13

*Wilson v. Conlin*,
3 Ill. App. 517, 1878 WL 10565 (Ill. App. Ct. 1878) ....................... 13


**STATUTES**

Federal:
Fed. R. Civ. P. 15(a) ........................................................................... 28

District of Columbia:
D.C. Code §16-1702 ............................................................................ 5

Georgia:
O.C.G.A §13-8-3(b) ............................................................................ 5

Illinois:
720 ILS 5/28.8 ................................................................... 3, 5, 24, 25

Kentucky:
KSR §372.020 ...................................................................................... 5

KSR §372.040 ................................................................................ 5, 26

KSR §446.080 .................................................................................... 26

Massachusetts:
ALM GL Ch. 137, §1 ........................................................................... 5

vii

## TABLE OF AUTHORITIES
### (continued)

**Page**

New Jersey:

    N.J.S.A. §2A:40-6 .............................................................. 3, 5, 24, 25

Ohio:

    ORC §3763.02 ........................................................................... 5

South Carolina:

    S.C. Code Ann. §32-1-20 ..................................................... 5

**OTHER**

South Carolina Attorney General Informal Opinion,

    1995 WL 805729 (S.C.A.G. Sept. 5, 1995) ........................................ 11

Plaintiff Charles E. Humphrey, Jr. ("Plaintiff"), by his attorneys, respectfully submits this memorandum of law in opposition to the motions to dismiss filed by defendants SportsLine.com, Inc. ("SportsLine"), Vulcan Sports Media, Inc. d/b/a/ The Sporting News ("Sporting News") and ESPN, Inc. ("ESPN").[1]

## PRELIMINARY STATEMENT

This a *qui tam* action whereby Plaintiff,[2] pursuant to the gambling loss recovery statutes of New Jersey and eight other states, seeks to recover statutory losses incurred by participants in prize-based "pay-to-play" fantasy sports leagues operated by the Defendants.  Each of the defendants operated and promoted Internet-based fantasy sports leagues in which the participants agree to pay a specified amount of money to participate; the determination

---

[1]   SportsLine, Sporting News and ESPN are collectively referred to as the "Defendants."

[2]   SportsLine/Sporting News' disparaging description of Plaintiff as a "professional poker player" with some personal political agenda (SportsLine/Sporting News Memorandum of Law ("SL/SN Mem.") at 1) is, in addition to being plainly inappropriate, just plain false as well.  In fact, Plaintiff is an attorney and formerly was a partner in the Kirkland & Ellis law firm and also a former SEC staff attorney.  Plaintiff's law practice focuses on gambling law, and he currently maintains a website, www.gambling-law-us.com, that presents the federal and state gambling laws and numerous articles discussing and analyzing gambling law.  The website is very popular.  It is the number one returned hit for the Google search of "gambling law" and is, amazingly, in the top ten Google hits for the search of "gambling."

of winners is based predominantly on chance rather than skill; and the winners receive a monetary or other valuable prize well in excess of the fees paid.  Defendants receive the wagers made by participants to play in the fantasy sports leagues.  These wagers represent gambling losses.  The wagers are the source of revenues and profits to defendants from operating these Internet fantasy sports leagues.  That fantasy sports leagues are popular and played by many enthusiasts does not alter the conclusion that Defendants' fantasy sports leagues meet all of the elements of gambling – prize, chance and consideration.

Defendants' motion to dismiss asks this Court to find, as a matter of law and in the absence of any factual record, that fantasy sports leagues do not constitute gambling.  However, no court has ever has ever ruled that fantasy sports leagues do not constitute gambling, or that fantasy sports contests are games of skill, and this Court should not immunize Defendants conduct in the context of a motion to dismiss.  Indeed, Defendants motions are largely based on disputed factual contentions regarding the services they claim to provide (or the characterization of such services) rather than a challenge to the sufficiency of the pleading itself.  The Complaint plainly gives Defendants adequate notice of Plaintiff's claims, and this Court should follow the lead of other modern courts that have addressed the anti-gambling

2

*qui tam* laws in the context of summary judgment and not a motion to dismiss. *See, e.g., Glick v. MTV Networks*, 796 F. Supp. 743, 747-48 (S.D.N.Y. 1992) (addressing summary judgment as to whether an MTV "900" number sweepstakes constituted violations of N.J.S.A. §2A:40-6); *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997) (reviewing summary judgment decision with respect to whether 720 ILS 5/28.8 applied to gambling).

## STATEMENT OF FACTS

Armed with the technological abilities of the Internet, what was once a small game played socially among friends has been transformed into a lucrative industry dominated by large multi-media corporations. Complaint ¶¶23-28. Although first operated largely by providing statistics and player information for their fantasy league participants, operation of the leagues has since shifted to payment of fees to the league operators in return for participants to bet on the performance of professional athletes and the outcome of football, baseball, hockey and basketball games, for the chance to win a prize well in excess of the fees paid. *Id.*

Each of the Defendants operate Internet-based fantasy sports leagues whereby players pay the Defendants fees ranging from $9.99 to $499.95 to operate as a virtual team owners in "drafting" real-life professional athletes

3

to be members of their respective fantasy teams. *Id.* at ¶¶33-34, 37-38, 41-43, 45-48. As these professional athletes compete in their football, baseball, hockey or basketball games, the statistics of their real-life performance[3] are used by Defendants to award fantasy points to their virtual team owners. *Id.* at 47. These points ultimately determine a winner in either rotisserie or head-to-head scoring options, the latter featuring weekly match-ups between the league's teams. *Id.* The team that accumulates the most points or victories over the course of the season – and in the case of head-to-head prevails in the postseason – is declared the league winner and awarded a cash or other valuable prize, ranging from $25 to $5,000. *Id.* at ¶¶33-34, 37-38, 41-43, 45-48. The higher the payment to participate in certain of Defendants' leagues (Gold, Platinum, Diamond, Double Diamond for SportsLine), the higher the prize payout. *Id.* To the extent that Defendants offer free leagues without payment, prizes are not available to participants in those leagues. *See, e.g.*, Friedman Decl. (Dkt. No. 11) Ex. Q at 9 ("No prizes are awarded in free leagues").

---

[3] There are many instances where the goals of real life athletes and sports teams to win games diverge from the goals of the participants in Defendants fantasy sports leagues to win points for a shot at valuable prizes. *See, e.g.*, Complaint ¶¶51-63. However, participants in Defendants' leagues obviously have no control over the performance of the professional athletes that comprise their virtual teams.

Plaintiff's Complaint sets forth well-pleaded factual allegations that Defendants' fantasy sports leagues constitute gambling, and thereby support Plaintiff's claims seeking to recover the gambling losses of league participants under the anti-gambling *qui tam* laws of New Jersey and six other states and the District of Columbia.[4]

## **ARGUMENT**

## I.   **THE STANDARDS APPLICABLE TO DEFENDANTS' MOTIONS**

When considering a motion to dismiss based on the pleadings, the Court must read the Complaint in a light most favorable to the Plaintiff, presume the truth of the Complaint's allegations, and give Plaintiff the benefit of every reasonable inference to be drawn from them.  *See Shaev v. Saper*, 320 F.3d 373, 375 (3d Cir. 2003), *citing Hayes v. Gross*, 982 F.2d 104, 105-06 (3d Cir. 1992); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996); *Gomez v. Toledo*, 446 U.S. 635, 636 (1980); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).  "The defendant bears the burden of

---

[4]   The relevant statutes are D.C. Code §16-1702 (District of Columbia); O.C.G.A §13-8-3(b) (Georgia); 720 ILS 5/28.8 (Illinois); KSR §§372.020 & 372.040 (Kentucky); ALM GL Ch. 137, §1 (Massachusetts); N.J.S.A. §2A:40-6 (New Jersey); ORC §3763.02 (Ohio); and S.C. Code Ann. §32-1-20 (South Carolina).

showing that no claim has been presented," *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

These standards are particularly important here, where so much of Defendants' motions are based on factual contentions raised by Defendants to try and distinguish their operations from gambling. Indeed, the difficulties in determining whether a scheme involved gambling was noted by Chief Justice Warren in *Federal Communications Commission v. American Broadcasting Co.*, 347 U.S. 284, 292-93 (1954):

> Law enforcement officers, federal and state, have been plagued with as many types of lotteries as the seemingly inexhaustible ingenuity of their promoters could devise in their efforts to circumvent the law. When their schemes reached the courts, the decision, of necessity, usually turned on whether the scheme, on its own peculiar facts, constituted a lottery. So varied have been the techniques used by promoters to conceal the joint factors of prize, chance, and consideration, and so clever have they been in applying these techniques to feigned as well as legitimate business activities, that it has often been difficult to apply the decision of one case to the facts of another.

These standards show that a motion to dismiss is not the appropriate context in which to resolve the many disputed factual contentions raised by Defendants.

6

## II.   ALL OF THE ELEMENTS OF GAMBLING ARE PRESENT IN THE PARTICULAR PAY-TO-PLAY FANTASY SPORTS LEAGUES RUN BY DEFENDANTS

Each of the Defendants operates an enterprise that has all of the necessary elements of gambling: prize, chance and consideration.  *Lucky Calendar Co. v. Cohen*, 117 A.2d 487, 494 (N.J. 1955) ("[I]t has often been said in the decisions that there are three essential elements of a lottery: (1) the distribution of prizes, (2) according to chance, (3) for a consideration.").

### A.   Prize

Prizes are won in Defendants' leagues by the players who make the most correct picks of how well one or more athletes will perform in sporting contests in which no league player is a participating athlete.  Complaint, ¶¶33, 34, 37, 38, 41-43.

### B.   Chance

The element of chance is present due to the ever-present human element involved in how well an athlete will perform, such as if his performance will be altered by other factors such as injuries, or even whether the athlete will play at all.  Chance is present where the elements of chance are material in determining outcome.  *Boardwalk Regency Corp. v. Attorney General of State of N.J.*, 457 A.2d 847, 850 (N.J. Super. Ct. Law Div. 1982) ("Thus, the proper focus of the inquiry here [whether the game of

7

backgammon was a game of skill, which the court held it was not] is not on the level of skill which may affect the outcome of the contested activity but rather on whether the element of chance is a factor that is material to the final result.").

Many states have adopted a somewhat narrower view, requiring that the elements of skill predominate over those of chance in determining outcome.  Among the most pertinent cases on skill games is *In re Allen,* 377 P.2d 280 (Cal. 1962), where the California Supreme Court announced the defining elements of a game of skill in the context of contract bridge, which it upheld as a game of skill:

> The term 'game of chance' has an accepted meaning established by numerous adjudications.  Although different language is used in some of the cases in defining the term, the definitions are substantially the same. It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill.  The test is not whether the game contains an element of chance or an element of skill but which of them is the ***dominating factor*** in determining the result of the game.

377 P.2d at 281 (citations omitted; emphasis added).

## C.   <u>Consideration</u>

Defendants receive and keep, and thus win, the pay-to-play net consideration that must be paid by the players in order to be allowed to enter theses fantasy sports games of chance.  Complaint ¶¶33, 37 and 41 (listing

8

amounts).  The net consideration is the amounts required to be paid by the players less the stated and to-be-determined amounts of the prizes paid out. *Id.* (listing amounts).

## III.   DEFENDANTS' EFFORTS TO DISTINGUISH THEIR BUSINESS FROM GAMBLING ARE UNAVAILING

Defendants' efforts to camouflage the true nature of their businesses – gambling games with elements of illegal bookmaking and aspects of lotteries – cannot withstand scrutiny, and largely involve factual contentions inappropriate for resolution in the context of a motion to dismiss.

Indeed, gambling operators have long tried to hide the true nature of their activities with ingenious twists on garden-variety gambling activities and by raising inapplicable arguments.  For instance, the defendant in *U.S. v. Korpan*, 354 U.S. 271, 274 (1957), who were charged with failing to pay a per device tax applicable to the operation of gambling machines, contended that the subject pay-to-play pinball machines involved a degree of skill and were thus not gambling machines as envisioned by the tax statute.   In upholding the application of the statute to the operation of these pinball machines, Justice Black explained that:

> If the respondent's position were adopted [the tax statute] would be restricted to a peculiar type of gambling device – the so-called 'one-armed bandit' – even though ingenuity, a desire to avoid taxes, and technological progress provide a multitude of new devices which permit substantially the same kind of

gambling but only with a different kind of coin-operated machine[].

354 U.S. at 276-277.

Just as in *Korpan,* Plaintiff here should not be prevented from advancing his case alleging that the true nature of Defendants' leagues constitute gambling, notwithstanding the ingenuity, desire to profit and technological niceties invented by Defendants to dress up their gambling games.

A.     **Chance vs. Skill**

The claims in this litigation center largely on whether and to what extent the outcome of Defendants' games are based on chance.   The Complaint alleges in great detail that chance is involved because the outcome-determinative performances of athletes involved in sporting contests is based on human factors that are never predictable with any predominant degree of accuracy.   Complaint ¶¶49-63.   Defendants try to disguise the presence of the predominantly chance nature of the games they offer by contending that the efforts of those who bet on the game involve skill.   However, the mere presence of skill is legally inapposite.   Rather, in order to avoid the element of chance being legally present, the elements of skill must ***predominate*** over the elements of chance in determining outcome. *See In re Allen*, 377 P.2d at 281.   All of the states with gambling-loss

10

recovery statutes that are raised in this lawsuit, with the exception of Illinois,[5] apply this predominance test, or, in the case of New Jersey a stricter test.  *See, e.g.*, *Boosalis v. Crawford,* 99 F.2d 374, 376 (D.C. Cir. 1938); *Grant v. State,* 44 S.E.2d 513, 515 (Ga. App. 1947); *Commonwealth v. Allen*, 404 S.W.2d 464, 466-67 (Ky. 1966); *Commonwealth v. Lake*, 57 N.E.2d 923, 924 (Mass. 1944); *Boardwalk Regency Corp. v. Attorney General of State of New Jersey*, 457 A.2d 847, 852 (N.J. Super. Ct. Law Div. 1982); *Progress Vending, Inc. v. Department of Liquor Control*, 394 N.E.2d 324, 328-29 (Ohio Ct. App. 1978); September 5, 1995 South Carolina Attorney General Informal Opinion, 1995 WL 805729, at *3 (S.C.A.G. Sept. 5, 1995), citing dissent in *Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1251 (Pa. Super. Ct. 1989) rejecting *Las Vegas Hacienda v. Gibson*, 359 P.2d 85 (Nev. 1961) (golf hole-in-one was predominantly skill based).

***There is no legal precedent to support a contention that pay-to-play fantasy sports leagues are games of skill***, and the Court cannot reasonably resolve the issue in the context of a motion to dismiss in light of Plaintiff's well-pleaded allegations that chance predominates.  Indeed, the game rules submitted by the Sporting News evidence the absence of skill and support

---

[5]   The Illinois courts have not directly addressed the predominance test.

11

Plaintiff's allegations.  The Sporting News' game rules state that "Winning at Ultimate Fantasy Hockey takes intuition, luck, research and trial and error."  Friedman Decl. Ex. F at 3 (under the caption "What's the basic strategy?").  Three of the four factors that The Sporting News concedes are involved in winning are chance based: intuition, luck and trial and error. Only research appears to be skill based.  Given the undisputed similarities in the games operated by all Defendants, these same factors admitted by the Sporting News would apply equally to the games operated by SportsLine and ESPN.

**B.    The Bet vs. Entry Fee Distinction Without a Difference**

Defendants contend that their pay-to-play fantasy sports leagues do not involve bets, but rather the mere payment of entry fees in order to become eligible for a pre-determined prize that Defendants must award in all events.  Defendants say: "There can be no bet or wager here because the prizes are fixed by contract in advance of the competition and Defendants are certain to pay out those fixed prizes to the best-performing team manager at the conclusion of the season." SL/SN Mem. at 9; *see also* ESPN Mem. at 23-24.

Defendants' argument is flawed in several respects.  Fundamentally, to the extent that a handful of courts have recognized a "bet vs. entry fee"

distinction, those decisions have done so only in the context of games of skill, and so are not applicable here, where the outcome of the games is entirely dependent on the performance of third parties in football, baseball, hockey and basketball games.   Moreover, Defendants' reliance on these cases is also misplaced because almost all of the cases apply the law of the states whose gambling laws are not at issue in this litigation, and the three cases cited by Defendants from relevant states whose *qui tam* laws are relevant to this action involved actual contests of skill, such as bicycle racing, horse race contests among the owners of the horses, and, in more modern cases golf hole-in-one contests and puzzle-solving contests.   *See, e.g.*, *Wilson v. Conlin*, 3 Ill. App. 517, 1878 WL 10565, at *1 (Ill. App. Ct. 1878) (payment of an entry fee for a chance to enter a horse owned by the person paying the fee, who then stood to win a prize based on how well his horse ran as compared with the other entrants, deemed a skill-based competition, where the underlying race was not unlawful.); *Wilkinson v. Stitt*, 175 Mass. 581, 583, 56 N.E. 830 (Mass. 1900) (addressing right of a winning bicycle club to gain possession for a year of a challenge trophy cup under the terms of a trust granting that right [much the same as the right to hold the traveling trophy awarded to the winner of the America's Cup]); *Las Vegas Hacienda v. Gibson*, 359 P.2d 85, 86-87 (Nev. 1961) (skill dominates

13

in hole-in-one golf prize game); *State v. American Holiday Assoc.*, 727 P.2d 807, 810 (Ariz. 1986) (puzzle-solving contest "are not like most bookmaking operations because prizes are not awarded on the basis of the outcome of some event involving third parties").[6]

Ultimately, Defendants do not cite to any case that has held, as they ask this Court to find, that a gambling game of chance can be exempted from the anti-gambling laws of a state by merely denominating the bet as being an "entry fee" and fixing the payout of a prize before the beginning of the game of chance. Defendants' argument, taken to its logical conclusion, would sanction a clearly illegal activity such as a lottery not specifically authorized by state law. Consider a situation where the owner of a house sells raffle tickets for a given price per ticket, with the holder of the winning ticket receiving the house as a prize. Skill is not involved in determining the winner of the house. This is illegal gambling under applicable state laws

---

[6] The Arizona legislature subsequently overturned the result in *American Holiday* by amending Arizona Revised Statutes Sec. 13-3305(A) to provide: "no person may engage for a fee, property, salary or reward, in the business of accepting, recording or registering any bet, purported bet, wager or purported wager . . . with respect to the result or purported result of any race, sporting event, contest *or other game of skill* or chance or any other unknown or contingent future event or occurrence whatsoever." (Emphasis added.)

notwithstanding the payment of a fixed entry fee to win a guaranteed prize announced in advance.

**C.    Prizes Are, in Fact, Based on the Number of Players in a Fantasy League**

Defendants' seek to bolster their entry fee argument by advancing the factual contention that the prize is determined without regard to the number of participants in the contest.  *See* SL/SN Mem. at 10 (asserting that "prizes are established by contract at the outset of the season regardless of the number of players in each league or the cumulative amount of their entry fees."); ESPN Mem. at 6 (asserting that prizes "do not depend upon the number of participants").  In fact, however, the rules of the leagues specify how many teams will compete for the prize offered, such that there is a pre-determined number of participants, which Defendants certainly take into consideration in determining the prizes they will offer.

That the prizes are based on the number of players/teams in a given league is evidenced by the game rules cited by Defendants.  For instance, SportsLine's rules for prize eligibility in its football, basketball and hockey leagues state that "[a]ll leagues are required to have 12 participants or team 'owners'" (Friedman Decl. Ex. O (football), Ex. P (basketball), Ex. Q (hockey)), with "10 participants or team 'owners'" required for prizes in the baseball leagues.  *Id.* at Ex. N.  The game rules for the Sporting News

15

leagues state that "To be eligible for league prizes, he/she must be in a League with 10 teams or more." *Id.* at Ex. F (text contained in the hyperlink referred to at page 2 of the exhibit).[7]  Prizes in the ESPN leagues are also based on a full compliment of teams in order for a league to be formed. *See* http://sports.espn.go.com/fantasy/football/ffl/story?page=fflrulesleagues ("Each standard league consists of 10 teams . . . [L]eagues must have all team spots filled").

Thus, Defendants' assertion that their prizes are without regard to the number of participants in the leagues is demonstrably false.

### D.    Defendants Are "Winners"

Another of Defendants' contentions that is utterly without merit is that these fantasy sports league operators are immunized from liability because they are not a "'winner' who either participates in gambling activity or bets on others who do."   SL/SN Mem. at 2; *see also* ESPN Mem. at 29.[8] Defendants participate in gambling activity by virtue of their offering and

---

[7]    The                         hyperlink                         is: http://fantasygames.sportingnews.com/hockey/fullseason/ultimate/about/ga me_rules.html#whatis_prizes, with the "click here" instructions leading to http://fantasygames.sportingnews.com/hockey/fullseason/ultimate/about/priz es.html.

[8]    All the *qui tam* laws underlying Plaintiff's claims indisputably permit recovery against the winner.

conduct of the leagues. They are also the direct recipients, and thus the winners, of the amounts bet by players in these pay-to-play fantasy sports leagues in the same sense that the bookmaker is the winner of all amounts paid in to it by losing bettors.

**E.   Defendants' Services Are Just a Cost of Doing Business and Are Irrelevant to a Determination Of Whether the Fantasy Sports Leagues Constitute Gambling**

That Defendants offer services to players does not distinguish Defendants' leagues from run-of-the-mill gambling games. In fact, the nature of the services offered is akin to the publishing of betting lines by bookies, the offering of new online technology making it easier and more convenient for players to wager, or the operation, participation in and hosting of online forums discussing various aspects of the wagers made. The cost of providing the services may cut into the net profits of the Defendants, but does not change the essential nature of the game being offered: a gambling game akin to a combination of bookmaking and the conduct of a semi-disguised lottery.

In any event, players must pay the total amount demanded by the Defendants to participate in a given fantasy sports league in order for a player to become eligible to win the prize offered. This fact obviates and

17

makes irrelevant the argument that players are paying to access the Defendants' services.

## IV.   PLAINTIFF'S COMPLAINT MEETS THE REQUIREMENTS FOR ALLEGING THE *QUI TAM* CLAIMS

Defendants various attacks on the sufficiency of Plaintiff's pleading are misplaced and cannot withstand scrutiny.

The *qui tam* statutes do not require an identification of the bettors or the amounts of their bets, as Defendants contend.  Indeed, Defendants cited authority supports the notice pleading standard applicable here, but dismissed the cases based on reasons such as the absence of adequate records detailing losses at other gambling games.  *See, e.g.*, *Salamon v. Taft Broadcasting Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) (identification of people playing various midway-type games at an amusement park was "unknown and unknowable"); *Bressler v. Averbuck*, 76 N.E.2d 146, 148 (Mass. 1947) (direct, non-*qui tam* action, did not adequately specify time period of the alleged losses by playing cards over a five-month period).  These cases are largely inapplicable where, as here, the identities of the particular players in these leagues and the amounts they bet, and when they bet (based largely on deadlines under the game rules) is all

readily ascertainable by the Defendants, as well as being in their exclusive domain.

Defendants' argument that certain of the leagues do not satisfy the minimum loss requirement of certain of the *qui tam* statutes is simply a matter of damages as to individual losses and does not support dismissal of Plaintiff's claims as a matter of law, where, as here, each of the Defendants operated leagues with payments well in excess of the statutory minimum. *See, e.g.*, Complaint ¶33 (SportsLine leagues ranging from $24.95 to $499.95), ¶37 (ESPN leagues ranging from $29.95 to $69.95), ¶42 (Sporting News leagues ranging from $9.99 to $199.95).

## V.    *THIBODAUX* ABSTENTION DOES NOT APPLY

The *Thibodaux* doctrine that a federal court may abstain from deciding matters over which it would normally have jurisdiction stems from the Supreme Court's decision in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 30 (1959), and was subsequently limited in its use by the Court's later decision in *Colorado River Water Conservation District v. Akin*, 424 U.S. 800, 813-14 (1976). *Thibodaux* was a diversity-based case challenging a local municipality's attempt to use a state statute for an eminent domain taking. 360 U.S. at 29-30. After noting the district judge's quandary where the state statute appeared to permit the taking; the state's

Attorney General concluded that the statute did not permit the taking; and the statute had never been interpreted by any court, the Court upheld the district judge's decision to abstain from deciding the case. *Id.* at 30.

The Court in *Thibodaux* did not address any particular standards for abstention, other than referring to "the special nature of eminent domain" and a federal court's general discretion to stay proceedings pending resolution of a state court declaratory judgment action. *Id.* at 29-30. Rather, the standards for abstention were set forth seventeen years later in the *Colorado River* case:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163, 1166 (1959). "[I]t was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it." *Alabama Pub. Serv. Comm'n. v. Southern R. Co.*, 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002, 1015 (1951) (Frankfurter, J., concurring in result).

424 U.S. at 813-14.

The Court in *Colorado River* noted the circumstances appropriate for abstention include[9] a case "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" (*citing Thibodaux*), but that "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction," does not "impair impermissibly the State's effort to effect its policy," and does not "interrupt any such efforts by restraining the exercise of authority vested in state officers."  424 U.S. at 815-16.[10]

Here, there is no basis for abstention that meets the standards set forth in *Colorado River*, as this Court's consideration of Plaintiff's *qui tam* claims will not disrupt (let along transcend) any state effort at regulating gambling activity or affect any state policy with respect to gambling and defendants

---

[9] This was one of "three general categories" in which the Court "confined the circumstances appropriate for abstention."  424 U.S. at 814. The other two categories are "cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law," *Id.*, and cases in which "jurisdiction has been invoked for the purpose of restraining state criminal proceedings… absent bad faith, harassment, or a patently invalid state statute."  *Id.* at 816.

[10] Defendants conspicuously fail to address the standards applicable to *Thibodaux* abstention and fail to address what the Third Circuit has called a "comprehensive restatement of abstention doctrine" set forth in *Colorado River.  See Lac D'Amiante Du Quebec v. American Home Assurance Co.*, 864 F.2d 1033, 1044 (3d Cir. 1988).

have failed to point to any such disruption apart from the unremarkable fact that an adverse decision would adversely impact their business. That states have elected not to set policy with respect to pay-to-play fantasy sports leagues further demonstrates that any disruption to state policy is purely speculative and thus insufficient under *Colorado River*. Indeed, most of the cases cited by Defendants that address *Thibodaux,* addressed claims where the state was actively setting policy that might be disrupted by the federal court.[11] Other cases cited by Defendants addressed abstention where plaintiffs made direct challenges to a specific state statute or state regulation

___

[11]  *See, e.g.*, *Glen 6 Associates, Inc. v. Dedaj*, 770 F. Supp. 225, 228-29 (S.D.N.Y. 1991) (remanding landlord/tenant case where removal was a tactic to thwart the state's policy of providing state court summary eviction proceedings for unpaid rent); *Phillips, Nizer, Benjamin, Krin & Ballon v. Rosentstiel*, 490 F.2d 509, 516 (2d Cir. 1973) (noting that the defendants could have (but failed to) seek a timely stay of a federal action for attorneys' fees rendered in a state court matrimonial action because the state courts have exclusive jurisdiction over matrimonial actions); *Johnson v. Collins Entertainment Co., Inc.*, 199 F.3d 710, 715-16 (4th Cir. 1999) (Abstention appropriate in case brought by habitual gamblers "addicted to video poker" against video poker operators because the "South Carolina General Assembly has been engaged in extensive efforts to regulate the video poker industry"; the state's Department of Revenue and Law Enforcement Division have "enforced the laws" [citing examples]; and the state's Attorney General "issues opinions on a wide range of video poker matters."); *Club Association of West Virginia, Inc. v. Wise*, 156 F. Supp.2d 599, 607-608 (S.D. W.Va. 2001) (Challenge to recently enacted Limited Video Lottery Act that "fundamentally alters the regulation of video poker and gambling machines" and was passed "[a]fter decades of public policy wrestling in all three Branches").

(and therefore a direct challenge to state policy), such that abstention under *Buford v. Sun Oil Co.*, 319 U.S. 315, 333 (1943) (abstention of federal claims to let state courts and/or state tribunals first address challenges of important, complex and comprehensive state administrative agency regulatory framework) was appropriate. *See, e.g.*, *Chiropractic America v. Lavecchia*, 180 F.3d 99, 100 (3d Cir. 1999) (challenge to state insurance regulations for treatment of auto accident injuries) and *Lac D'Amiante Du Quebec v. American Home Assurance Co.*, 864 F.2d at 1046 (challenge to state liquidation proceedings of insolvent insurance company).[12]

---

[12] The Court in *Chiropractic America* held that abstention of a federal case was appropriate to avoid a "parallel regulatory review" where the same appellants had already commenced a state court challenge to the same regulations. 180 F.3d at 108. The Court in *Lac D'Amiante Du Quebec* identified specific harm the federal case would pose to the state regulatory scheme, particularly where state court addressing the liquidation had issued an anti-suit injunction aimed at stopping all litigation outside of the liquidation proceedings. 864 F.2d at 1046-47. Many other cases cited by Defendants likewise address federal court abstention in the face of pending state action. *See, e.g.*, *Chun v. State of New York*, 807 F. Supp. 288, 290 (S.D.N.Y. 1992) (abstention under *Buford* and *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500 (1941) (abstention to first permit state court to construe state claim in a manner to avoid federal claim) where two other state court cases were proceeding on the precise question in the federal case); *Martin v. Stewart*, 438 F. Supp. 2d 603, 607 (D.S.C. 2006) (*Buford* abstention where "in this specific context, all branches of South Carolina's government have spent considerable time and energy shaping and reviewing the statutes being challenged"). Finally, Defendants' reliance on *Richmand Bros. Records, Inc. v. U.S. Sprint Communications Co.*, 953 F.2d 1431, 1442-43 (3d Cir. 1991), is misplaced because that case addressed whether an

23

Here, there is no such challenge to a state's policies, law or regulations, and the speculative nature of any impact on state policy and the absence of any state action or other proceedings with respect to Plaintiff's *qui tam* claims fatally undermine a claim for *Thibodaux* abstention in this action. That Plaintiff's claims may involve difficult questions of state law or even questions that have not been addressed by state courts does not come close to meeting the *Colorado River* standards. Indeed, with respect to the New Jersey *qui-tam* gambling-loss recovery statute in particular, *Thibodaux* abstention did not prevent Judge Duffy in *Glick v. MTV Networks*, 796 F. Supp. at 747-48, from addressing summary judgment as to whether an MTV "900" number sweepstakes constituted violations of N.J.S.A. §2A:40-6 or prevent the Seventh Circuit in *Vinson v. Casino Queen, Inc.*, 123 F.3d at 657, from exercising federal court diversity jurisdiction to substantively address a summary judgment decision with respect to whether 720 ILS 5/28.8 applied to riverboat gambling. The exact same arguments of important state policy affecting numerous business and consumers largely

---

order referring a discrete issue for determination by an administrative agency while retaining jurisdiction was appealable as a final order under 28 U.S.C. §1291. The Third Circuit did not at all address *Thibodaux* abstention, the standards for *Thibodaux* abstention, or any instance under which *Thibodaux* abstention would be appropriate.

applied to the *qui tam* claims brought in *Glick* and *Vinson* without any abstention.

## VI.   OTHER FEDERAL COURTS HAVE EXERCISED JURISDICTION OVER THE SAME *QUI TAM* STATUTES

SportsLine and Sporting News alone[13] advance the broad argument that the federal courts have no subject matter jurisdiction over *qui tam* laws because such laws are penal laws of a state.  However, the efforts of SportsLine and Sporting News to fit *qui tam* laws into the framework of state penal laws that federal courts have declined to hear are flawed in many respects and should be summarily rejected.  Fundamentally, ***it is undisputed that other federal courts have exercised jurisdiction over many of the exact same qui tam laws involved in this action***.  *See, e.g.*, *Glick v. MTV Networks*, 796 F. Supp. at 747-48 (exercising federal court jurisdiction over *qui tam* action brought under N.J.S.A. §2A:40-6); *Vinson v. Casino Queen, Inc.*, 123 F.3d at 657 (exercising federal court jurisdiction over *qui tam* action brought under 720 ILS 5/28.8); *Scott v. Curd*, 101 F. Supp. 396, 398

---

[13] ESPN does not contend that the Court lacks subject matter jurisdiction for *qui tam* laws as penal in nature.

(E.D. Ky. 1951) (denying motion to dismiss in diversity jurisdiction *qui tam* action brought under KSR §372.040).[14]

SportsLine and Sporting News fail to advance any reasoned basis why this Court should not follow the other Courts that have exercised jurisdiction over the same anti-gambling *qui tam* laws.  Indeed, SportsLine and Sporting News do not cite to any decision from any federal court that has declined to enforce the anti-gambling *qui tam* laws (or any other *qui tam* laws) on a

---

[14]   SportsLine and Sporting News wrongly argue (SL/SN Mem. at 20) that KSR §372.040 "must be strictly construed" under *Jacob v. Clark*, 72 S.W. 1095, 1096 (Ky. Ct. App. 1903), for, as noted in *Scott v. Curd*, that rule was overturned with the enactment of KSR §446.080, requiring liberal interpretation of the statute.  101 F. Supp. at 397 ("the Kentucky Court of Appeals said: '… The statute was made for the prevention of gambling or betting, and under the express provisions of section 460, Ky. St., ***it must be liberally construed***, with a view to promote its object.'"  (Citation omitted; emphasis added.)).  *Scott v. Curd* therefore also rejects ESPN's assertion, without reference to any relevant legal authority, that KSR §372.040 "must be narrowly construed."  ESPN Mem. at 15.

theory that such laws are really penal laws for which the federal courts lack

jurisdiction.[15]

---

[15] The caselaw cited by SportsLine and Sporting News are not *qui tam* actions in which a federal court has declined jurisdiction. *See, e.g.*, *State v. Moriarity*, 268 F. Supp. 546, 554 (D.N.J. 1967) (remanding civil forfeiture case arising out of guilty plea in criminal case because the forfeiture case was not an action against the Director of the IRS as a federal officer under 28 U.S.C. §1442(a)(1), notwithstanding the tax lien against the seized funds); *Mulligan v. Western Union Tel. Co.*, 20 F. Supp. 953, 957-958 (D.N.J. 1937) (remanding case alleging that a chain letter scam was in violation of the New Jersey Crimes Act and New Jersey Gaming Act, and distinguishing such an alleged violation from "a number of cases involving penalties and *qui tam* actions in the New Jersey and other courts, wherein such actions are held to be civil proceedings." *Tasner v. U.S. Industries, Inc.*, 379 F. Supp. 803, 808 (N.D. Ill. 1974) (state statutory fine was "in no way connected with the damages actually suffered by the plaintiffs" and "without relation to any injuries suffered by them") addressed a claim for statutory penalties resulting from a corporation's failure to comply with a shareholder request for inspection of corporate books and records, and reached its decision based on a prior Seventh Circuit decision finding that the Court had no jurisdiction over that statute.   As such, *Tasner* is additionally inapplicable here because unlike the corporate statute in that case, the Seventh Circuit has expressly exercised jurisdiction over the anti-gambling *qui tam* law underlying Plaintiff's claims.  *See Vinson v. Casino Queen, Inc.*, 123 F.3d at 657.  Finally, although *Kleimeyer v. Payne*, 15 Ohio Dec. 671, 1905 WL 812 (Ohio Super. May 1905) states in dicta (the case was a direct action and not a *qui tam* action) that an Ohio state court has no jurisdiction over an action to recover under a Kentucky *qui tam* law, that court did not cite any caselaw supporting such a conclusion and did not at all mention federal court jurisdiction relevant here.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in all respects and award Plaintiff such other and further relief as the Court deems appropriate.[16]

Dated: November 9, 2006

<div style="margin-left: 40%;">

Respectfully submitted,

**GARDY & NOTIS, LLP**

By:    s/ James S. Notis
     Mark C. Gardy (MG-0338)
     James S. Notis (JN 4189)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiff*

</div>

---

[16]   Plaintiff respectfully requests leave to amend should the Court grant Defendants motions to dismiss in any part.  Fed. R. Civ. P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires," and the Supreme Court has cautioned that although "the grant or denial of an opportunity to amend is within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules."  *In re Burlington Coat Factory*, 114 F.3d at 1434, *quoting Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  Leave to amend is also particularly appropriate where, as here, Defendants claim defects in the specificity of the pleadings. *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).

<u>**CERTIFICATE OF SERVICE**</u>

Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system as follows:

Kenneth D. Friedman                     Peter C. Harvey
MANATT, PHELPS                          PATTERSON BELKNAP
       & PHILLIPS, LLP                     WEBB & TYLER
E-mail: kfriedman@manatt.com            E-mail: pcharvey@pbwt.com

*Counsel for defendants*                *Counsel for defendant*
*SportsLine.com, Inc. and*              *ESPN, Inc.*
*Vulcan Sports Media, Inc.*
*d/b/a The Sporting News*

                              s/ James S. Notis
                              James S. Notis (JN 4189)
                              GARDY & NOTIS, LLP
                              440 Sylvan Avenue, Suite 110
                              Englewood Cliffs, New Jersey 07632
                              Tel: 201-567-7377
                              Fax: 201-567-7337

                              *Counsel for Plaintiff*