Andrew C. DeVore (NY Bar No. AD3511)
  (admitted *pro hac vice*)
Kenneth D. Friedman (Dist. Ct. Bar No. KF6186)
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York  10036
Tel:  (212) 790-4500
Fax:  (212) 790-4545

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES E. HUMPHREY, JR.,<br><br>         Plaintiff,<br><br>-v-<br><br>VIACOM INC., CBS CORPORATION, CBS TELEVISION NETWORK, SPORTSLINE.COM, INC., THE WALT DISNEY COMPANY, ESPN, INC., VULCAN, INC., VULCAN SPORTS MEDIA, AND THE SPORTING NEWS,<br><br>         Defendants. | No. 2:06 Civ. 2768 (DMC) (MF)<br><br>Return Date:  December 11, 2006<br><br>**Oral Argument Requested** |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**SPORTSLINE.COM, INC. AND VULCAN SPORTS MEDIA, INC.'S**
**MOTION TO DISMISS THE COMPLAINT**
<u>**FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)**</u>

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii
PRELIMINARY STATEMENT ................................................................................................. 1
ARGUMENT ............................................................................................................................... 2
I.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE FANTASY SPORTS LEAGUES ARE NOT GAMBLING TRANSACTIONS AS A MATTER OF LAW ................................................................. 2
    A.    Fantasy Sports Leagues Are Not Gambling Transactions ..................................... 2
    B.    Federal Law Confirms That The Complaint Should Be Dismissed ...................... 8
II.    THE COURT LACKS THE POWER TO ENFORCE THESE PENAL STATUTES .................................................................................................................... 9
III.    THE COURT SHOULD ABSTAIN UNDER THIBODAUX ....................................... 10
CONCLUSION .......................................................................................................................... 12

## TABLE OF AUTHORITIES

Page

**CASES**

*Alvord v. Smith*,
    63 Ind. 58, 1878 WL 6352 (Sup. Ct. 1878) .................................................................. 5

*Castellon v. Hudson County Treasurer*,
    366 A.2d 1358 (N.J. Super. Ct. App. Div. 1976) .......................................................... 3

*Chenard v. Marcel Motors*,
    387 A.2d 596 (Me. 1978) ........................................................................................... 4, 7

*Chiropractic Am. v. LaVecchia*,
    180 F.3d 99 (3d Cir. 1999) ......................................................................................... 10

*Club Assoc. of West Virginia, Inc. v. Wise*,
    156 F. Supp. 2d 599 (S.D.W. Va. 2001) .................................................................... 10

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ................................................................................................... 10

*Glen 6 Assocs., Inc. v. Dedaj*,
    770 F. Supp. 225 (S.D.N.Y. 1991) ............................................................................. 10

*Hankins v. Ottinger*,
    47 P. 254 (Cal. 1896) .................................................................................................... 5

*Johnson v. Collins Entertainment Co.*,
    199 F.3d 710 (4th Cir. 1999) ...................................................................................... 10

*Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co.*,
    864 F.2d 1033 (3d Cir. 1988) ..................................................................................... 10

*Las Vegas Hacienda, Inc. v. Gibson*,
    359 P.2d 85 (Nev. 1961) ............................................................................................... 5

*Lawrence v. Fallon*,
    46 N.E. 296 (N.Y. 1897) ............................................................................................... 5

*Mulligan v. Western Union Tel Co.*,
    20 F. Supp. 953 (D.N.J. 1937) ...................................................................................... 9

*Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*,
    953 F.2d 1431 (3d Cir. 1991) ..................................................................................... 10

*State v. American Holiday Assoc., Inc.*,
    727 P.2d 807 (Ariz. 1986) ................................................................................... 3, 4, 5, 6

*Stevens v. Cincinnati Enquirer Co.*,
    13 Ohio. Dec. 235, 1902 WL 1016 (Super. Ct. 1902) .................................................. 4

*Stichtenoth v. Central Stock & Grain Exchange of Chicago*,
    99 F. 1 (N.D. Ill. 1900) ................................................................................................. 9

*Toomey v. Penwell*,
    245 P. 943 (Mont. 1926) ........................................................................................... 5, 7

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Wilkinson v. Stitt*,
   56 N.E. 830 (Mass. 1900) ............................................................................................... 4

*Wilson v. Conlin*,
   3 Ill. App. 517, 1878 WL 10565 (App. Ct. 1878).................................................... 4, 7

**STATUTES**

31 U.S.C. § 5361 ............................................................................................................... 8

31 U.S.C. § 5362 ............................................................................................................... 8

Ariz. Rev Stat. § 13-3305 ................................................................................................. 5

Ariz. Rev Stat. § 13-3307 ................................................................................................. 5

N.J. Stat. Ann. § 2A:40-1.................................................................................................. 3

**RULES**

Fed. R. Civ. P. 12(b)(6)............................................................................................... 1, 12

Defendants SportsLine.com, Inc., ("SportsLine") and Vulcan Sports Media, Inc. d/b/a The Sporting News ("Sporting News") (collectively "Defendants"), by and through the undersigned, respectfully submit this reply memorandum of law in further support of their Motion to Dismiss the Complaint for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

In the legal equivalent of football's "Hail Mary," Plaintiff throws up one long-shot idea – that this Court should resolve for the first time ever on behalf of eight states that fee-based fantasy sports leagues are really illegal gambling – in a desperate effort to avoid dismissal of his extraordinary case.  But, as New Jersey's own gambling statute makes plain, there is no gambling absent a wager on a future event such that someone wins and others lose based on the outcome.  Fantasy sports leagues, in which neither participants' entry fees nor the prizes awarded are "risked" in any way on the outcome, do not contain these essential elements.  As a result, after decades of broad public awareness and participation, no federal or state enforcement agency has ever sought to prosecute those who play in or provide fantasy sports leagues, no court has held that playing in fee-based fantasy sports leagues constitutes gambling, and Federal law expressly excludes precisely the type of fantasy leagues Defendants conduct from any definition of gambling.

Plaintiff nonetheless makes the unsupported assertion that a "human element" transforms fantasy sports into illegal gambling operations.  But case after case and now federal law confirm emphatically that – irrespective of any "human element" – such contests, in which players pay a fixed entry fee for the opportunity to compete against other players and win a fixed prize, are not gambling as a matter of law.  For example, although competitions such as golf and horse racing contain a "human element," they are not gambling because the players risk nothing

whatsoever on the outcome – win or lose, the fee they pay for the opportunity to participate is irretrievably lost. Fantasy sports leagues are likewise devoid of any such risk – the millions of players across the country who pay a non-refundable fee for the right to compete unequivocally "wager" nothing on the outcome of the leagues. Plaintiff's "Hail Mary" falls flat in the face of the facts and the law, and his case should be dismissed for failure to state a claim.

## ARGUMENT

I. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE FANTASY SPORTS LEAGUES ARE NOT GAMBLING TRANSACTIONS AS A MATTER OF LAW

A. **Fantasy Sports Leagues Are Not Gambling Transactions**

Plaintiff devotes most of his opposition brief to trying to arrange uncontested facts to create the demonstrably false appearance that paying for the right to compete as a participant in a fantasy sports league is equivalent to betting on the outcome of a single football game. He declares, without support in fact or law, that competing in a fantasy sports competition constitutes gambling based on three elements: prizes awarded based on "how well one or more athletes will perform in sporting contests," (Opp. Mem. at 7), chance in the form of the "ever-present human element" involved in athletic events, (*id.* at 7-8), and consideration in that Defendants "receive and keep, and thus win" the entry fees paid by those who compete in fantasy leagues. (*Id.* at 8, 17.) None of these contentions withstands scrutiny.[1]

Even Plaintiff's statement of the law, based on an old New Jersey lottery case, is deceptive. He relies on old lottery law because the correct law – New Jersey's gambling

---

[1] At the heart of his strategy to avoid dismissal Plaintiff seeks to divert the Court's attention to the wrong competition. As demonstrated below, fantasy league players pay their entry fees exclusively for the opportunity to participate in the fantasy league competition itself. The underlying athletic competitions serve merely to generate the raw data that forms a uniform baseline for each fantasy competition. Thus, it is not "how well one or more athletes will perform" in the underlying athletic events, but how well fantasy league players perform in the fantasy league, that determines who wins the contest.

2

transaction statute – itself identifies the essential element absent from fantasy sports that dooms Plaintiff's claims: a "wager, bet or stake" between Defendants and the millions who compete in fantasy sports leagues. N.J. Stat. Ann. § 2A:40-1. Plaintiff does not contest, and therefore concedes, that players risk absolutely nothing in paying an entry fee for the opportunity to participate in the fantasy competitions. The one-time entrance fee is non-refundable, and cannot possibly involve such a risk. (*See* Defs. Mem. at 6.) In agreeing in advance to pay out pre-determined prizes irrespective of the outcome of the competition, Defendants likewise have neither risk of loss nor chance of gain based on the outcome of any league.[2] Absent the necessary element of a "wager, bet or stake" between Defendants and players that depends in any way on the outcome of the league competitions, fantasy sports leagues cannot be gambling transactions under the law of New Jersey or any other one of the subject states.[3]

Controlling precedent from the subject states makes crystal clear that Plaintiff's case should be dismissed because fantasy sports do not contain these essential elements. The

---

[2]  Contrary to Humphrey's assertion, the pre-determined prizes are not based upon the number of fantasy league participants. (Opp. Mem. at 15-16.) The rules simply require that there be a full complement of teams in each league in order to compete. Prize amounts vary irrespective of the number of teams in the various leagues. The fact that some leagues may include many more than the required minimum number of teams likewise has no bearing on prize amount. (*See, e.g.*, Sporting News Game Rules, Friedman Decl. Ex. F (linked text provides that "[t]o be eligible for prizes," participants "must be in a league with 10 teams *or more*") (emphasis supplied).) Moreover, Humphrey's contention is irrelevant in light of the rule that "the payment of an entrance fee is not an illegal bet or wager in an otherwise legal competition for prizes to be awarded by a nonparticipant . . . where the entrance fees do not specifically make up the prize purse." *State v. American Holiday Assoc., Inc.*, 727 P.2d 807, 810 (Ariz. 1986).

[3]  Given this reality, it is no surprise that Plaintiff offers no legal or factual support for his assertion that Defendants "receive and keep, and thus win" participants' entry fees. (Opp. Mem. at 8-9, 16-17.) Of course, this is pure fiction. Particularly since the *qui tam* statutes at issue are penal statutes that must be strictly construed, (*see* Defs.' Mem. at 7); *Castellon v. Hudson County Treasurer*, 366 A.2d 1358, 1359 (N.J. Super. Ct. App. Div. 1976) (civil penalty provision regarding all lawful lotteries is penal and must be "strictly construed lest it be applied to persons or conduct beyond the Legislature's contemplation"), that unsupported assertion must be rejected.

courts of Massachusetts, Illinois, and Ohio have already ruled that such contests, which do not involve wagering but instead the payment of an entry fee for the opportunity to compete in a contest and win a fixed prize, do not constitute gambling as a matter of law. *See Wilkinson v. Stitt*, 56 N.E. 830, 831 (Mass. 1900) (ruling on demurrer that defendants' contention that offer of a prize to winner of bicycle race was "betting, gambling, or wagering . . . is too plainly untenable to require discussion"); *Wilson v. Conlin*, 3 Ill. App. 517, 1878 WL 10565, at *2 (App. Ct. 1878) (reversing lower court because horse race in which sponsor "certainly did not hazard anything merely by receiving an entrance fee" and paid out prize to owner of the "swiftest horse" did not constitute gambling; holding that to "require a fee in advance for the privilege of being admitted to contest the prize, is no more a gambling process than the offer of a prize to the successful party. There is nothing staked upon the result of a future contingency."); *Stevens v. Cincinnati Enquirer Co.*, 13 Ohio. Dec. 235, 1902 WL 1016, at *3 (Super. Ct. 1902) (50¢ entry fee to guess the nearest vote for elected official in exchange for chance of winning prize did not constitute gambling). These controlling cases, each involving the payment of an entry fee for the opportunity to participate in a contest for predetermined prizes, dictate dismissal of Plaintiff's case.

      Recognizing the case-ending effect of these decisions, Plaintiff argues weakly that only "a handful of courts" have recognized this controlling analysis. (Opp. Mem. at 12.). In truth, cases from across the country confirm the analysis and dictate the same result. *See, e.g., State v. American Holiday Assoc., Inc.*, 727 P.2d 807, 809 (Ariz. 1986) (offer of prizes of increasing value paid from fund derived from entrance fees to participants in a spelling contest not gambling)[4]; *Chenard v. Marcel Motors*, 387 A.2d 596, 601 (Me. 1978) (entry fee in

---

[4]    In another effort to evade controlling law, Humphrey inexplicably argues that *American Holiday* has been overturned by statute. (Opp. Mem. at 14 n.6.) To the contrary, the recodified statutory language Humphrey points to in support of that claim is *identical* to the statutory

exchange for prize did not transform golf contest into gambling; participants "were paying the fees for the privilege of participating in the tournament[]"); *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 86 (Nev. 1961) (50¢ entry fee to compete in golfing contest for $5,000 prize does not constitute gambling; gambling contract is one in which "each party interested therein has a chance of gain and takes a risk of loss[]"); *Toomey v. Penwell*, 245 P. 943, 945 (Mont. 1926) (no gambling where horse owner paid entry fee to participate in race for a prize because "[w]hen plaintiff paid the entrance fee, he received an adequate consideration for it – the privilege of having the horse . . . participate in the race[]"); *Lawrence v. Fallon*, 46 N.E. 296, 297 (N.Y. 1897) (offer of a prize by horse race sponsor does not constitute gambling); *Hankins v. Ottinger*, 47 P. 254, 255 (Cal. 1896) (distinguishing a legal "premium," which is a "reward or recompense for some act done," with an illegal wager, which is a "stake upon some uncertain event") (quoting *Alvord v. Smith*, 63 Ind. 58, 1878 WL 6352, at *3 (Sup. Ct. 1878)).[5]  In light of this controlling law from the subject states and beyond, Plaintiff's complaint should be dismissed.

Plaintiff tries to avoid the mandate of these cases by maintaining that an "ever-present human element" such as "injuries, weather, and personal tragedies" transforms player participation in fantasy sports league competitions into illegal gambling. (Opp. Mem. at 7-8, 13; Compl. ¶ 50.)  Plaintiff's "human element" argument cannot, and should not, preclude dismissal of this case.  *First*, human competition by its nature includes a "human element" – the wind may

---

language at issue in *American Holiday*.  *Compare* the recodified language at Ariz. Rev Stat. § 13-3305(A) (prohibiting a bet or wager on the outcome of any "contest or other game of skill or chance") to the language at issue in *American Holiday* at Ariz. Rev Stat. § 13-3307(A) (same).

[5]    These same decisions belie Humphrey's half-hearted argument that Defendants are "winners" akin to bookmakers. (Opp. Mem. 16-17.)  As the Arizona Supreme Court ruled in *American Holiday*, the sponsor of a contest such as Defendants' fantasy leagues is not analogous to a bookie because the sponsor is a "nonparticipating party" and the amount of the prize is set from the beginning and does not depend on "odds" or the total amount of entry fees.  727 P.2d at 809.

5

blow off course a golf ball otherwise headed for a hole-in-one, a racing bicycle may get a flat tire, or a racing horse may stumble. Yet contests structured just like fantasy sports involving that very same "human element" have been ruled repeatedly and unequivocally not to constitute gambling as a matter of law. *See, e.g., American Holiday,* 727 P.2d at 809 (fee-based hole-in-one contest not gambling under statute that prohibits betting on games of skill *or* chance; lower courts' efforts to pigeonhole the contest as one of either skill or chance "has little relevance to whether the fees are illegal bets or legal entrance fees").[6]

   *Second,* plaintiff's contention that the "human element involved in how well an athlete will perform" transforms fantasy sports leagues into illegal gambling, (Opp. Mem. at 7), misapprehends the very nature of the fantasy competition. The outcome of the fantasy competition does not turn, as Plaintiff would have the Court believe, on how well any particular athlete in an underlying "real" competition performs. To the contrary, the fantasy league competition focuses exclusively on how well each *fantasy sports player* performs, relative to each other fantasy player, in utilizing statistics derived from real competitions to manage his or her fantasy team. Irrespective of whether athletes on the field perform well or poorly, fantasy league competitors alone control every single draft, addition, trade, activation, "benching" or other lineup change based on uniform statistical information that will determine the winner of the fantasy competition. (*See* Defs. Mem. at 4-7.) It is the fantasy league participants' ability to gather, process, and strategically utilize the wealth of statistical information generated by "real" competitions that is the very essence of the fantasy competition. The fact that all such statistical

---

[6]  As with the statute at issue in *American Holiday*, the gambling statutes in subject states Ohio and South Carolina proscribe wagering whether the underlying contest is one of skill or chance. Such proscriptions confirm emphatically that it is the structure of the contest – and not, as Humphrey would have it, the presence or absence of a "human element" – that determines whether or not the contest involves gambling.

information – including information relating to "injuries, weather, and personal tragedies" – is equally available to all fantasy players renders particularly absurd the suggestion that a "human element" materially changes the nature of the game.[7]  Because a "human element" cannot distinguish this case from the other perfectly lawful contests cited above, the case should be dismissed as a matter of law.

Plaintiff's contention that fantasy sports are merely illegal lotteries akin to a raffle for a house, (Opp. Mem. at 7, 9, 14-15), is another deception that scrutiny shatters.  As Defendants explained in their opening brief, fantasy sports players receive a host of valuable services in consideration for their entrance fees.  Players are not "primarily risking their fees in the hopes of making a return on the money as in a wagering transaction," but, as described above, are "paying the fees for the privilege of participating in the tournament."  *Chenard*, 387 A.2d at 601; *see also Toomey*, 245 P. at 945 ("When plaintiff paid the entrance fee, he received an adequate consideration for it – the privilege of having the horse . . . participate in the race."); *Wilson*, 1878 WL 10565, at *2 ("[T]o require a fee in advance for the privilege of being admitted to contest the prize, is no more a gambling process than the offer of a prize to the successful party.").  Moreover, just like the horse racer or spelling bee contestant, it is a player's own ability relative to each of the other participants in the fantasy competition that ultimately determines success.  A raffle is utterly bereft of such participation or intra-player competition.  Plaintiff's manufacture of this inapt analogy cannot save his fatally defective complaint from dismissal.

In summary, dismissal of Plaintiff's case does not require this Court to determine whether fantasy sports leagues are primarily games of skill or chance, but whether Defendants

---

[7]   To put it mildly, Plaintiff's assertion that fantasy league participants "bet on the performance of professional athletes and the outcome of football, baseball, hockey and basketball games," (Opp. Mem. at 3), finds no support in the uncontested facts.

and the millions who compete against each other in fantasy sports leagues are involved in illegal gambling transactions. The foregoing decisions demonstrate unequivocally that Defendants' offer of fixed prizes to players who pay a fixed fee for the right to compete in fantasy sports leagues does not constitute a gambling transaction as a matter of law. Indeed, it "would be 'patently absurd' to conclude that these types of contests are gambling operations." *American Holiday*, 727 P.2d at 809. Because fantasy sports competitions lack the essential elements of a gambling transaction, Plaintiff's Complaint should be dismissed.

**B.      Federal Law Confirms That The Complaint Should Be Dismissed**

As the Court likely is well aware, on October 3, 2006, the President signed The Unlawful Internet Gambling Enforcement Act of 2006, a law that broadly prohibits Internet gambling and related transactions. *See* 31 U.S.C. § 5361 *et seq.* That law confirms emphatically that fantasy sports leagues such as those operated by Defendants do not constitute gambling as a matter of law. *See* 31 U.S.C. § 5362(1)(E)(ix). Under the law, an illegal "bet" or "wager" specifically does not include "participation in any fantasy or simulation sports game" where, as here:

> (I) All prizes and awards offered to winning participants are established and made known to the participants in advance of the game or contest and their value is not determined by the number of participants or the amount of any fees paid by those participants.
> (II) All winning outcomes reflect the relative knowledge and skill of the participants and are determined predominately by accumulated statistical results of the performance of individuals (athletes in the case of sports events) in multiple real-world sporting or other events.
> (III) No winning outcome is based –
> > (aa) on the score, point-spread, or any performance or performances of any single real-world team or a combination of such teams; or
> > (bb) solely on any single performance of an individual athlete in any single real-world sporting or other event.

8

*Id.*  This law highlights precisely the point Plaintiff tries so hard to avoid in this case – that fantasy league competitions are not gambling transactions as a matter of law because winners are "determined predominately by cumulative statistical results."  *Id.*  So long as fantasy league competition does not turn on the performance of a "real-world team" or "individual athlete in any single real-world sporting or other event" – as Defendants' fantasy leagues plainly do not – the competition is not gambling as a matter of law.  Federal law thus reflects precisely the controlling analysis set forth in the cases above, confirms that Plaintiff's case should be dismissed, and underscores yet again the absurdity of Plaintiff's request that this Court reach exactly the opposite conclusion as a matter of first impression on behalf of eight different states.

## II.     THE COURT LACKS THE POWER TO ENFORCE THESE PENAL STATUTES

Humphrey does not contest, and therefore concedes, that the subject *qui tam* laws are state penal statutes that federal courts have no jurisdiction to enforce.  He instead contends, in effect, that the Court should exercise jurisdiction because "other courts have done it."  (Opp. Mem. at 25.)  But two wrongs do not make a right with regard to that error.  While the courts in the cases Humphrey cites failed to consider this threshold jurisdictional issue, many others have expressly declined to exercise jurisdiction over gambling *qui tam* actions for this very reason.  *See, e.g., Mulligan v. Western Union Tel Co.*, 20 F. Supp. 953, 959 (D.N.J. 1937) (declining to exercise removal jurisdiction because "New Jersey created [its lottery *qui tam*] form of penalty for the violation of her statutes.  The courts of the state of New Jersey constitute the forums wherein such actions shall be tried"); *Stichtenoth v. Central Stock & Grain Exchange of Chicago*, 99 F. 1, 3 (N.D. Ill. 1900) (ruling that, because the very same Illinois gambling *qui tam* statute at issue here is "thoroughly penal," a "federal court cannot take jurisdiction of such an action.  The courts of the United States do not sit to punish offenders against the law of the

9

state."). Thus, should this Court determine to enforce these *qui tam* laws as to fantasy sports, it should dismiss this case with prejudice for lack of jurisdiction.

### III.     THE COURT SHOULD ABSTAIN UNDER *THIBODAUX*

Humphrey offers two basic arguments in opposition to the clear command that the Court should abstain under the *Thibodaux* abstention doctrine: that this Court's intervention would not affect any subject state's gambling regulations, (*Id.* Opp. Mem. at 21-22), and that *Thibodaux* abstention is only appropriate where a state is "actively setting policy."[8] (*Id.* Opp. Mem. at 22-23.) These arguments again misstate the law and the facts.

*Thibodaux* abstention is proper where, as here, "there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co.*, 864 F.2d 1033, 1044 n.12 (3d Cir. 1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). And, of course, the issue is not whether any state is "actively setting policy" as Humphrey suggests, but whether the case raises a question of "unclear state law" and an "important state interest [is] at stake." *Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*, 953 F.2d 1431, 1443 (3d Cir. 1991); *see also Chiropractic Am. v. LaVecchia*, 180 F.3d 99, 103 (3d Cir. 1999) (*Thibodaux* abstention is designed to "leave to the states the resolution of unsettled questions of state law"); *Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225, 228 (S.D.N.Y. 1991) (*Thibodaux* abstention appropriate where area of law at issue is "continually evolving and to a certain extent unsettled").

---

[8]     In support of the latter contention, and indeed the great bulk of his abstention analysis, Humphrey cites decisions that do not even analyze the *Thibodaux* abstention doctrine. (Opp. Mem. 22 n.11.) For example, in *Johnson v. Collins Entertainment Co.*, 199 F.3d 710, 720 (4th Cir. 1999), the court held that *Burford* abstention was proper. Similarly, in *Club Assoc. of West Virginia, Inc. v. Wise*, 156 F. Supp. 2d 599, 618 (S.D.W. Va. 2001), the court abstained under the *Pullman* abstention doctrine.

If the Court applied the gambling *qui tam* statutes of eight different states to fantasy sports, it would necessarily be presented with such a "difficult question" of state law bearing on policy problems of substantial public import. The very premise of these *qui tam* statutes is obsolete, and the subject states have materially relaxed their assessment of what constitutes gambling activity since these antiquated statutes were enacted. (*See* Defs. Mem. at 26-27.) Against that backdrop alone, the law at issue is plainly "unsettled," and the decision to call fantasy sports leagues "gambling" under the *qui tam* statutes is by definition such a "difficult question." The difficulty of that question is compounded substantially by the fact that the fantasy leagues lack essential elements of gambling under the various states' laws, have never been prosecuted by any state or federal enforcement authority, have never been ruled unlawful, and, according to the Complaint, are actively enjoyed by numerous participants in each of the subject states. In light of all of these facts, there can be little serious question that the decision to apply antiquated *qui tam* statutes to fantasy sports leagues would go to the very heart of state gambling regulations, and is quintessentially a policy problem of substantial public import whose result transcends the result in this case. Under *Thibodaux*, this Court may not, and should not, arrogate to itself the authority to set a new course for the gambling policies of eight different states.

## **CONCLUSION**

For all of the foregoing reasons, Defendants SportsLine and Sporting News respectfully request that the Court grant their motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Dated:  December 4, 2006

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP


By:     /s/ Kenneth D. Friedman
   Kenneth D. Friedman (Dist. Ct. Bar No. KF6186)

Andrew C. DeVore (NY Bar No. AD3511)
 (admitted *pro hac vice*)
7 Times Square
New York, New York 10036
Tel:  (212) 790-4500
Fax:  (212) 790-4545

*Attorneys for Defendants SportsLine.com, Inc. and Vulcan Sports Media, Inc. d/b/a The Sporting News*

80377788.4