FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CHARLES E. HUMPHREY, JR., | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Case No. 06-2768 (DMC) |
| | : | |
| VIACOM, INC., CBS CORPORATION, | : | |
| CBS TELEVISION NETWORK, | : | |
| SPORTSLINE.COM, INC., THE WALT | : | |
| DISNEY COMPANY, ESPN, INC., THE | : | |
| HEARST CORPORATION, VULCAN, | : | |
| INC., VULCAN SPORTS MEDIA and | : | |
| THE SPORTING NEWS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

DENNIS M. CAVANAUGH, U.S. District Judge

This matter comes before the Court upon motions by Defendants ESPN, Vulcan Sports Media and Sportsline.com ("Defendants") to dismiss Complaint of Charles E. Humphrey, Jr. ("Plaintiff" or "Humphrey") pursuant to Federal Rule of Civil Procedure.12(b)(6).  No oral argument was heard pursuant to Federal Rule of Civil Procedure 78.  After carefully considering the submissions of the parties and for the following reasons, Defendants' motions to dismiss Plaintiff's Complaint are **granted**.

<u>**BACKGROUND**</u>

**Fantasy Sports**

Fantasy sports leagues allow participants to "manage" virtual teams of professional players in a given sport throughout a sport's season and to compete against other fantasy sports participants based upon the actual performance of those players in key statistical categories. Fantasy sports have become extremely popular in recent years. They have earned a place in modern popular culture and are the subject of countless newspaper and magazine articles, books, internet message boards and water-cooler conversations. The enormous popularity of fantasy sports can be attributed in part to the services offered on internet websites, such as those operated by Defendants. The websites provide a platform for real-time statistical updates and tracking, message boards and expert analysis. (Compl. ¶¶ 26 - 31).

Fantasy sports leagues allow fans to use their knowledge of players, statistics and strategy to manage their own virtual team based upon the actual performance of professional athletes through a full season of competition. In the early days of fantasy sports, participants compiled and updated the players' statistics manually. Today, the rapid growth of the internet fostered additional services, such as those offered by Defendants, that provide an internet environment and community for playing and discussing fantasy sports. The technology also allows for automatic statistic updates for players and teams and access to expert fantasy sports analysis. As a result, fantasy sports have become much more accessible and popular throughout the country. <u>Id.</u>

Although the rules and services vary somewhat from one fantasy sports provider to another, the websites operate as follows. Participants pay a fee to purchase a fantasy sports team

2

and the related services.  The purchase price provides the participant with access to the support services necessary to manage the fantasy team, including access to "real-time" statistical information, expert opinions, analysis and message boards for communicating with other participants.  Id.

The purchase price also covers the data-management services necessary to run a fantasy sports team.  Using these services, the participants "draft" a slate of players and track the performance of those players in key statistical categories throughout the season.  Participants are grouped into "leagues" of as many as twelve teams and compete not only against the members of their own leagues, but can also compete against the winners of the other leagues.  Id. at ¶¶ 45 - 46.

The success of a fantasy sports team depends on the participants' skill in selecting players for his or her team, trading players over the course of the season, adding and dropping players during the course of the season and deciding who among his or her players will start and which players will be placed on the bench.  The team with the best performance -- based upon the statistics of the players chosen by the participant -- is declared the winner at the season's end. Nominal prizes, such as T-shirts or bobble-head dolls, are awarded to each participant whose team wins its league.  Managers of the best teams in each sport across all leagues are awarded larger prizes, such as flat-screen TVs or gift certificates.  These prizes are announced before the fantasy sports season begins and do not depend upon the number of participants or the amount of registration fees received by Defendants.  Id. at ¶¶ 32 - 48.

**Plaintiff's Complaint**

Plaintiff filed a Complaint on or around June 20, 2006, against Viacom Inc., the CBS

Corporation, the CBS Television Network, Sportsline.com, Inc, The Hearst Corporation, The Walt Disney Company, ESPN, Inc., Vulcan, Inc., Vulcan Sports Media and The Sporting News for alleged violations of the anti-gambling laws of New Jersey and several other states.  Only ESPN, Sportsline and Vulcan Sports Media remain in the case as Defendants.  Plaintiff voluntarily dismissed all other Defendants.  The Defendants operate separate pay-for-play online fantasy sport leagues.

The Complaint alleges that Defendants operate three distinct pay-for-play fantasy sports sites in violation of several states' *qui tam* gambling loss-recovery laws.  The Complaint indicates that Plaintiff is invoking the *qui tam* laws of the District of Columbia, Georgia, Illinois, Kentucky, Massachusetts, New Jersey, Ohio and South Carolina in an attempt to recover losses incurred by the residents of each state who participated in the Defendants' fantasy sports games.

Although each state's *qui tam* statutes differ slightly, there are no substantial differences between the New Jersey statute and those of the other states.  Through invocation of the various *qui tam* laws, Plaintiff alleges that he is entitled to recover  the individual gambling losses of all participants of the Defendants' allegedly unlawful gambling schemes.  Plaintiff claims that the registration fees paid by fantasy sports leagues participants constitute wagers or bets, and he seeks to recover these fees pursuant to the *qui tam* gambling loss-recovery statutes.  In other words, Humphrey concludes that the Defendants' fantasy sports leagues constitute gambling because the participant "wagers" the entry fee for the chance to win a prize and the winner is determined predominantly by chance due to potential injuries to players and the vicissitudes of sporting events in general.

The ESPN Defendants filed a 12(b)(6) Motion to Dismiss on September 28, 2006.  The

4

Sportsline and Vulcan Sports Media Defendants together filed their own 12(b)(6) Motion to Dismiss on September 29, 2006.

### *Qui Tam* Statutes

The *Qui Tam* statutes derive from the 1710 Statute of Queen Anne, an English statute that authorized gambling losers and informers to sue to recover losses incurred "at any [t]ime or sitting by playing at [c]ards, [d]ice, [t]ables or other [g]ame or [g]ames whatsoever or by betting on the [s]ides or [h]ands of such as do play at any of the [g]ames aforesaid." 9 Anne ch. 19 (1710), *reproduced* in 9 Statutes of the Realm (George Eyre & Andrew Strahan, pubs., 1810-1822).

The American versions of the Statute of Anne contain similar language and were similarly directed at deterring traditional gambling. New Jersey's statute, for example, was adopted in 1797 and permitted the recovery of losses incurred "by playing at cards, dice, billiards, tables, tennis, bowls, shuffle-board, or other game or games, or by betting on the sides or hands of such as do play at any game or games, or by betting at cock-fighting, or other sport or pastime." Act to Prevent Gaming, February 8, 17907, ¶¶ 4-5, *at* New Jersey Session Laws, Legislature 21, 149-151.

Although the specific elements of the *Qui Tam* statutes vary, they share a common origin and purpose. They were intended to prevent gamblers and their families from becoming destitute due to gambling losses – and thus becoming wards of the State – by providing a method for the gambler's spouse, parent or child to recover the lost money from the winner. *See* Berkebile v. Outen, 311 S.C. 30, 55 (1993) (*qui tam* statute's purpose is to "protect a gambler . . . from abusing the vice and exceeding limits which bring harm to the gambler and his or her family");

Salonen v. Farley, 82 F.Supp. 25, 28 (E.D. Ky. 1949) (*qui tam* statute was "primarily intended by

the legislature . . . for the protection of the dependents of those losing in gambling").  The

statutes were also intended to supplement states' general anti-gaming provisions in an era when

local governments' own regulatory and enforcement powers were much less effective than they

are today.  *See e.g.*, Vinson v. Casino Queen, Inc., 123 F.3d 655, 657 (7th Cir. 1997) (The

[Illinois] Loss Recovery Act was intended to deter illegal gambling by using its recovery

provisions as a powerful enforcement mechanism."); Salomon v. Taft Broadcasting Co., 16 Ohio

App. 3d 336, 475 N.E.2d (1292, 1293 (Ct. App. 1st Dist., 1984) (observing that *qui tam* statute

was "born in a vanished era where the absence of an organized police authority to enforce

criminal statutes made necessary the use of such rewards for informers").

<u>ANALYSIS</u>

**Legal Standard on a Motion to Dismiss**

In deciding a Rule 12(b)(6) motion to dismiss, the Court is required to accept as true the

allegations in the complaint, and to view them in the light most favorable to the plaintiff, but the

Court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" Morris v. Lower

Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Rather, the Third Circuit has explained

that:

> the plaintiff must allege sufficient facts in the complaint to survive
> a Rule 12(b)(6) motion.  Confronted with such a motion, the court
> must review the allegations of fact contained in the complaint; for
> this purpose, the court does not consider conclusory recitations of
> law.

Commonwealth of Pa. v. PepsiCo, Inc., 836 F.2d 173, 179 (3d Cir. 1988).

A plaintiff who fails to allege basic facts in support of his claims should not be allowed to

6

proceed.  *See* <u>DM Research v. Coll. of Am. Pathologists</u>, 170 F.3d 53, 55-56 (1ˢᵗ Cir. 1999)

("[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete

enough to warrant further proceedings, which may be costly and burdensome.  Conclusory

allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a

fishing expedition.).

### Stating a Claim under *Qui Tam* Laws

Plaintiff asserts claims under the gambling *qui tam* statutes of the District of Columbia,

Georgia, Illinois, Kentucky, Massachusetts, New Jersey, Ohio and South Carolina.  Courts have

long held that the *qui tam* statutes must be narrowly construed because they are penal in nature.

*E.g.*, <u>Justice v. The Pantry</u>, 335 S.C. 572 (1999) (South Carolina statute is penal and must be

strictly construed); <u>State v. Schwabie</u>, 84 N.E.2d 768, 770-71 (Ohio App. 1948) (Ohio statute is

penal and must be strictly construed); *see also*, *e.g.*, <u>Kizer v. Walden</u>, 198 Ill. 274, 65 N.E. 116

(Ill. 1902) (Illinois statute is penal); <u>Donovan v. Eastern Racing Ass'n</u>, 324 Mass. 393, 86 N.E.2d

903 (Supreme Judicial Court, 1949) (Massachusetts statute is penal); <u>Glick v. MTV Networks</u>,

796 F.Supp. 743, 745 (S.D.N.Y. 1992) (New Jersey statute is "quasi-penal"); <u>Hartlieb v. Carr</u>, 94

F.Supp. 279, 281 (E.D. Ky. 1950) (Kentucky statute provides a penalty).

Courts have also construed the *qui tam* statutes narrowly in light of their history and

purpose, in part because they provided a remedy in derogation of the common law.  *E.g.,* <u>Vinson</u>,

123 F.3d at 657 (*qui tam* statute "should not be interpreted to yield a . . . result contrary to its

purpose"); <u>Cole v. Applebury</u>, 136 Mass. 525, 530-31, 1884 WL 10512, at *5 (Mass. 1884) (*qui

tam* statute "must be enforced . . . according to its . . . intent"); <u>Thompson v. Ledbetter</u>, 74 Ga.

App. 427, 428, 39 S.E.2d 720, 721 (Ct. App. Div. 2, 1946) (construing statute narrowly because

gambling losses were not recoverable under the common law); <u>Johnson v. McGregor</u>, 41 N.E.

558 (Ill. Sup. Ct. 1895) (Statutory conditions for recovery must be strictly observed because the

right of action exists "by virtue of the statute only"); <u>Hooker v. Depalos</u>, 28 Ohio St. 251, 262,

1876 WL 6, at *7 (Ohio 1876) (because loss-recovery statutes "are in derogation of the common

law . . . [they] are to be construed strictly").

These principles of strict and narrow construction are particularly appropriate in this case,

where Plaintiff seeks to recover unspecified losses to which he has no personal connection.

While *qui tam* plaintiffs often have not personally suffered a loss, they are not excused from the

obligation to allege specific facts demonstrating that their claims are within the narrow confines

of the statutes under which they seek relief.  In considering a similar claim brought by a plaintiff

seeking damages under a gambling loss-recovery statute, the court in <u>Salomon v. Taft</u>

<u>Broadcasting Co.,</u> 16 Ohio App. 3d 336, 475 N.E.2d 1292, 1298 (Ct. App. 1st Dist., 1984),

explained that given the anachronistic purpose of the *qui tam* statutes, it would be inappropriate

to enforce them in any way that would extend their reach beyond the scope originally intended:

> [I]t is significant that no authority is cited to us from anywhere in
> this jurisdiction or elsewhere which would permit a third person,
> wholly a stranger to the transaction, to recover for his own use,
> [an] unknown (but presumably substantial) amount of money lost
> by unnamed and unknowable persons in unspecified games of
> chance . . . .
>
> Similarly, it is not possible to ignore the ancient and arguably
> anachronistic nature of *qui tam* actions of the instant sort, born in a
> vanished era where the absence of an organized police authority to
> enforce criminal statutes made necessary the use of such rewards
> for informers . . . While it is not within the authority of the
> judiciary to abolish legislative enactments, however obsolete they
> may arguably appear to be, we certainly are authorized to decline
> any construction which would extend and enlarge the thrust and

8

scope of the legislation in question.

The <u>Salomon</u> court's reasoning is squarely applicable to this case. This Court will not extend the *qui tam* statutes to cover fantasy sports league entry fees unless that coverage is warranted by the explicit language of each statute and is supported by specific allegations of Plaintiff.

A review of Plaintiff's Complaint indicates that his allegations are tailored exclusively to New Jersey's gambling loss-recovery statute. As the Complaint asserts, New Jersey law allows a loser – or a *qui tam* plaintiff – to recover from a "winner, depositary or stakeholder" money lost by a "wager[], bet[], or stake[]. <u>N.J.S.A.</u> 2A:40-6). Plaintiff does not address the elements of a cause of action under any state's law other than New Jersey's.

<u>Does Plaintiff Allege the Specific Facts Necessary to Pursue a *Qui Tam* Claim?</u>

Plaintiff must come forth with facts to support his claim that there exists a specific loss that he is entitled to recover under New Jersey's *qui tam* statute. In 1898, the New Jersey Supreme Court held that a plaintiff proceeding under the gambling loss-recovery *qui tam* statute is legally bound" to show with "clearness and certainty" that his case is "within the statute." <u>Fitzgerald v. Schlos</u>, Vroom 472, 474, 41 A. 677 (N.J. 1898). In that case, the *qui tam* plaintiff identified a specific individual who lost money to the defendant on a specific race. <u>Id.</u> Nonetheless, the Court upheld a dismissal of the complaint because – although the plaintiff had alleged that the individual had "lost" money on a race to the defendant – the plaintiff had not specifically alleged that the money was a bet or wager on the race and that the defendant was the winner. <u>Id.</u>

Here, the Complaint is far less detailed than the pleading dismissed in <u>Fitzgerald</u>.

Plaintiff does not identify any individual who paid an entry fee to play one of the Defendants' fantasy sports games; he does not identify the nature of the "wager" or "bet" made between such an individual and either of the Defendants; he does not allege when the loss occurred; and, as in Fitzgerald, he does not allege that such an individual lost such a "wager" or "bet" to either of the Defendants.

Plaintiff fails to identify even one individual who participated in even one of the subject leagues, much less one who allegedly lost money to Defendants in those leagues, and concedes that he has done neither himself.  (Compl. ¶¶ 9, 71).  In short, Plaintiff asks this Court to indulge a gambling *qui tam* suit seeking a "recover[y] for his own use, unknown amount of money lost by unnamed and unknowable persons."  Salamon, 475 N.E.2d at 1298.

New Jersey's adoption of more modern notice pleading rules has not changed the strict requirement that a plaintiff seeking to pursue a claim under the gambling loss-recovery statute "must, in his pleading, allege all the facts necessary to bring him within the statute."  Zabady v. Frame, 22 N.J. Super. 68, 70 (App. Div. 1952).  As the Zabady court noted in requiring that every "essential element" of the gambling loss recovery statute must be pleaded:

> the substantive law has not been changed by the adoption of our new rules but, on the contrary, it has been preserved, and our procedure has been made to serve the ends of substantial justice, not by abandoning stating the essentials of a cause of action or defense, but by doing so in simple, concise and direct terms.

Id, 22 N.J. Super. at 71.

Here, the Complaint lacks the most basic factual allegations necessary to support Plaintiff's claim.  Plaintiff has neither alleged all of the elements of a claim under New Jersey's *qui tam* statute nor alleged a "factual predicate concrete enough to warrant further proceedings,"

10

DM Research, 170 F.3d at 55-56, much less the type of factual predicate required by courts strictly and narrowly construing the *qui tam* statutes.  Plaintiff fails to allege the purported amount of alleged "losses," or when those alleged losses were purportedly sustained.

In addition to failing to plead the identity of the loser(s), the amount of each loser's loss, when the loss occurred, the nature of the "wager" or "bet" made between a "loser" and either of the Defendants, Plaintiff does not allege, as he must under the statute, that (1) a "loser" failed to bring suit within six months of losing the bet; and (2) his own suit is brought within six months of the expiration of that "loser's" time to sue.  New Jersey courts have held that the six-month time limitation provided for in New Jersey's gambling loss-recovery statute is an affirmative element of the claim that must be pleaded.  Zabady, 22 N.J. Super. at 70 (requirement that loser sue within six months "is a condition attached to the right to sue," rather than a limitation on recovery, and "[a] complaint does not state a cause of action if it fails to contain an allegation showing compliance with this essential element"); Shack v. Dickenshorst, 14 Gummere 120, 122, 122 A. 436, 436 (N.J. Court of Errors and Appeals, 1923).  Failure to plead compliance with these time limits mandates dismissal of the Complaint.  *See* Zabady, 22 N.J. Super. at 70 (dismissing complaint for failure to plead compliance with time limits); Shack, 14 Gummere at 122.

Given the absence of the necessary factual allegations showing a recoverable loss under New Jersey's *qui tam* statute, this Court grants Defendants' motions to dismiss and finds no substantial difference between New Jersey's *qui tam* statute and those of the other jurisdictions under which Plaintiff brought his Complaint.

<u>Is Payment of an Entry Fee to Participate in Fantasy Sports Leagues Gambling?</u>

Defendants argue that Plaintiff fails to state a claim under New Jersey's *qui tam* statute because, as a matter of law, the payment of an entry fee to participate in a fantasy sports league is not wagering, betting or staking money.  New Jersey allows recovery only of "wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event."  *See* <u>N.J.S.A.</u> 2A:40-1.  Although Plaintiff uses the words "wager" and "bet" to describe the entry fees for ESPN's fantasy sports games (*e.g.* Cmplt. ¶¶ 4, 19), those allegations are legal conclusions, and "a court need not credit a complaint's . . . legal conclusions when deciding a motion to dismiss."  *See* <u>Morse v. Lower Merion Sch. Dist.,</u> 132 F.3d 902, 906 (3d Cir. 1997).

As Plaintiff alleges, Defendants' fantasy sports league participants pay a set fee for each team they enter in a fantasy sports league.  This entry fee is paid at the beginning of a fantasy sports season and allows the participant to receive related support services and to compete against other teams in a league throughout the season.  As Plaintiff further alleges, Defendants offer set prizes for each league winner and for the overall winners each season.  These prizes are guaranteed to be awarded at the end of the season, and the amount of the prize does not depend on the number of entrants.  Moreover, Defendants are neutral parties in the fantasy sports games – they do not compete for the prizes and are indifferent as to who wins the prizes.  Defendants simply administer and provide internet-based information and related support services for the games.  Plaintiff does not allege otherwise.

New Jersey courts have not addressed the three-factor scenario of (1) an entry fee paid unconditionally, (2) prizes guaranteed to be awarded and (3) prizes for which the game operator

is not competing.  Courts throughout the country, however,  have long recognized that it would

be "patently absurd" to hold that "the combination of an entry fee and a prize equals gambling,"

because if that were the case, countless contests engaged in every day would be unlawful

gambling, including "golf tournaments, bridge tournaments, local and state rodeos or fair

contests, . . . literary or essay competitions, . . . livestock, poultry and produce exhibitions, track

meets, spelling bees, beauty contests and the like," and contest participants and sponsors could

all be subject to criminal liability.  <u>State v. Am. Holiday Ass'n, Inc.</u>, 151 Ariz. 312, 727 P.2d

807, 809, 812 (Ariz. 1986) (*en banc*).

       Courts have distinguished between *bona fide* entry fees and bets or wagers, holding that

entry fees do not constitute bets or wagers where they are paid unconditionally for the privilege

of participating in a contest, and the prize is for an amount certain that is guaranteed to be won by

one of the contestants (but not the entity offering the prize).  Courts that have examined this issue

have reasoned that when the entry fees and prizes are unconditional and guaranteed, the element

of risk necessary to constitute betting or wagering is missing:

> A prize or premium differs from a wager in that in the former, the
> person offering the same has no chance of his gaining back the
> thing offered, but, if he abides by his offer, he must lose; whereas
> in the latter, each party interested therein has a chance of gain and
> takes a risk of loss . . .
>
> The fact that each contestant is required to pay an entrance fee
> where the entrance fee does not specifically make up the purse or
> premium contested for does not convert the contest into a wager.

<u>Las Vegas Hacienda, Inc. v. Gibson</u>, 77 Nev. 25, 359 P.2d 85, 86-87 (Nev. 1961).  *See also* <u>Am.</u>

<u>Holiday Ass'n</u>, 727 P.2d at 810 ("[A] bet is a situation in which the money or prize belongs to

the persons posting it, each of whom has a chance to win it.  Prize money, on the other hand, is

found where the money or other prize belongs to the person offering it, who has no chance to win it and who is unconditionally obligated to pay it to the successful contestant."). Therefore, where the entry fees are unconditional and the prizes are guaranteed, "reasonable entrance fees charged by the sponsor of a contest to participants competing for prizes are not bets or wagers." <u>Am. Holiday Ass'n</u>, 727 P.2d at 811.

Plaintiff incorrectly argues that the case law cited by Defendants is inapplicable because it applies only to games of skill. To the contrary, none of the decisions cited by Defendants turn on whether the activity in question is a game of skill or chance. Indeed, courts have made clear that the question whether the money awarded is a *bona fide* prize (as opposed to a bet or wager) can be determined without deciding whether the outcome of the game is determined by skill or chance. *See* <u>Las Vegas Hacienda</u>, 359 P.2d at 87. ("Whereas we have concluded that the contract does not involve a gaming transaction [because there is no bet or wager], consideration of . . . [whether] the shooting of a "hole-in-one" was a feat of skill . . . becomes unnecessary.").

Plaintiff's argument that the distinction between "bets" and "entry fees" is meaningless in the context of a lottery is similarly unavailing. In his brief in opposition to Defendants' motions to dismiss, Plaintiff states that "Defendants operate[] an enterprise that has all of the necessary elements of gambling: 'prize, chance and consideration.'" In the very next line, Plaintiff states that those three elements are essential of a lottery, however a separate statutory scheme governs lotteries.

That betting/wagering is a subset of gambling activity, different from lotteries, is made clear by the fact that a separate statute – <u>N.J.S.A.</u> 2A:40-8 – provides for a *qui tam* action to penalize the operators of lotteries. This distinction between gaming and lotteries has been a part

of New Jersey's statutory scheme since the first gambling loss recovery statutes were passed in 1797. *See* Act to Prevent Gaming, February 8, 1797, ¶¶ 4-5, *at* New Jersey Session Laws, Legislature 21, 149-151 (providing for *qui tam* action to recover money lost "by playing at cards . . . or other games, or by betting . . . at cock-fighting, or other sport or pastime"); An Act for Suppressing of Lotteries, February 13, 1797, ¶ 2, *at* New Jersey Session Laws, Legislature 21, 166-167 (providing for *qui tam* action to recover a penalty from any person who operates a lottery).

Plaintiff seeks relief under the betting and wagering statute, N.J.S.A. 2A:40-6, not the lottery statute, N.J.S.A. 2A:40-8. Accordingly, the lottery case law Plaintiff cites is irrelevant. For example, Plaintiff's primary argument in opposition to this motion to dismiss is that he has alleged that Defendants' fantasy sports leagues involve "gambling" as described in Lucky Calendar Co. v. Cohen, 117 A.2d 487, 488 (N.J. 1955), a case that dealt solely with New Jersey's now-repealed Lottery Act, N.J.S.A. 2A:121-6. The issue in that case was whether a certain promotional advertising scheme constituted a "lottery" for purposes of the Lottery Act. Lucky Calendar Co., 117 A.2d at 493-94. The mantra Plaintiff repeats in his Complaint and opposition brief – "prize, chance and consideration" -- is the Lucky Calendar court's definition of a lottery. Id. This case does not concern a lottery. Consequently, Lucky Calendar is simply irrelevant. Because the "prize, chance, consideration" test is irrelevant here, Plaintiff's argument that fantasy sports leagues are games of chance is without effect. Although Defendants deny that fantasy sports leagues are games of chance, this Court need not reach this issue in deciding Defendants' motions.

As a matter of law, the entry fees for Defendants' fantasy sports leagues are not "bets" or

"wagers" because (1) the entry fees are paid unconditionally; (2) the prizes offered to fantasy sports contestants are for amounts certain and are guaranteed to be awarded; and (3) Defendants do not compete for the prizes.

<u>Are Defendants "Winners" under the <em>Qui Tam Statutes</em>?</u>

Defendants cannot be considered "winners" as a matter of law.  In his opposition brief, Plaintiff asserts that Defendants are winners because they "receive and keep, and thus win, the pay-to-play net consideration that must be paid by the players in order to be allowed to enter theses (sic) fantasy sports games of chance."  Plaintiff, however, provides no legal support whatsoever for this assertion.

This Court need not accept as true Plaintiff's unsupportable assertion that Defendants are "winners" under the <em>qui tam</em> statutes.  <em>See</em> <u>Doug Greate, Inc. v. Greay Bay Casino Corp.</u>, 232 F.3d 173, 1843 (3d Cir. 2000).  Defendants plainly are not "winners" as a matter of law, but merely parties to an enforceable contract.  Defendants provide substantial consideration, in the form of administration of the leagues and the provision of extensive statistical and analytical services, in exchange for the entry fees paid for participation in the fantasy leagues.  At no time do Defendants participate in any bet.  Absent such participation, Defendants cannot be "winners" as a matter of law.  <u>Las Vegas Hacienda</u>, 359 P.2d at 86 (offering prize to winner of athletic or similar competition does not give rise to a wagering contract if the offeror does not participate in the competition and has no chance of gaining back the prize offered).  To suggest that one can be a winner without risking the possibility of being a loser defies logic and finds no support in the law.

Furthermore, Defendants are not "winners" under the plain terms of the <em>qui tam</em> statutes.

16

The statutes make clear that the "winner" must be a participant in the card, dice or other game at issue.  For example, the D.C., Massachusetts, and South Carolina statutes define a "winner" as one who wins by playing at cards, dice or any other game, or by betting on the sides or hands of person[s] who play."  D.C. Code § 16-1702; Mass. Gen. Laws ch. 137, § 1; S.C. Code § 32-1-10. In Kentucky, only the "winner" of money from a gambling loser is liable under the statute.  Tyler v. Goodman, 240 S.W.2d 582, 584 (Ky. Ct. App. 1951).  The New Jersey statute likewise makes clear that a "winner" is one who actually "wagers, bets or stakes" upon a race, game or other unknown or contingent event.  N.J. Rev. Stat. §§ 2A:40-1, 2A:40-6.

Finally, Plaintiff's allegations in the Complaint confirm that Defendants do not compete against fantasy sports participants in any way, and do not "win" anything from them.  Defendants provide extensive services to the participants throughout the course of the relevant sports season. (Compl. ¶¶ 45-48, Friedman Decl. Ex. R at ¶ 2).  At the end of the season, Defendants award prizes, in pre-determined amounts fixed by contract, to the team managers who have accrued the most "fantasy points" or victories.  At no point do the participant-owners of any team pay anything to Defendants that is in any way dependent on the outcome of any league.  Nor do participants ever "risk" losing their entry fee – they irrevocably part with that fee shortly after they enter a league, and receive in exchange substantial services from Defendants over the course of an extended sports season.

Accordingly, because Defendants do not "play" in the fantasy leagues, bet on the side of any of the participants or have any financial interest whatsoever in the outcome of any league, Defendants cannot be "winners" subject to liability under the gambling *qui tam* statutes as a matter of law.

<u>Do Fantasy League Participants Sustain the "Loss" Necessary to Bring a Claim?</u>

A *qui tam* plaintiff like Humphrey has no right to recovery unless a participant in gambling activity wins money from one who loses money in that activity.  In addition to the fact that fantasy leagues are not gambling and that defendants do not win anything, participants suffer no "loss" in participating in the fantasy leagues.  *See* D.C. Code § 16-1702; Ga. Code Ann. § 13-8-3; 720 Ill. Comp. Stat. 5/28-8; Ky. Rev. Stat. Ann. § 372.020; Mass. Gen. Laws ch. 137, § 1; Ohio Rev. Code Ann. § 3763.02; N.J. Rev. Stat. § 2A:40-5; S.C. Code Ann. § 32-1-20.

No fantasy league participant suffered any such "loss."  To the contrary, participants pay Defendants a one-time, non-refundable entry fee to participate in the leagues, and receive in consideration for that fee the benefit of Defendants' extensive administrative, statistical and analytical services throughout the relevant sports season.  Only at the end of the sports season are prizes awarded, in amounts fixed by the contracts that govern participation in the leagues.  Accordingly, in paying for the right to participate in the leagues and receive Defendants' services, participants simply do not "lose" anything, and certainly suffer no cognizable "gambling" loss.  Whether or not a participant is a successful league manager, their entry fee never hangs in the balance in any way in connection with their participation in the league.  (Compl. ¶¶ 15, 22; Friedman Decl. Ex. O at 3; http://sprtingnews.com/contract/canellation.html (Sept. 28, 2006)).  Indeed, once participants have selected their team and begin their season, the fee cannot be recovered.  There is no "loss" on these facts, and this exchange of consideration is an "ordinary contract," in which "both parties may ultimately gain by entering into the agreement."  <u>Martin v. Citizens' Bank of Marshallville</u>, 171 S.E. 711, 713 (Ga. 1933).

Because those who participate in Defendants' fantasy sports leagues do not suffer the

required "loss" under any of the *qui tam* statutes pursuant to which Plaintiff brings his

Complaint, Plaintiff cannot recover as a matter of law.

**Federal Law Confirms that the Complaint Should be Dismissed.**

The Unlawful Internet Gambling Enforcement Act of 2006 broadly prohibits Internet

gambling and related transactions. *See* 31 U.S.C. § 5361 *et seq.* That law confirms that fantasy

sports leagues such as those operated by Defendants do not constitute gambling as a matter of

law. *See* 31 U.S.C. § 5362(1)(E)(ix). Under the law, an illegal "bet" or "wager" specifically

does not include "participation in any fantasy or simulation sports game where, as here:

> **(I)** All prizes and awards offered to winning participants are
> established and made known to the participants in advance
> of the game or contest and their value is not determined by
> the number of participants or the amount of any fees paid
> by those participants.
>
> **(II)** All winning outcomes reflect the relative knowledge and
> skill of the participants and are determined predominately
> by accumulated statistical results of the performance of
> individuals (athletes in the case of sports events) in
> multiple real-world sporting or other events.
>
> **(III)** No winning outcome is based –
> (aa) on the score, point-spread, or any performance or
> performances of any single real-world team or a
> combination of such teams; or
> (bb) solely on any single performance of an individual
> athlete in any single real-word sporting or other event.

Id. Federal law thus confirms that Plaintiff's case must be dismissed. This Court will not

deviate from this analysis, nor should it extend the coverage of a 200-year old statute to an

activity far removed from the traditional gaming it was never intended to cover. *See* Salomon, 16

Ohio App. 3d at 336, 475 N.E.2d at 1293 (court should "decline any construction which would

extend and enlarge the thrust and scope" of the *qui tam* statute).

CONCLUSION

For the reasons stated, it is the finding of this Court that defendants' motions to dismiss

Plaintiff's Complaint are **granted**.  An appropriate Order accompanies this Opinion.


  S/ Dennis M. Cavanaugh
Hon. Dennis M. Cavanaugh, U.S.D.J.


Date:   June   19   , 2007

20